**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **K.C., et al**<br>*Plaintiffs,* | §<br>§<br>§ | Civil Action No. 1:08-cv-456 |
| v. | §<br>§<br>§ | |
| **RICHARD NEDELKOFF,et al**<br>*Defendants.* | §<br>§ | |

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION**

# EXHIBIT A

# AFFIDAVIT OF THOMAS ADAMSKI

STATE OF TEXAS §
§
COUNTY OF BROWN §

On this day, Thomas Adamski, the affiant, appeared in person before me, a notary public who knows him to be the person whose signature appears below. The affiant stated under oath:

1. My name is Thomas Adamski, I am over 18 years of age, and I am competent in every way to make this affidavit. All statements contained herein are true and correct, and are based on my personal knowledge.

2. I am the Superintendent of the Ron Jackson State Juvenile Correctional Complex in Brownwood, Texas. The Ron Jackson facility is an all-female juvenile correctional facility operated by the Texas Youth Commission ("TYC"). I am making this affidavit to provide a general overview of two policy areas: Security and searches. I am familiar with these policies, including their implementation and enforcement.

3. Following a legislative change in 2007, youth who have committed misdemeanors are placed under community supervision and are not committed to TYC. Under the Family code, only youth convicted of felonies may be committed to TYC. Many youth in our facility have committed serious felonies including aggravated assault, aggravated robbery, or murder. The Ron Jackson facility houses approximately 150 female juvenile offenders who have been convicted of felonies.

4. The main campus consists of seven dormitories where youth reside, have classes, group meetings, and meetings with case workers. Additionally, there is an academic building, a gymnasium/auditorium, cafeteria, vocational building, a chapel, and a building called Security.

5. The Security building consists of approximately 29 single occupancy cells, a central control station, 3 dayrooms, shower facilities, administrative offices, and a room for hearings.

6. A youth may be referred to Security intake by staff or at the youth's own request.

7. Youth self-refer to Security for a variety of reasons including wanting temporary separation from another youth in her dorm, needing "quiet time" to deal with a family matter, or to see a friend who has been admitted into Security. If the youth requests to go to Security, staff will counsel the youth about alternatives. If the youth declines alternatives, staff will allow the youth to self-refer to Security unless self-referrals have been suspended by the superintendent. The superintendent or assistant superintendent may place moratoriums on self-referrals when appropriate.

8. Youth are referred by staff to Security for their behavior or conduct, including attempted escape, assault of another youth or staff, threats of assault or self-harm, or other destructive

or harmful behavior. When youth engage in behavior that meets the criteria for referral to security intake, staff will contact the appropriate security staff and request transportation of the youth to security.

9. A youth may be held in security intake on referral for up to one hour. The superintendent or designee may extend the one hour time limit up to one additional hour, if requested and necessary, in order to make a proper decision on whether to admit the youth or return her to general population. If a youth is referred to security intake for danger of injury to self, security staff shall immediately contact a mental health professional and a trained designated staff who must initiate a suicide risk screening. This affidavit does not discuss all the policies concerning suicide alerts and behaviors.

10. Within one hour (or two hours if an extension has been granted) of the youth's arrival at security intake, designated staff shall determine whether criteria for admission have been met. If the mental health status of the youth is not appropriate for admission, she will not be admitted. The Security Duty Officer will determine whether the youth should be admitted and will take into account any written statements by staff, as well as the youth's statement regarding the incident. If the referral is for self injurious behavior, the Security Duty Officer must admit the youth until mental health screens are conducted pursuant to agency policy.

11. A youth may remain in security intake for up to 24 hours. Security intake is a temporary status which allows the youth to cool down and regain composure, as well as providing time for staff to determine whether further disciplinary measures or interventions are necessary.

12. Within 24 hours of admission to the security intake, a youth will be released to general population or one of the following programs: the security program, Institution Detention Program, or protective custody. Protective custody is appropriate for youth with self-injurious behaviors. Before being admitted into the security program, a hearing is held where the youth and her advocate are present. Youth are held in the security program for 24 hours at a time, unless released early by the Director of Security or other authorized, designated staff. Youth are not held longer than 24 hours without additional cause to hold the youth and an additional hearing.

13. In some situations, a youth's behavior poses such a serious threat that a more restrictive program may be necessary. In these situations, a youth will be admitted into the Institution Detention Program. The youth remains in Security temporarily, but typically between 5 and 10 days. This time allows a Multi-Disciplinary Team consisting of mental health staff, education staff, case managers, medical staff, and daily living specialists to assess a youth's situation and determine the best treatment solution. A hearing is held to determine whether the youth should return to general population or enter Re-Direct. The youth and the youth's advocate attend the hearing, and the youth has a right to appeal a decision to enter Re-Direct.

14. Youth are only admitted into the security program for serious behavior problems and would only have an extended stay in Security if those behavioral problems continued. Security is

not an alternative housing for youth; it is a temporary measure designed to be a last resort when all when other methods of resolution have been exhausted. Staff should take all necessary steps to reintegrate youth back into dorm life, including contacting the youth's family members and case managers.

15. The Re-Direct program is typically reserved for youth who, while living at the facility, have committed assaults, sexual assaults, escape, or riots. The Re-Direct program, also in the Security building, is separate and distinct from the security program. The Re-Direct program is separate and distinct from the security program, although the Re-Direct program also exists in the Security building. Youth are admitted into Re-Direct only after less restrictive means have been attempted and after a determination by the assessment team and mental health professionals that placement is appropriate.

16. Once admitted into Re-direct, an assessment team meets within 3 days to develop an individualized treatment plan for the youth that is specific to the incident or incidents which resulted in the youth's placement in the program, as well as the individual youth's needs and circumstances. This assessment is done with the help of the youth's case manager, medical staff, and mental health staff.

17. Unlike the security program, which is short-term, Re-Direct is more long term and designed to help offenders with serious behavioral problems reintegrate into the general population. The goal of the Re-Direct program is to modify behavior and work towards reintegration back into dorm life. At stage 1 each youth remains in the Security building but is involved in exercise, education, counseling, and therapy outside of her room. At stage 2 the youth will begin reintegration. Education and some counseling takes place in the dormitories with the other youth, while the remaining activities (including sleep) take place in the Security building. At stage 3, all activities take place on the dorms or other areas of campus with the other students, and the youth returns to the Security building only to sleep.

18. Regarding searches, youth are pat-searched when they return from a work assignment, return from visitation, or are referred to security. These searches take place in the Security building. In addition, some circumstances may require additional pat searches when not in Security. Unfortunately, searches are necessary and routine in a correctional setting. It is not uncommon for youth to acquire contraband from family members or work assignments. This poses a serious threat to security and safety because youth can injure themselves or others. Pat searches are done in lieu of strip searches so that youth may remain clothed. Pat searches are conducted with two staff members present, with the actual pat down performed by female staff. The youth is required to take off her socks, shoes, and bra. The youth removes her bra either without taking off her shirt, if possible, or otherwise, behind a closed door for privacy. Other guidelines are in place to help ensure the speed and dignity of the process.

19. Strip searches may only be performed under certain circumstances and only after appropriate permission is received from the superintendent, assistant superintendent, or the

administrative duty officer. An example of a circumstance requiring strip search would be a youth who is on Suicide Alert (SA) who has been reported to have contraband, staff members are aware that the youth possesses contraband, but the pat search reveals no contraband. A strip search would be performed for the safety of the youth and only after other methods were unsuccessful. Youth on this facility have used easily concealed, everyday objects such as pens, paper clips, and hair barrettes to cause serious harm to themselves or others.

FURTHER AFFIANT SAYETH NOT.

Thomas Adamski

THOMAS ADAMSKI

Subscribed and sworn to before me on this 19TH day of December, 2008.

Notary Public in and for
The State of Texas

KIM KING
Notary Public
STATE OF TEXAS
Commission Exp. 10-02-2011
Notary without Bond