# EXHIBIT A

Transforming Juvenile Justice in Texas

# A FRAMEWORK FOR ACTION




Blue Ribbon Task Force Report

*David W. Springer, Ph.D., Chair*

September 2007

## TABLE OF CONTENTS


List of Task Force Members......iv

Acknowledgements......vi

One-Page Executive Summary......1

Executive Summary......2

Shifting Demographics of Texas......4

Stopping the Juvenile-to-Adult-Pipeline......5

Research-Based Recommendations......7

Before Incarceration......8

What is the Problem?......8

Recommendations......9

Prevention/Diversion......9

Detention......13

Sentencing and Probation Reform......16

During Incarceration......21

What is the Problem?......21

Recommendations......22

Funding and Governance......22

Accountability......23

Centers/Facilities/Services......24

Security......48

Cost Effectiveness......49

Management......50

After Incarceration......51

What is the Problem?......51

Recommendations......52

Conclusion: A New Reform Movement......57

References......58

## List of Tables

Table 1: Guiding Principles for Transforming the Juvenile Justice System in Texas....... ... 3

Table 2: Fundamental Elements of Effective Regionalization..................................29

Table 3: Gender-Specific Recommendations for Female Juvenile Offenders................ .34

Table 4: Treatments Organized by Effect Size and Treatment Outcome for Dually Diagnosed Adolescents..............................................................................38

Table 5: Ten Preliminary Treatment Guidelines for Dually Diagnosed Adolescents .........39

Table 6: Differentiating Risk Factors Linked and Unlinked to Sexual Offending............41

Table 7: Model Transition Process for Youth Completing Placement in TYC.................53

## List of Figures

Figure 1: Multi-Stage Model of Progression through the Texas Juvenile Justice System.......4

Figure 2: Cycle of Violence.....................................................................5

Figure 3: Screening and Assessment Emergent Risk Model....................................25

Figure 4: Stages of Developing and Maintaining Change with Individuals, Families, Organizations & Communities in an Ecological Context (IFOCEC) Model...................56

## List of Exhibits

Exhibit 1: Crime Rates and Youth Incarceration in Texas and California Compared: Public Safety or Public Waste?.....................................................................6

Exhibit 2: Brief Overview of Restorative Justice ............................................13

Exhibit 3: Interpreting Exhibit 4 - Reducing Crime with Evidence-Based Options: What Works, and Benefits & Costs...............................................................16

Exhbit 4: Reducing Crime with Evidence-Based Options: What Works, Benefits & Costs...18

Exhibit 5: Brief Overview of the Missouri Division of Youth Services (DYS)................28

Exhibit 6: Evidence-Based Practices for Treating Substance Use Disorders...................42

Exhibit 7: Stages of Developing and Maintaining Change with Individuals, Families, Organizations, & Communities in an Ecological Context (IFOCEC) Model.................55

## Appendix

List of All Recommenations Across the Before, During, and After Sections of Report......66

# *Transforming Juvenile Justice in Texas: A Framework for Action*

## List of Task Force Members

**Chair**

**Dr. David W. Springer**
Associate Dean for Academic Affairs
University Distinguished Teaching Professor
The University of Texas at Austin
School of Social Work
Austin, TX

**Members (Listed Alphabetically)**

**Mr. Steve Aos**
Associate Director
Washington State Institute for Public Policy
Olympia, WA

**Dr. Yitzhak Bakal**
President
North American Family Institute
Danvers, MA

**Dr. Kevin Corcoran**
Professor
Portland State University
School of Social Work
Portland, OR

**Dr. Phillipe B. Cunningham**
Associate Professor
Medical University of South Carolina
Department of Psychiatry and Behavioral Sciences
Family Services Research Center
Charleston, SC

**Professor Michele Deitch**
Adjunct Professor
The University of Texas at Austin
LBJ School of Public Affairs
Austin, TX

**Mr. James A. Gondles, Jr.**
Executive Director
American Correctional Association
Alexandria, VA

**Ms. Ellen Halbert**
Director, Victim Witness Division
District Attorney, Travis County
Austin, TX

**Dr. Regina Hicks**
Project Director
Technical Assistance Partnership
Corporate Headquarters
Washington, DC

**Dr. Barry Krisberg**
President
National Council on Crime and Delinquency
Oakland, CA

**Dr. Michael Lauderdale**
Clara Pope Willoughby Centennial Professor
in Criminal Justice
The University of Texas at Austin
School of Social Work
Austin, TX

**Dr. Peter E. Leone**
Professor and Director
The National Center on Education, Disability, & Juvenile Justice
Department of Special Education
University of Maryland
College Park, MD

**Mr. Bart Lubow**
Director of Programs for High Risk Youth
Anne E. Casey Foundation
Baltimore, MD

**Dr. Pablo Martinez**
Assistant Professor
Texas State University
Department of Criminal Justice
San Marcos, TX

**Dr. C. Aaron McNeece**
Dean and Walter W. Hudson Professor of Social Work
Florida State University
College of Social Work
Tallahassee, FL

**Mr. Adrian Moore**
Executive Director
Council on At-Risk Youth (CARY)
Austin, TX

**Dr. Forrest Novy**
Adjunct Faculty
The University of Texas at Austin
School of Social Work
Assistant Deputy Executive Director of
Education, Treatment, and Workforce Development
Texas Youth Commission
Austin, TX

**Dr. Jacqueline Page**
Associate Professor
Department of Psychiatry
University of Tennessee Science Center
Memphis, TN

**Dr. Eduardo J. Sanchez**
Director, Institute for Health Policy
The University of Texas
Health Science Center at Houston
School of Public Health
Austin, TX

**Dr. Juan Sanchez**
El Presidente, CEO
Southwest Key Programs
Austin, TX

**Dr. Paul E. Tracy**
Professor, Criminology, Public Policy,
and Political Economy
Editor, Crime and Delinquency
School of Economic, Political,
and Policy Sciences
The University of Texas at Dallas
Dallas, TX

**Doctoral Student Research Support**

**Kimberly Bender**
Doctoral Student
The University of Texas at Austin
School of Social Work
Austin, TX

**Stephen J. Tripodi**
Doctoral Student
The University of Texas at Austin
School of Social Work
Austin, TX

## ACKNOWLEDGMENTS

First, I would like to acknowledge the members of the Blue Ribbon Task Force, who on very short notice rearranged their schedules so that they could participate in a two-day summit in May of 2007 that led to the generation of this report. Each member of the Task Force brought a unique set of strengths and perspectives, and the recommendations set forth in this report are a result of their collective effort. I would like to thank the professionals at the Texas Youth Commission (TYC) – Stan DeGerolami, Deidre Hernandez, Jay Kimbrough, Tracy Levins, Forrest Novy, Ed Owens, Dimitria Pope, and Tim Savoy - for their support of the Task Force. I am grateful to Governor Perry's office and to the members of the Joint House and Senate Committee on the Operation and Management of the Texas Youth Commission, particularly to co-chairs Representative Jerry Madden and Senator John Whitmire, for their ongoing interest in and support of the work of the Task Force. The two-day summit would not have been possible without the support of my Dean, Barbara White, and colleagues at The University of Texas at Austin School of Social Work, especially the incredible efforts of Robert Canon, Jennifer Luna-Idunate, John Trapp, and Diana Villarreal. I am indebted to my administrative associate, Hollee Ganner, who dropped everything to help me plan and coordinate every last detail of the summit. Kathleen Casey, Igor Gorlach, Nalini Negi, Katherine Sanchez, and Jillian Webb did an exceptional job of serving as recorders during the summit. Doctoral students Kimberly Bender and Stephen Tripodi deserve special recognition as they were with me from beginning to end - planning the summit, conducting background research, serving as recorders, and helping to prepare this report. Finally, I would like to extend a special thank you to those individuals who selflessly shared their guidance and expertise: Marilyn Armour, Dottie Carmichael, Susan Craven, Tommy Darwin, Sherri Hammack, Mark Lipsey, Albert Roberts, and Jim Schwab.

David W. Springer, Ph.D.
Austin, TX

## ONE-PAGE EXECUTIVE SUMMARY

The work of this Blue Ribbon Task Force was driven by two questions: (1) If we could re-design health care, education, treatment and case management at Texas Youth Commission (TYC) correctional facilities, what would it look like? (2) If we could re-design the juvenile justice system in Texas, what would it look like? The members of the Task Force view the care of youth as a continuum-of-care to include before, during, and after confinement. Accordingly, this report is structured into three major sections: Before, During, and After.

The Before section focuses on primary crime prevention/diversion, detention, and sentencing reform. We emphasize keeping youth in the community. Several juvenile justice programs are explored that serve as alternatives to incarceration, decrease recidivism rates, and save money for taxpayers, with the savings generated by these programs ranging from $4,622 to $77,798 per participant. The cost effectiveness of these programs illustrates that there are programs for juvenile offenders that produce long-term economic benefits. Considering that approximately three-quarter of adult offenders have previously been in the juvenile justice system, this finding demonstrates the attractiveness of community-based juvenile justice prevention and intervention programs as a means to reduce crime, which ultimately affects the need for prison construction and the ability to save Texas taxpayers' money.

The During section addresses the health care, education, treatment, and case management of adjudicated juvenile delinquents in TYC facilities. The recommendations enumerated in this section of the report are driven by a response to two overarching questions. First, "how do we keep our communities safe?", and second, "what would one expect (or accept) for his or her own child?" There are ten guiding principles that cut across the recommendations in this section: (1) The environment within the TYC should be safe, health-promoting, and facilitate the appropriate educational and moral development of youth; (2) Youth should spend the least amount of time possible in the TYC system; (3) The TYC environment should be as least restrictive as possible (4) Staffing capacity should be commensurate with the size and needs of the population; (5) Evidence-based policies and programs should be implemented; (6) TYC should be child-focused, family-centered, and non-violent; (7) Communication must be effective; (8) TYC should be grounded in positive youth development where education and treatment, rather than punishment, is the primary work of the TYC; (9) Youth with disabilities should be identified and accommodated; and (10) Youth and families should have easy access to attorneys and advocacy groups. We assert that these efforts may be more fully realized using a regionalized system of care that supports the use of small facilities, that admits youth to TYC using research-based risk assessment and classification, and that provides specialized treatment for youth and families.

Finally, the After section of the report coalesces around transition planning, reentry, aftercare, and parole. Here, we emphasize a community reentry model of aftercare upon entry to TYC using a Structured Decision Making approach, creating a system of accountability, promoting a strength-based rather than a failure-based model of aftercare, and tailoring aftercare services to match a youth's readiness for change.

Our vision and hope for this report is that it serves as a compass to guide the short-term and long-term transformation of the juvenile justice system in Texas.

# *TRANSFORMING JUVENILE JUSTICE IN TEXAS: A FRAMEWORK FOR ACTION*

## EXECUTIVE SUMMARY

Out of clutter, find simplicity.
From discord, find harmony.
In the middle of difficulty, lies opportunity.
~ Albert Einstein

The Texas Youth Commission (TYC) was created to care for, treat and educate the state's most serious and chronic juvenile offenders. In March of 2007, Rick Perry, Governor of Texas, placed the TYC under conservatorship to guide reform of the agency's correctional and rehabilitative systems following reports of sexual abuse of youth at TYC facilities.

In April of 2007, Ed Owens, then Interim Executive Director of TYC, asked me to form a Blue Ribbon Task Force charged with defining a new TYC rehabilitation system, including identifying evidence-based practices in the treatment and case management of adjudicated juvenile delinquents. With the unequivocal support of TYC administrators, including Mr. Owens, I expanded the scope of the Task Force to look more broadly at reforming the juvenile justice system in Texas.

Accordingly, the work of the Task Force was ultimately driven by two questions:

1. If we could re-design health care, education, treatment and case management at TYC correctional facilities, what would it look like?
2. If we could re-design the juvenile justice system in Texas, what would it look like?

A Blue Ribbon Task Force of national and regional experts was quickly convened. The Task Force met over the course of a two-day summit held on May 21 and 22, 2007, in Austin, Texas. We operated under a Consensus Model[1].

On day one of the two-day summit, the Task Force generated and subsequently operated under a number of agreed-upon guiding principles to form the recommendations in this report. The transformation of the juvenile justice system in Texas should be driven by the guiding principles enumerated below (see Table 1).

Suggested citation for this report: Springer, D. W. and colleagues (2007). *Transforming Juvenile Justice in Texas: A Framework for Action. Blue Ribbon Task Force Report.* Austin, TX: The University of Texas at Austin, School of Social Work.

---

[1] A Consensus Model is realized when each member of the Task Force is involved in making the recommendations in the report, and a recommendation is included in the report when everyone supports it and agrees to implement it given their respective roles. In keeping with a Consensus Model, each member of the Task Force is a co-author of this report. The conclusions and recommendations expressed in this report are those of the authors and do not necessarily represent the official position or policies of the Texas Youth Commission or any other agency of the state or federal government.

| Table 1: Guiding Principles for Transforming the Juvenile Justice System in Texas |
|---|
| **1.** The continuum-of-care for youth has as its primary aims crime reduction and rehabilitation.<br>**2.** Congruent with the Texas Youth Commission (TYC) mission, TYC facilities incarcerate and treat only high-risk, serious, chronic juvenile offenders.<br>**3.** The continuum-of-care aims to minimize the penetration of youth into the juvenile and adult justice systems in order to decrease the flow of the juvenile-to-adult pipeline.<br>**4.** Services aim to decrease the number of youth who are incarcerated and to use the least restrictive and most home-like environment possible to rehabilitate youth.<br>**5.** The system maximizes cost effectiveness and uses taxpayers' money wisely.<br>**6.** The continuum-of-care promotes equal and equitable treatment for all youth.<br>**7.** Structures are in place to ensure that youth feel safe and are safe.<br>**8.** Referral and treatment decisions are formed by risk assessment that is multi-pronged, on-going, and includes practitioners, parental, and self-monitoring so that services are responsive to changing needs of the youth.<br>**9.** Services are flexible and tailored to meet the individual needs of the client system (e.g., strength-based, client-centered, family-focused, gender-sensitive, developmentally-congruent, disability-responsive, and culturally-grounded).<br>**10.** The entire juvenile justice system is set up to be child-centered and family-focused.<br>**11.** Parents and youth have easy access to advocacy organizations and attorneys to ensure that they are informed about their rights, and they have access to advocacy organizations and attorneys.<br>**12.** School-based and integrative community-based youth violence, delinquency and drug abuse prevention programs are prioritized.<br>**13.** The entire juvenile justice system is grounded with a clear focus on education.<br>**14.** A continuum of evidence-based treatment alternatives is implemented as an alternative to incarceration.<br>**15.** A regional management delivery system is implemented that supports the use of small community-based facilities, which allow juveniles to be kept as close as possible to their home communities.<br>**16.** Professional treatment and correctional staff are trained, retained, and supervised across the juvenile justice system through effective executive leadership.<br>**17.** Professional treatment and correctional staff are an appropriately educated workforce who are youth-focused and strength-based in their approach.<br>**18.** The entire juvenile justice system is driven primarily by evidence-based practices and policies.<br>**19.** The entire juvenile justice system is driven by clear measurable standards and grounded in a culture of accountability through the systematic monitoring and evaluation of programs and the treatment of juveniles.<br>**20.** Services aim to produce sustainable and meaningful changes in juveniles over time. |

The members of the Task Force view the care of youth as a continuum-of-care to include before, during, and after confinement. Accordingly, this report is structured into three major sections: Before, During, and After. The Before section focuses on primary crime prevention/diversion, detention, and sentencing reform. The During section addresses the health care, education, treatment, and case management of adjudicated juvenile delinquents in correctional facilities. Finally, the After section coalesces around transition planning, reentry, aftercare, and parole. Our complete listing of recommendations can be found in the Appendix at the end of the report.

**Preventative Care → Confinement Care → After Care**

## SHIFTING DEMOGRAPHICS OF TEXAS

Texas has undergone a shift in population demographics that demographers expect to continue over the next several years. Today, almost half (49%) of the Texas population is Anglo, over one-third (35%) is Hispanic, and nearly 12 percent is African American. By comparison, the current TYC population is 22% Anglo, 44% Hispanic, and 34% African American.

To examine such rates of disproportionality in the Texas juvenile justice system, Dr. Dottie Carmichael and her colleagues at the Texas A&M Institute for Policy Analysis examined differential rates of referral and progression through the juvenile justice system (see Figure 1). Using existing databases from the Texas Education Agency and the Texas Juvenile Probation Commission, virtually every Texas school child enrolled in grades 8 to 12 during the 1999 school year was monitored for juvenile justice involvement over a five-year period.

**Figure 1. Multi-Stage Model of Progression through the Texas Juvenile Justice System**[2]




They found that compared to Anglos, Hispanic juveniles have a significantly higher likelihood of progressing through all four stages of case processing from initial contact through court action (see Figure 1). African American youth have a higher likelihood of progressing through the first two stages, initial contact and prosecutorial referral.

[2] Source: Carmichael, D., Whitten, G., & Voloudakis, M. (2005). *Study of minority over-representation in the Texas juvenile justice system.* Submitted to the Office of the Governor, Criminal Justice Division. Public Policy Research Institute, Texas A&M University.

Dr. Carmichael and her colleagues concluded that efforts should be targeted toward minimizing the number of minority youth in high-risk categories. In other words, resources should be invested in prevention or early intervention programs to reduce involvement of minorities in school delinquency, enhance academic performance, support economically disadvantaged families, and develop effective interventions for juveniles with emotional or learning disabilities.

This critical issue of minority youth being overrepresented in the Texas juvenile justice system will only be amplified in the years to come if we do not change the entry of youth of color into the system. The Texas State Data Center projects that the majority of Texans by 2020 will be Hispanic, and that Hispanics will account for over 50 percent of all Texans by 2040. We must alter the pipeline from the juvenile justice to the adult criminal justice system for all youth, and especially for youth of color, through prevention and early intervention programs.

## STOPPING THE JUVENILE- TO ADULT-PIPELINE: REDUCING CRIME AND SAVING MONEY

Incarcerating juveniles is very expensive, not only because of the costs of housing the youth, but also because of the correlation between juvenile incarceration and future incarceration as an adult. Research on youth sent to state institutions similar to the TYC has shown that youth incarceration predicts future criminal behavior more so than gang affiliation, weapons possession, and family dysfunction. Preventing adolescents from continuing a criminal lifestyle would save the taxpayers of Texas millions of dollars. Each teen prevented from becoming a career criminal (including future adult offenders) could save between 1.7 and 2.3 million dollars *per* youth. The ultimate goal is to stop the cycle of violence that feeds the juvenile- to adult-pipeline in which so many youth and families are trapped (see Figure 2).



**Figure 2.** Cycle of Violence[3]

Knowing that youth who committed crimes are more likely to desist from criminal behavior if they remain in their home communities, the Illinois state legislature created Redeploy Illinois: Building on Success. This program appears to have saved the State of Illinois over $1,000,000 by giving counties financial support to provide comprehensive services to delinquent youth in their home communities who might otherwise be sent to the Illinois Department of Corrections. The Redeploy Amended Legislative Report projects that in the first year of Redeploy Illinois, the state will save $2,123,063 in funds that would have gone to incarcerating the youth, and that $1,411,000 will be spent on locally-based programs. The preliminary results of Redeploy Illinois indicates that along with saving money, when youth are appropriately evaluated, local community services reduce re-arrests and imprisonments, and increase the likelihood that youth will pay restitution, complete community service, and successfully complete probation.

---

[3] Source: Bender, K. (2007). *Interrupting the cycle of violence: Identifying gender-specific pathways from childhood victimization to juvenile delinquency.* The University of Texas at Austin, School of Social Work: Unpublished Dissertation Manuscript.

Several juvenile justice programs that serve as alternatives to incarceration decrease recidivism rates and save money for taxpayers. According to the Washington State Institute for Public Policy (Aos, Miller, & Drake, 2006), there are currently 12 juvenile offender programs that save money for states and taxpayers (benefits minus costs). The savings range from $4,622 per participant to $77,798 per participant. The programs that save more than $10,000 per participant include Multidimensional Treatment Foster Care, Adolescent Diversion Project, Family Integrated Transitions, Functional Family Therapy, Multisystemic Therapy, and Aggression Replacement Training. The cost effectiveness of these programs illustrates that there are programs for juvenile offenders that produce long-term economic benefits. Considering that approximately three-quarter of adult offenders have previously been in the juvenile justice system, this finding demonstrates the attractiveness of juvenile justice programming as a means to reduce crime, which ultimately affects the need for prison construction and the ability to save Texas taxpayers' money.

**Exhibit 1: Crime Rates and Youth Incarceration in Texas and California Compared: Public Safety or Public Waste?**[4]

The Center on Juvenile and Criminal Justice (CJCJ) recently released a report comparing crime rates and youth incarceration in Texas and California. These are the nation's two most populous states, and are home to 22% of America's youth. Over the last two decades, Texas and California have taken diametrically opposite approaches to incarcerating juvenile offenders. From 1995 to 2006, Texas increased the number of youth that were incarcerated under the age of 18 by 48%. This was accomplished through sentencing practices that target non-violent, property, and drug offenders. By contrast, during the same period, California drastically reduced the total number of juveniles incarcerated in youth prisons by 75% by imprisoning only the most violent juvenile offenders. Our colleagues at CJCJ, in their report, examined the following question: Do higher incarceration rates reduce crime?

It is important to note that there are fundamental differences in the ages and types of the juveniles incarcerated in Texas and California. In Texas, 18% of the youth incarcerated in juvenile correctional facilities are younger than 15, compared to four-tenths of 1% in California. In 2006, nearly two-thirds of young offenders imprisoned in California were held for violent offenses, compared to a little more than one-quarter of the youth incarcerated in Texas. This means that on average, Texas imprisons larger numbers of younger offenders for less serious crimes, while California incarcerates older offenders for more serious crimes.

Interestingly, in examining the effects on crime, the trends over the last decade in Texas and California are *identical*. Youth crime rates in both states began a steady and consistent decline beginning in 1995 that continued through 2005. Texas's massive increase in youth incarceration produced no changes in youth crime rates relative to California. By reducing the proportion of non-violent juvenile offenders incarcerated for property and drug offenses, as well as the number of imprisoned youth overall, California experienced larger declines in rape, burglary, robbery, car theft, and arson.

These results suggest that juvenile crime control policies that emphasize incarceration and similar punitive measures need to be reconsidered. The savings achieved through reduced rates of incarceration could be reinvested in a range of community-based interventions.

---

[4] This comparison of crime rates and youth incarceration in Texas and California is excerpted with permission from: Males, M., Stahlkopf, C., & Macallair, D. (2007, June). *Crime rates and youth incarceration in Texas and California compared: Public safety or public waste?* San Francisco, CA: Center on Juvenile and Criminal Justice.

## RESEARCH-BASED RECOMMENDATIONS

This report is a synthesis of opinions and perceptions of a group of people. Nevertheless, to the extent possible, the recommendations provided in this report are grounded in and driven by current research and evidence-based practice. This Task Force recommends implementing evidence-based programs throughout the continuum-of-care. Similar to evidence-based medicine, the goal of evidence-based juvenile justice programs is to improve the juvenile justice system by implementing programs that have been shown to work in reducing crime and rehabilitating youth. Determining whether a practice or policy is evidence-based is based upon outcome performance, rigorous evaluation, and cost-effectiveness analysis.

Dr. Mark Lipsey and Dr. Francis Cullen recently conducted a systematic review (meta-analysis) of hundreds of studies to examine the effectiveness of juvenile and adult correctional rehabilitation. Across the many studies that they reviewed, Lipsey and Cullen (in press) found striking consistency on two key points. "First, every meta-analysis of studies that compare recidivism outcomes for offenders receiving greater versus lesser or no sanctions has found, at best, modest mean recidivism reductions for the greater sanctions and, at worst, increased recidivism for that condition. Second, every meta-analysis of large samples of studies comparing offenders who receive rehabilitation treatment with those who do not has found lower mean recidivism for those in the treatment conditions." In short, there is a large body of evidence that supports the conclusion that rehabilitation treatment is capable of reducing re-offense rates of convicted offenders, and that it has greater capability of doing so than correctional sanctions. We use research findings such as this to drive our recommendations.

One very important caveat needs to be underscored. Some recommendations in this report have already been enacted, in part or in full, by the Governor's office, the Texas legislature (i.e., SB 103), and/or the current TYC administration. My charge to the members of the Task Force was to operate as if they had a *tabula rasa,* to create the ideal system from the ground up. While we were thoughtful about historical trends and current momentum, we were mindful to not allow ourselves to feel constrained by these parameters. By listing recommendations in this report that have already been put in motion is by no means intended to minimize efforts already underway. Rather, we do not want good ideas to be lost with the passing of time, so we include ideas and strategies congruent with the guiding principles of the Task Force. In short, our vision and hope for this report is that it serves as a compass to guide the short-term and long-term transformation of the juvenile justice system in Texas.

David W. Springer, Ph.D., LCSW
Chair, Blue Ribbon Task Force

## I. BEFORE

### WHAT IS THE PROBLEM?

The goal of primary prevention is to decrease crime and its impact on victims while concomitantly reducing state costs by addressing elements of youth in advance of the TYC system. Despite the fact that serious juvenile crime rates have been declining over the past decade, too many youth are being referred to the TYC and not being kept in the local systems where services are more effective and less costly. Most youth housed in today's large, secure juvenile facilities (such as TYC) do not require such high levels of security, especially considering that research suggests that confining youth in these facilities is not only ineffective in improving functioning and is unnecessarily expensive, but actually makes the youth "worse off." Nearly two in three youth were committed to the TYC in 2006 for non-violent offenses. Moreover, large, centralized facilities remove youth from their community, which increases alienation and isolates troubled youth exclusively with other troubled youth.

Schools and school districts play a critical role in the Texas juvenile justice system. Unfortunately, some schools create conditions in which low achieving and badly performing students are more likely to be detained and/or committed to the TYC. Information from a Texas Education Agency report indicates student discipline reports rose 52 percent between the 2000-2001 and 2005-2006 school years, from 1.7 million to 2.6 million. While some students may be removed from the general school program to an alternative school program because of serious violations of the school disciplinary code, many students are removed for problem behavior that should be resolved within the school. Further, the quality of alternative education placements is highly variable. Some alternative education settings become dumping grounds for youth who experience unmotivated teachers and staff, inadequate resources, and a culture of school failure. Data from the TYC for 2005-2006 show that the average youth committed at age 16 performs at about the 6th grade level in reading and the 5th grade level in math – well below that of their peers. Further, about 40 percent of committed youth have a history of special education services and their median performance on standardized measures of intelligence is in the low average range. While the TYC does not report on prior school suspensions and grade-level retention of students, data from other states indicate that youth committed to juvenile corrections have a history of school suspensions, expulsions, and grade-level retentions.

Recommendations are given below for crime prevention/diversion, detention, sentencing and probation reform, and community-based care.[5]

[5] Recommendations in the Before section of the report are enumerated sequentially (e.g., #1.1, #1.2, and so on), as are recommendations in the During section (e.g., #2.1, #2.2) and After section (e.g., #3.1, #3.2) of the report.

## RECOMMENDATIONS

### PREVENTION/DIVERSION

One indisputable way to decrease the population of youth in the TYC, to prevent future crime, and to minimize the traumatic impact on victims while simultaneously saving state funds is to prevent youth crime and reduce the likelihood of coming to the attention of the TYC. Yet, many local communities lack the capacity to meet the needs of at-risk young offenders. This is, in part, because funding and services are fragmented and need to be integrated at the community level.

**Recommendation #1.1**
**Emphasize keeping youth in the community.** Community-based services (e.g., school- and faith-based programs, community policing, children and family services) are more effective and less costly than incarceration.

Research on the impact of large juvenile incarceration centers on reducing recidivism rates are at best equivocal, with as many as 50 to 70 percent of youth being rearrested within two years following their release. According to Kelly, Johnson, and Weitzer (2005), community-based programs generally contain lower recidivism rates than large state facilities for the following reasons: (1) they reduce crowding, (2) they cut the costs of operating juvenile detention centers, (3) they help the offender avoid associating with youth who have more serious delinquency issues, and (4) they maintain positive ties between the juvenile and his or her family and community. In a review of research on community-based interventions, Howell (1995) found community programs such as group homes and day reporting centers to be more effective than traditional correctional programs at reducing recidivism and improving community adjustment, even for violent adolescent offenders. In a meta-analysis conducted by the Washington State Institute for Public Policy (Aos, Miller, & Drake, 2006), one community-based treatment program – Multisystemic Therapy - was found to reduce juvenile recidivism by 10.5% resulting in benefits to crime victims (of the reduction in crime) of $12,855 and benefits to taxpayers of $9,622. Accordingly, a brief overview of MST is provided below.

*Multisystemic Therapy (MST)* is an intensive family- and community-based treatment that has been applied to adolescent offenders with a wide range of serious clinical problems, including substance use, chronic and violent criminal behavior, sexual offending, and serious health problems.

MST works with youth, family members, and all pertinent systems in which the youth is involved including peers, school, extended family, family supports, the neighborhood, community groups, and other involved agencies such as child welfare or juvenile justice. Early in treatment, specific measurable overarching goals and functionally meaningful outcomes are set in collaboration with the family, and as appropriate, other stakeholders. MST overarching goals are broken down into measurable weekly goals. Any person or agency that may influence attainment of these goals is engaged by the therapist and caregiver with specific interventions designed to encourage actions that will facilitate goal achievement.

Strong engagement with the family is essential for successful outcomes, and the MST treatment model incorporates strategies to encourage cooperative partnering. Families are treated with respect and are assumed to be doing the best they can. Other youth-associated systems are viewed as vital partners in the treatment process.

MST is provided via a home-based model of service delivery, and the use of such a model has been crucial to the high engagement and low dropout rates obtained in MST outcome studies (Henggeler, Pickrel, Brondino, & Crouch, 1996). Henggeler, Sheidow, and Lee (2007) summarize the critical service delivery characteristics utilized in MST:

1. Low caseloads to allow intensive services: A MST team consists of 2 to 4 full-time therapists, a .50 time supervisor per team, and appropriate organizational support. Each therapist works with 4 to 6 families at a time. The therapist is the team's main point of contact for the youth, family and all involved agencies and systems.
2. Delivery of services in community settings (e.g., home, school, neighborhood center) to overcome barriers to service access, facilitate family engagement in the clinical process, and provide more valid assessment and outcome data.
3. Time-limited duration of treatment (4 to 6 months) to promote efficiency, self-sufficiency, and cost effectiveness.
4. 24 hour/day and 7 day/week availability of therapists to provide services when needed and to respond to crises. MST is proactive, and plans are developed to prevent or mitigate crises. Crisis response can be taxing, but most families are appreciative, and a supportive response can enhance engagement. Moreover, the capacity to respond to crises is critical to achieving a primary goal of MST programs – preventing out-of-home placements.

Federal entities such as the Surgeon General (U.S. DHHS, 1999; U.S. Public Health Service, 2001), National Institute on Drug Abuse (1999), National Institutes of Health (2004), Center for Substance Abuse Prevention (2001), and President's New Freedom Commission on Mental Health (2003), as well as consumer organizations (e.g., National Alliance for the Mentally Ill, 2003; National Mental Health Association, 2004), have identified MST as either demonstrating or showing considerable promise in the treatment of youth criminal behavior, substance abuse, and emotional disturbance. These conclusions are based on the findings from 15 published outcome studies (14 randomized, one quasi-experimental) with youths presenting serious clinical problems and their families. Henggeler, Sheidow, and Lee (2007) summarize the research findings across several trials with violent and chronic juvenile offenders, where MST produced 25% to 70% decreases in long-term rates of rearrest, and 47% to 64% decreases in long-term rates of days in out-of-home placements.

Considering the effectiveness of community-based interventions on reducing recidivism rates for adolescent offenders, it may be worth exploring ways that we can direct any resulting savings from diversion efforts to additional prevention and community-based services. TYC should only incarcerate adolescent offenders who are at-risk for re-offending and absconding. These adolescents should be housed as close to their home communities as possible, enabling the TYC to work with the adolescent's family and help the adolescent re-adjust to his or her community upon release from the TYC. (See also Recommendation 2.12.)

**Recommendation #1.2**

**Prioritize prevention for at-risk youth through integrated services including schools, faith-based institutions, community policing, and children and family services.** Incorporate early identification of at-risk youth, as suggested by school disciplinary issues, assaults, bullying, truancy, and illiteracy. Early identification targets the enhancement of health (including hunger) programs, mental health and substance abuse treatment, and youth and family services that are gender-sensitive. It is critical to create a system-of-care that is racially-equitable and disability-responsive, with the goal to end the over-representation of youth of color and youth with disabilities in the Texas Youth Commission.

Patterns of school and school district referrals to police and juvenile courts for behavior that occurs in school and on school grounds should be carefully examined. Nationally, there has been a disturbing trend to "criminalize" school misbehavior. The pressure schools and school districts face to achieve Adequate Yearly Progress on No Child Left Behind (NCLB) standards has resulted in students with marginal skills and behavior problems being "pushed out" of the mainstream. When these students are out of school and in the community, they are at increased risk for involvement in juvenile courts and juvenile corrections and for involvement in crime. In Texas, schools have relied too heavily on the "ticketing" of students for violations of school rules, which sends students to local juvenile courts for hearings. Fortunately, House Bill 278 by Representative Jerry Madden prohibits ticketing at schools for non-penal code violations, so that students now must be in violation of penal code to be ticketed. This is an important step in keeping youth out of the juvenile justice system. Schools should use positive behavioral support systems, not the juvenile justice system, to impact students' learning.

**It is critical to create a system-of-care that is racially-equitable and disability-responsive, with the goal to end the over-representation of youth of color and youth with disabilities in the Texas Youth Commission.**

Dr. Dottie Carmichael and her colleagues (2005) at the Texas A&M Institute for Policy Analysis recently found that one school disciplinary report is the most powerful predictor of future delinquency offenses in Texas. Furthermore, a recent study by Dr. Soyon Jung (2007) revealed that African American high-school students are approximately 3 times more likely and Hispanic students are 2 times more likely to receive an internal school suspension compared to White students (even after adjusting for gender and socioeconomic status). Schools and school districts should be required to report the number and reasons for referral of students to law enforcement and the courts as well as for students suspended and expelled. Reporting should provide the ethnic and racial background of students as well as special education status, and whether the students have been retained in grade.

House Bill 3202 by Representative Jerry Madden will infuse state Texas Education Agency funding to local school districts to be used for youth assigned to disciplinary settings for the actions of assault, aggression, abuse and bullying. The bill calls for a 12 month case management system with use of "best practice" violence prevention, drug abuse prevention and delinquency prevention programs. Thus, targeting a program initiative to this specific group will have a significant impact on reduction of intake into the juvenile justice system. This

information will help state and local policymakers, as well as school officials, make decisions about the use of resources and adequacy of school-based prevention efforts.

**Recommendation #1.3**
**Prioritize youth education and vocational training that equip youth to be self-sufficient.** For exemplary programs such as STAR to be effective, students need to attend school. Communities in Schools (CIS), the largest dropout prevention organization in the United States (including Texas), can play a critical role in this effort. In partnership with the local school system, CIS identifies the most critical needs of students and families, and then locates community resources, dedicated volunteers and agencies to serve in partnership with the public schools (see www.cisnet.org/about/who.asp). Organizations like CIS should be supported and utilized so that educational and vocational programs have the opportunity to work.

**Recommendation #1.4**
**Fund community-based substance abuse and mental health programs to address the needs of at-risk youth so that these youth never enter the juvenile justice system.** Approximately half of the youth currently in the TYC are in need of such programs. A range of treatment options to consider are provided later in the report (see Exhibits 4 and 6).

**Recommendation #1.5**
**Offer special programs for children of incarcerated parents to help them develop a path to positive adulthood.** Children of incarcerated parents are five to six times more likely to go to prison than their peers. We can and must do more to stop this cycle of violence.

**Recommendation #1.6**
**Require counties to primarily use evidence-based practices through financial incentives.** It is also important to reserve some funds for innovative interventions that include implementing rigorous evaluation. To accomplish the goal of reducing crime, decreasing victimization, and improving cost effectiveness, Texas will need to:

- Build capacity at the local level.
- Strengthen community bonds.
- Keep families involved, beginning with prenatal care and continuing throughout the life cycle.
- Shift funding (by decreasing incarceration rates) to proven community-based programs.
- Allot funding to counties based on youth population and require that counties bear the costs of sending youth to the TYC.

After prevention, reforms should include the use of detention and sentencing, including the use of probation. For youth who come under the authority of the juvenile justice system but who are not sentenced to the TYC, we recommend early triage and probation. This is critical because research consistently shows that low level offenders get worse by being incarcerated, which in turn results in more crime, an increase in the number of victims, and an increase in the amount of money needed to address crime.

With the goal of decreasing the number of youth with formal charges and increasing the use of community-based alternatives, early assessment and diversion is necessary. Immediate triage of cases early in the juvenile justice process should be pursued as the best way to divert a youth from the TYC, while promoting cost-effectiveness and efficacy of services. This early assessment should begin with local law enforcement. Alternative programs should include county-based diversion programs and restorative justice programs for non-violent offenders. Victim-offender mediation (VOM) is the oldest, most widely developed, and most empirically grounded expression of restorative justice (see Exhibit 2). One meta-analysis (Nugent, Williams, & Umbreit, 2003) found an 18% reduction in crime for juvenile offenders that participated in VOM.

| **Exhibit 2: Brief Overview of Restorative Justice[6]** |
| --- |
| Restorative justice offers a different way of understanding and responding to crime. Instead of viewing the state as the primary one offended by criminal acts and placing the actual victims and the community, as well as offenders, in passive roles, restorative justice turns this arrangement around and recognizes crime as fundamentally directed against individual people. It is grounded in the belief that those most affected by crime should be the ones to be actively involved in resolving the conflict. Restorative justice is grounded in the following principles: (a) crime is a violation of a person by another person; (b) the harm suffered by victims must be paramount, and victims must be helped to move beyond their sense of vulnerability; (c) offenders must be encouraged to understand the harm they have caused and be given an opportunity to make amends; and (d) the community must be involved in holding the offender accountable, promoting a healing response to the needs of victims and offenders, and assuming responsibility for the social conditions that contribute to offender behavior. |

## DETENTION

Detention, or the local "jailing" of youth, as a major predictor of which youth eventually are sent to the TYC should be improved to make it more useful and cost effective. The use of detention should also be curtailed.

**Recommendation #1.7**

**Ensure that youth and their families have adequate legal representation.** It is essential that youth and their families are represented by competent attorneys who are capable of providing effective representation in juvenile proceedings. However, attorneys should focus on diverting youth with disabilities and other special needs from the juvenile justice system by securing appropriate community-based services that would enable them to remain in their homes or be placed in less restrictive settings. Often these youth enter the juvenile justice system because of the failure to receive appropriate mental health and educational services in the community. To effectively represent these youth, public defenders and other attorneys would greatly benefit from the knowledge and skills of social workers who can provide assistance and support to these attorneys in diverting their clients from the juvenile justice system. Public defender offices should employ social workers to assist attorneys in achieving this goal of diversion.

---

[6] Source: Armour, M. P., & Umbreit, M. S. (2007). Victim-offender mediation and forensic practice. In D. W. Springer & A. R. Roberts (Eds.), *Handbook of forensic mental health with victims and offenders: Assessment, treatment, and research* (pp. 519-539). NY: Springer Publishing Co.

**Recommendation #1.8**

**Develop, fund, and use alternatives to incarceration where appropriate, including mental health courts and drug courts.** Incarceration alone does little to break the cycle of illegal drug use and crime. Since treatment for substance abuse is a key component in preventing re-offenses, the need for alternative programs is evident. A promising and innovative approach to the growing substance abuse problem is the establishment of diversionary programs known as drug courts. Two main types of drug courts exist: those organized simply to speed up the processing of drug offenders and those that exist to provide treatment to offenders. The focus here is on treatment-oriented drug courts.

The drug court model creates an interface between the various components of the criminal justice and substance abuse treatment systems in order to use the coercive power of the court to promote abstinence and prosocial behavior. The primary goals of drug courts are to reduce drug use and associated criminal behavior by engaging and retaining drug-involved offenders in programmatic and treatment services; to concentrate and coordinate expertise about drug cases in a single courtroom; to address other defendant needs through clinical assessment and case management; and to free judicial, prosecutorial and public defense resources for adjudicating non-drug cases.

Drug courts have been successful in closely supervising drug offenders in the community through frequent monitoring and close supervision including mandatory frequent drug testing, placing and retaining drug offenders in treatment programs, providing treatment and related services to offenders who have not received such services in the past, generating actual and potential cost savings and substantially reducing drug use and recidivism. In their systematic review of the literature, Lipsey and Cullen (in press) reported that juvenile and adult drug courts together resulted in reduced recidivism rates ranging from 14% to 24%. (Mental health courts serve a similar function for offenders with mental health problems, although more research is needed on mental health courts to demonstrate their degree of effectiveness.)

**Recommendation #1.9**

**Restrict detention to only those youth who have committed violent crimes and who are at-risk of flight and/or re-offending.** Detention should not be used for misdemeanor offenses, except in extenuating circumstances. Detention should not be used as a sanction or placement, but as a means of holding a juvenile on a very short-term basis prior to adjudication or transfer to the TYC, in cases where the juvenile's release to the community would pose unreasonable risks. The focus of detention should be to protect the community, not to punish kids.

**Recommendation #1.10**

**Detain youth for the shortest time-period possible, in cases where detention is essential.** Long-term detention of youth does not improve the functioning of youth, and therefore, does not improve the safety of communities in the long-run. It is critical that youth are integrated back into their communities as soon as possible so that services can truly be family-based and client-centered.

**Long-term detention of youth does not improve the functioning of youth, and therefore, does not improve the safety of communities in the long-run.**

**Recommendation #1.11**
**Deter counties from using detention as an alternative to TYC placement.** Implement/utilize community-based services to treat juvenile offenders. One strategy to eliminate detention as an alternative to the TYC is to make fewer cases formal. Counties can deal with adolescents through community-based services without the case being formerly adjudicated, resulting in diversion from the juvenile justice system. (See also Recommendation 2.10.)

**Recommendation #1.12**
**Use consistent and accurate (i.e., reliable and validated) standardized risk and need assessment instruments to inform hearings (detention and otherwise) of juvenile offenders.** This will help ensure that detention decisions and sentencing decisions are more uniform across Texas, and that less serious offenders are not placed unnecessarily in overly secure settings. Such assessment instruments will also facilitate a juvenile's transition to TYC when necessary.

**Recommendation #1.13**
**Assure that youth in juvenile detention who are eligible for Children's Health Insurance Program (CHIP) or Children's Medicaid receive health coverage immediately upon release so that they experience no delay in accessing health care, particularly community mental health services.** This very effort is currently being piloted jointly through the Health and Human Services Commission, the Texas Youth Commission, and the Texas Juvenile Probation Commission. This pilot should be closely monitored and problems corrected so that statewide implementation can begin as soon as feasible, perhaps as early as the fall of 2007.

**Recommendation #1.14**
**Redirect money saved on decreasing detention to prevention and community-based programs.** The redirection of such funds should reside at the local county level.

**Recommendation #1.15**
**Ensure that all youth in detention receive appropriate federal and state mandated education services. Enrollment for services should not be delayed.** Require that schools and school districts promptly send students' transcripts and information about special education status and, if appropriate, Individualized Education Program information to detention centers within 5 school days of a youth's detention. Adequate funding and staff are needed to ensure that students receive full school days, including the array of mandated educational services. Additionally, youth with disabilities should be diverted from the TYC whenever possible and referred instead to community-based services.

**Recommendation #1.16**
**Monitor the use and construction of local detention facilities.** In keeping with Recommendations 1.8 to 1.15, there may well be a need to monitor how local detention facilities are utilized. Because of the real risk that local detention facilities could spring up to fill a perceived gap in sentencing options for juveniles, and thereby undermine the goal of Texas's efforts at community-based diversion, Texas should require the development of a system for counties to seek state approval for expansion of detention facilities before state funds can be expended for juvenile probation programs. In short, we should avoid shifting incarceration to the local level.

In general, more stringent limits on using detention will reduce crime, decrease crime victimization, and decrease the victimization of low-risk offenders while saving taxpayers' dollars.

## SENTENCING AND PROBATION REFORM

To further decrease the reliance on the TYC, further decrease the risk of crime victimization, and more wisely use funding resources, Texas should reform its sentencing procedures and the use of probation. TYC should be reserved for the most serious youthful offenders; all others should be handled in their home communities through probation.

**Recommendation #1.17**

**Rely more on probation at the county level, with an emphasis on the use of evidence-based community-based interventions**. Probation should be community-based with services in the youth's home environment, with particular emphasis on evidence-based interventions. Emphasis should be placed on programs that significantly decrease recidivism rates and save money. For a thorough list of such programs, see Exhibits 3 and 4[7]. (Exhibit 3 serves as a guide for interpreting the findings in Exhibit 4.)

| **Exhibit 3: Interpreting Exhibit 4 – Reducing Crime with Evidence-Based Options: What Works, and Benefits & Costs** |
| --- |
| Exhibit 4 summarizes the findings from a recent systematic review of the evaluation research literature by the Washington State Institute for Public Policy. Overall, the researchers reviewed and meta-analyzed the findings of 571 comparison-group evaluations of adult corrections, juvenile corrections, and prevention programs.<br><br>For each category of programs that they analyzed, the results in Exhibit 4 reflect the evidence-based effect that one would expect for the "average" program. For example, the results indicate that the average adult drug court reduces the recidivism rate of participants by 8% and that the average juvenile drug court reduces the recidivism rate of participants by 3.5%. Some drug courts, of course, achieve better results than this, some worse. At the bottom of Exhibit 4, they also list a number of programs for which the research evidence is inconclusive at this time.<br><br>In column (1) of Exhibit 4, our colleagues at the Washington State Institute for Public Policy show the expected percentage change in crime outcomes for the program categories that they reviewed. This figure indicates the average amount of change in the crime outcomes – compared to no treatment or treatment as usual – that can be achieved by a typical program in each category of programs. A negative value indicates the magnitude of a statistically significant reduction in crime. A zero percent change means that, based on their review of the evidence, a typical program does not achieve a statistically significant change in crime outcomes. A few well-researched programs even have a positive sign indicating that crime is increased with the program, not decreased. In addition to reporting the effect of the programs on crime outcomes, column (1) also reports (in parentheses) the number of studies on which the estimate is based. |

[7]Source: Aos, S., Miller, M., & Drake, E. (2006). *Evidence-based public policy options to reduce future prison construction, criminal justice costs, and crime rates*. Olympia: Washington State Institute for Public Policy. Full report available on line: www.wsipp.wa.gov/rptfiles/06-10-1201.pdf

As Exhibit 4 reveals, we find that a number of programs demonstrate statistically significant reductions in crime outcome. We also find other approaches do not achieve a statistically significant reduction in recidivism. Thus, the first lesson from this evidence-based review is that some programs work and some do not. A direct implication from these mixed findings is that public policies that reduce crime will be ones that focus resources on effective evidence-based programming while avoiding ineffective approaches.

As an example of how to interpret the information provided in Exhibit 4, consider a program for juvenile offenders named "Functional Family Therapy," or FFT. The FFT program involves an FFT-trained therapist working for about three months with a youth in the juvenile justice system and his or her family. The goal is to increase the likelihood that the youth will stay out of future trouble. Seven rigorous evaluations of this program were located and meta-analyzed, revealing that the average FFT program with quality control can be expected to reduce a juvenile's recidivism rates by 15.9%. This analysis indicates that, without the program, a youth has a 70% chance of recidivating for another felony or misdemeanor conviction after a 13-year follow-up. If the youth participates in FFT, then we would expect the recidivism rate to drop to 59% - a 15.9% reduction.

Exhibit 4 also contains estimates of the benefits and costs of many of the program categories analyzed. Within three broad groupings – programs for adult offenders, programs for juvenile offenders, and prevention programs – many of the options are ranked by their assessment of each program's "bottom line" economics for reducing crime. For programs that have an evidence-based ability to affect crime, they estimate benefits from two perspectives: taxpayers' and crime victims'. For example, if a program is able to achieve statistically significant reductions in recidivism rates, then taxpayers will spend less money on the criminal justice system. Similarly, if a program produces less crime, then there will be fewer crime victims. The estimates shown in columns (2) and (3) of Exhibit 4 display the estimates of victim and taxpayer benefits, respectively. Column (4) shows cost estimates of many programs.

Finally, column (5) shows "bottom line" estimates of the net gain (or loss). These figures are the net present values of the long-run benefits of crime reduction minus the net up-front costs of the program. This provides the best overall measure each type of program can be expected to achieve per program participant. An examination of column (5) provides an important finding from this analysis. There are some programs for juvenile offenders that produce especially attractive long-run economic returns.

For the Functional Family Therapy example, we find that the program costs, on average, $2,325 per juvenile participant. The costs are higher because it is a one-on-one program between a FFT therapist and the youth and his or her family. The 15.9% reduction in recidivism rates that we expect FFT to achieve generates about $34,146 in life-cycle benefits, measured in terms of the taxpayer and crime victim costs that are avoided because of the reduced long-run level of criminal activity of the youth. Thus, the net present value of this juvenile justice program is expected to be $31,821 per youth.

This finding, and others like it, coupled with the raw number of adult offenders in prison in Texas that have previously been in Texas' juvenile justice system, demonstrates the attractiveness of juvenile justice options as a means to affect the long-run need for prison construction in Texas.

Source – the text in Exhibit 3 to help interpret the findings in Exhibit 4 is excerpted with permission from: Aos, S., Miller, M., & Drake, E. (2006). *Evidence-based public policy options to reduce future prison construction, criminal justice costs, and crime rates*. Olympia: Washington State Institute for Public Policy. Full report available on line: www.wsipp.wa.gov/rptfiles/06-10-1201.pdf

***Exhibit 4***

**Reducing Crime With Evidence-Based Options: What Works, and Benefits & Costs**

| Washington State Institute for Public Policy<br>Estimates as of October, 2006<br><br>Notes:<br>"n/e" means not estimated at this ime.<br>Prevention program costs are partial program costs, pro-rated to match crime outcomes. | Effect on Crime Outcomes | Benefits and Costs (Per Participant, Net Present Value, 2006 Dollars) | | | |
|---|---|---|---|---|---|
| | Percent change in crime outcomes, & the number of evidence-based studies on which the estimate is based (in parentheses) (1) | Benefits to Crime Victims (of the reduction in crime) (2) | Benefits to Taxpayers (of the reduction in crime) (3) | Costs (marginal program cost, compared to the cost of alternative) (4) | Benefits (total) Minus Costs (per participant) (5) |
| **Programs for People in the Adult Offender System** | | | | | |
| Vocational education in prison | -9.0% (4) | $8,114 | $6,806 | $1,182 | **$13,738** |
| Intensive supervision: treatment-oriented programs | -16.7% (11) | $9,318 | $9,369 | $7,124 | **$11,563** |
| General educa ion in prison (basic educa ion or post-secondary) | -7.0% (17) | $6,325 | $5,306 | $962 | **$10,669** |
| Cogni ive-behavioral therapy in prison or community | -6.3% (25) | $5,658 | $4,746 | $105 | **$10,299** |
| Drug treatment in community | -9.3% (6) | $5,133 | $5,495 | $574 | **$10,054** |
| Correctional industries in prison | -5.9% (4) | $5,360 | $4,496 | $417 | **$9,439** |
| Drug treatment in prison (therapeutic communities or outpatient) | -5.7% (20) | $5,133 | $4,306 | $1,604 | **$7,835** |
| Adult drug courts | -8.0% (57) | $4,395 | $4,705 | $4,333 | **$4,767** |
| Employment and job training in the community | -4.3% (16) | $2,373 | $2,386 | $400 | **$4,359** |
| Electronic monitoring to offset jail time | 0% (9) | $0 | $0 | -$870 | **$870** |
| Sex offender treatment in prison wi h aftercare | -7.0% (6) | $6,442 | $2,885 | $12,585 | **-$3,258** |
| Intensive supervision: surveillance-oriented programs | 0% (23) | $0 | $0 | $3,747 | **-$3,747** |
| Washington's Dangerously Mentally Ill Offender program | -20.0% (1) | $18,020 | $15,116 | n/e | n/e |
| Drug treatment in jail | -4.5% (9) | $2,481 | $2,656 | n/e | n/e |
| Adult boot camps | 0% (22) | $0 | $0 | n/e | n/e |
| Domestic violence education/cognitive-behavioral treatment | 0% (9) | $0 | $0 | n/e | n/e |
| Jail diversion for mentally ill offenders | 0% (11) | $0 | $0 | n/e | n/e |
| Life Skills education programs for adults | 0% (4) | $0 | $0 | n/e | n/e |
| **Programs for Youth in the Juvenile Offender System** | | | | | |
| Multidimensional Treatment Foster Care (v. regular group care) | -22.0% (3) | $51,828 | $32,915 | $6,945 | **$77,798** |
| Adolescent Diversion Project (for lower risk offenders) | -19.9% (6) | $24,328 | $18,208 | $1,913 | **$40,623** |
| Family Integrated Transi ions | -13.0% (1) | $30,708 | $19,502 | $9,665 | **$40,545** |
| Functional Family Therapy on probation | -15.9% (7) | $19,529 | $14,617 | $2,325 | **$31,821** |
| Multisystemic Therapy | -10.5% (10) | $12,855 | $9,622 | $4,264 | **$18,213** |
| Aggression Replacement Training | -7.3% (4) | $8,897 | $6,659 | $897 | **$14,660** |
| Teen courts | -11.1% (5) | $5,907 | $4,238 | $936 | **$9,208** |
| Juvenile boot camp to offset institution time | 0% (14) | $0 | $0 | -$8,077 | **$8,077** |
| Juvenile sex offender treatment | -10.2% (5) | $32,515 | $8,377 | $33,064 | **$7,829** |
| Restorative justice for low-risk offenders | -8.7% (21) | $4,628 | $3,320 | $880 | **$7,067** |
| Interagency coordination programs | -2.5% (15) | $3,084 | $2,308 | $205 | **$5,186** |
| Juvenile drug courts | -3.5% (15) | $4,232 | $3,167 | $2,777 | **$4,622** |
| Regular surveillance-oriented parole (v. no parole supervision) | 0% (2) | $0 | $0 | $1,201 | **-$1,201** |
| Juvenile intensive probation supervision programs | 0% (3) | $0 | $0 | $1,598 | **-$1,598** |
| Juvenile wilderness challenge | 0% (9) | $0 | $0 | $3,085 | **-$3,085** |
| Juvenile intensive parole supervision | 0% (10) | $0 | $0 | $6,460 | **-$6,460** |
| Scared Straight | +6.8% (10) | -$8,355 | -$6,253 | $58 | **-$14,667** |
| Counseling/psychotherapy for juvenile offenders | -18.9% (6) | $23,126 | $17,309 | n/e | n/e |
| Juvenile education programs | -17.5% (3) | $41,181 | $26,153 | n/e | n/e |
| Other family-based therapy programs | -12.2% (12) | $15,006 | $11,231 | n/e | n/e |
| Team Child | -10.9% (2) | $5,759 | $4,131 | n/e | n/e |
| Juvenile behavior modification | -8.2% (4) | $19,271 | $12,238 | n/e | n/e |
| Life skills education programs for juvenile offenders | -2.7% (3) | $6,441 | $4,091 | n/e | n/e |
| Diversion progs. with services (v. regular juvenile court) | -2.7% (20) | $1,441 | $1,034 | n/e | n/e |
| Juvenile cognitive-behavioral treatment | -2.5% (8) | $3,123 | $2,337 | n/e | n/e |
| Court supervision vs. simple release wi hout services | 0% (8) | $0 | $0 | n/e | n/e |
| Diversion programs with services (v. simple release) | 0% (7) | $0 | $0 | n/e | n/e |
| Juvenile intensive probation (as alternative to incarcera ion) | 0% (5) | $0 | $0 | n/e | n/e |
| Guided Group Interaction | 0% (4) | $0 | $0 | n/e | n/e |
| **Prevention Programs (crime reduction effects only)** | | | | | |
| Nurse Family Partnership-Mothers | -56.2% (1) | $11,531 | $8,161 | $5,409 | **$14,283** |
| Nurse Family Partnership-Children | -16.4% (1) | $8,632 | $4,922 | $733 | **$12,822** |
| Pre-K education for low income 3 & 4 year olds | -14.2% (8) | $8,145 | $4,644 | $593 | **$12,196** |
| Seattle Social Development Project | -18.6% (1) | $1,605 | $4,341 | n/e | n/e |
| High school graduation | -10.4% (1) | $1,738 | $2,851 | n/e | n/e |
| Guiding Good Choices | -9.1% (1) | $570 | $2,092 | n/e | n/e |
| Parent-Child Interaction Therapy | -3.7% (1) | $268 | $784 | n/e | n/e |

**Program types in need of additional research & development before we can conclude they do or do not reduce crime outcomes:**

| Programs needing more research for people in the adult offender system | | Comment |
|---|---|---|
| Case management in the community for drug offenders | 0% (13) | Findings are mixed for this broad grouping of programs. |
| COSA (Faith-based supervision of sex offenders) | -22.3% (1) | Too few evaluations to date. |
| Day fines (compared to standard probation) | 0% (1) | Too few evaluations to date. |
| Domestic violence courts | 0% (2) | Too few evaluations to date. |
| Faith-based programs | 0% (5) | Too few evaluations to date. |
| Intensive supervision of sex offenders in the community | 0% (4) | Findings are mixed for this broad grouping of programs. |
| Medical treatment of sex offenders | -21.4% (1) | Too few evaluations to date. |
| Mixed treatment of sex offenders in he community | 0% (2) | Too few evaluations to date. |
| Regular parole supervision vs. no parole supervision | 0% (1) | Too few evaluations to date. |
| Restorative justice programs for lower risk adult offenders | 0% (6) | Findings are mixed for this broad grouping of programs. |
| Therapeu ic community programs for mentally ill offenders | -20.8% (2) | Too few evaluations to date. |
| Work release programs (from prison) | -4.3% (4) | Too few recent evaluations. |
| **Programs needing more research for youth in the juvenile offender system** | | |
| Dialectical Behavior Therapy | 0% (1) | Too few evaluations to date. |
| Increased drug testing (on parole) vs. minimal drug testing | 0% (1) | Too few evaluations to date. |
| Juvenile curfews | 0% (1) | Too few evaluations to date. |
| Juvenile day reporting | 0% (2) | Too few evaluations to date. |
| Juvenile jobs programs | 0% (3) | Too few recent evaluations. |
| Juvenile therapeutic communities | 0% (1) | Too few evaluations to date. |
| Mentoring in juvenile justice | 0% (1) | Too few evaluations to date. |