**Recommendation #1.18**
**Avoid "Trail 'em. Nail 'em. and Jail 'em." supervision and surveillance strategies.** The purpose of supervision is not simply to catch youth violating probation; rather, it is to provide case management[8] and treatment so that more serious options such as incarceration can be avoided. Strengthen local health, education, and social service agency supports to probation and parole officers to ensure access to needed treatment, educational, and workforce programs.

**Recommendation #1.19**
**Consider expanding the use of specialized case loads for probation officers.** In particular, specialized case loads should be considered for female juvenile offenders and for youth with disabilities so that probation officers are able to truly tailor services to meet these offenders' unique needs.

**Recommendation #1.20**
**Carefully narrow the category of which juveniles may be sent to TYC**. Limit TYC placement to high-risk or chronic felons. Every juvenile under consideration for a TYC placement should be given emergent risk and comprehensive needs assessments. This strategy would also ensure more uniformity in sentencing patterns and use of TYC resources across jurisdictions.

TYC should not accept any juvenile for whom such assessments do not indicate a high-risk of re-offense, and the TYC must be able to accommodate a youth's disability.

**Recommendation #1.21**
**Retain determinate sentencing[9] but reserve it for the most serious youth**. As long as determinate sentencing is available only for the most serious offenses and there is no widening of the net as to which juveniles are eligible for transfer to the adult system, this can be an effective option for juvenile judges. Also, in order for this sentencing option to be most effective, there has to be a realistic potential for the juvenile to be released directly from the TYC assuming his or her behavior and progress while in TYC is conducive to release. Juveniles facing the possibility of decades-long periods of incarceration need such an incentive in order to make their time in TYC meaningful and to encourage good behavior and participation in programming.

**Recommendation #1.22**
**Reform the certification of youth into the adult system so that anybody certified spends his or her youthful years (ages 14 to 19) in TYC prior to transfer to an adult correctional facility**. Regardless of their offense, youth of this age have specific needs (especially educational, programmatic, emotional, medical, recreational, and dietary) that cannot be adequately addressed in the adult system. Moreover, they are at severe risk of abuse in the adult system because of their age. Youth should be sent to the TYC to accommodate those needs until such time that they are adults and can safely be placed in adult prisons. It is particularly

---

[8] Effective *case management* includes at least six primary functions: (a) identification and outreach to people in need of services; (b) assessment of specific needs; (c) planning for services; (d) linkage to services; (e) monitoring and evaluation; and (f) advocacy for the client system.

[9] Determinate sentencing is a system whereby juveniles who have committed one of a number of serious crimes are given a fixed sentence that begins in TYC and takes them into adulthood and, upon reaching age 19, are evaluated either for release directly from TYC to TDCJ parole or for transfer to TDCJ institutional care (i.e., prison) to complete their sentence.

important to decrease the disproportionate number of youth of color serving time in adult correctional institutions. A disproportionate percentage of African American and Hispanic youth are being processed as adults, particularly older adolescents committed for drug-related offenses. Texas might also consider looking to the states of Illinois, Connecticut, and Delaware for guidance, as these states have recently taken steps to reduce the number of youth tried as adults.

**Recommendation #1.23**

**Implement a reverse transfer provision in order to provide judicial authority to send the case back to the juvenile system.** The current system allows juvenile judges to transfer a case to adult criminal court. The criminal judge, however, has no way to return the case to the juvenile court if, upon further review of the evidence, it becomes clear that the juvenile is not appropriate for certification. The Texas Legislature may want to consider passing a law that allows criminal judges to transfer juveniles to the juvenile court in appropriate cases.

**Recommendation #1.24**

**Improve information sharing between TYC and the Texas Department of Criminal Justice (TDCJ) to enable TDCJ to know which youth are being transferred pursuant to a determinate sentence, and in which programs they participated while at TYC.**

**Avoid "Trail 'em. Nail 'em. and Jail 'em." supervision and surveillance strategies. The purpose of supervision is not simply to catch youth violating probation; rather, it is to provide case management and treatment.**

## II. During

### What is the Problem?

The challenges for the Texas Youth Commission have been highlighted in recent months through countless media accounts and during the 80th Texas Legislative session. Former Conservator Jay Kimbrough's May 2007 report noted many of these challenges, including: overcrowding at TYC facilities; too great an emphasis on punishment, with insufficient resources for education and treatment; a fragmented health care delivery system; non-violent offenders being housed at TYC facilities; high caseloads and high turnover rates among staff; a shortage of correctional officers; too many incidents of violence at TYC facilities; youth being sentenced to TYC facilities that are too large and too far away from their home communities; dorm designs that make it difficult to monitor youth; and lack of accountability and transparency, including facility staff with too much control over the complaint process.

Generally, the recommendations enumerated in this section of the report are driven by a cumulative response to the above concerns and two overarching questions. First, "how do we keep our communities safe?", and second, "what would one expect (or accept) for his or her own child?"

The following guiding principles would engender a system that most parents and caregivers would find acceptable or appropriate. They are also responsive to the community, including those that may have been victimized as well as professionals in public education, law enforcement, prosecutors and the judiciary. (1) The environment within the TYC should be safe, health-promoting, and facilitate the appropriate educational and moral development of youth; (2) Youth should spend the least amount of time possible in the TYC system; (3) The TYC environment should be as least restrictive as possible (i.e., placements in settings ranging from the most integrated to the most segregated); (4) Staffing capacity should be commensurate with the size and needs of the population; (5) Evidence-based policies and programs should be implemented; (6) TYC should be child-focused, family-centered, and non-violent; (7) Communication must be effective; (8) TYC should be grounded in positive youth development where education and treatment, rather than punishment, is the primary work of the TYC; (9) Youth with disabilities should be identified and accommodated; and (10) Youth and families should have easy access to attorneys and advocacy groups.

Incarceration rates for juvenile delinquents in Texas are too high compared to the rest of the country and their adverse consequences on the youth, the victims and the state's budget are far too costly. The most recent data reported by the U.S. Department of Justice show that the Texas rate of commitment of youth to juvenile correction, 243 youth per 100,000 youth, is well above the national average of 219 per 100,000 youth. When compared to other states with an upper age of juvenile court jurisdiction at 16, Texas's rate is only exceeded by Louisiana which has a commitment rate of 246 youth per 100,000 youth.

The following recommendations address strategies to improve funding, governance, sentencing, accountability, policies and procedures, TYC centers, security, cost effectiveness, management, and services.

## RECOMMENDATIONS

### FUNDING AND GOVERNANCE

**Recommendation #2.1**
**Allocate adequate funding for facilities, rehabilitation and treatment programs, appropriate staffing ratios, education, and the training of employees.**

**Recommendation #2.2**
**Ensure that any appointed board and management receive adequate training in order to provide proper oversight and management of TYC facilities.** Consideration for appointment to the board should be from entities and persons with backgrounds that have direct interests in youth misconduct and rehabilitation. Training for executives, board, and staff should be child-centered. In this spirit, we recommend bringing in representatives from the National Juvenile Court Services Association (www.njcsa.org) to provide consultation on a range of issues, from the correctional climate to training.

**Recommendation #2.3**
**Formulate a Transitional Advisory Committee.** The Transitional Advisory Board's role, perhaps composed in part of representatives from this Juvenile Justice Blue Ribbon Task Force, should simply be to assure that the principles and recommendations set forth in this section of the report are clearly articulated and delivered to the newly created advisory board (see Recommendation 2.4). This group should be sunsetted when an advisory board is named.

**Recommendation #2.4**
**Convene an Advisory Board, regardless of structure, that is well-versed in the juvenile justice system, adolescent health and mental health treatment, law enforcement and education.** Board members and executive level personnel must visit facilities at least once per year and have recurring management and ethics training. The best interest of the youth needs to be the primary focus at all levels of executive leadership.

**Recommendation #2.5**
**Create an entity within the state government or academia to provide objective research to state policymakers on juvenile and criminal justice issues, and to provide population and racial impact analyses of all proposed adult and juvenile justice legislation.** This research component should be independent, system-wide, and ongoing, perhaps being housed in a university setting. Two exemplar centers can be found in California (Center for Evidence-Based Corrections at UC-Irvine) and Washington (Washington State Institute for Public Policy).

## ACCOUNTABILITY

**Recommendation #2.6**
**Create a system of accountability that allows an independent governmental office to investigate allegations of impropriety and to conduct routine inspections of facilities to assess conditions and the treatment of juveniles.** One model for this is to have the Office of the Inspector General (OIG) report directly to the Governor, and to have the Ombudsman report directly to the OIG. The need to conduct routine inspections is also important. It is insufficient to only look into complaints, as complaints may never be made and may never come to the agency's attention.

Ombudsman → OIG → Governor

**Recommendation #2.7**
**Support the newly established office of the Ombudsman.** The Ombudsman should have an intake system that promotes access and transparency, and should voice any concerns about potential areas of liability and/or human rights violations. He or she will need adequate funding to realize the potential of this important position.

**Recommendation #2.8**
**Require that TYC facilities and programs be properly accredited and that the agency complies with a set of appropriate standards.** TYC should obtain accreditation again from the American Correctional Association (ACA) (www.aca.org). (TYC has previously been accredited by ACA.) There are other sources that the TYC may want to consider for additional guidance and/or accreditation (i.e., the National Commission on Correctional Health Care, Southern States Association of Colleges, and the Council of Juvenile Correction Administrators).

**Recommendation #2.9**
**Administer a consumer satisfaction survey to youth currently housed in TYC facilities and at least one family member.** There is one such survey, originally developed by the Office of Juvenile Justice and Delinquency Prevention (OJJDP) and later streamlined by the National Council on Crime and Delinquency (NCCD), which takes about 35 minutes to administer. It is available on an electronic notebook, and in Spanish. A random sample of youth could be drawn from TYC facilities so that a baseline could be established now, and these data could be used to set management goals. The survey should allow management to assess emerging concerns about particular facilities, as well as programs or staff within facilities. This survey should be administered by individuals who are independent of the TYC. The results should be reported through the Office of the Ombudsman, and made publicly available.

## Centers/Facilities/Services

**Recommendation #2.10**

**Make decisions on whether to admit youth to TYC facilities using objective, research-based risk assessment and classification.** (See also Recommendation 1.20.) Risk assessment should drive decision-making about treatment (i.e., treatment matching). A recent meeting of juvenile justice assessment experts dubbed the "Consensus Conference" produced recommendations for screening and assessment of mental health needs in the juvenile justice system (Wasserman et al., 2002). Following the RAND Corporation expert consensus guidelines approach (Brook et al., 1986), the group asked juvenile justice staff about current and best practices in assessment. The Consensus Conference urges personnel in the juvenile justice system to screen for issues presenting immediate risk for harm within 24 hours of system intake. The early screen for "emergent risk" targets screening for (1) risk of self-harm, (2) risk of harm to others, (3) immediate mental health crises, (4) current medications, (5) recently ingested substances, and (6) recent mental health treatment (Potter & Jenson, 2007) (see Figure 3 – Screening and Assessment Emergent Risk Model).[10] The initial health assessment should include a medical and dental assessment that is performed by personnel with the appropriate training and credentials to conduct the assessment using standing delegation orders and protocols developed by a multidisciplinary health team (mental, dental, and medical). For youth committed to correctional care, treatment needs with recommendations should be identified and comprehensive psychological, forensic, and educational/workforce development assessments conducted.

**Keeping youth in institutional settings on the basis of treatment or educational needs, rather than risk, is unwarranted and inefficient.**

The type of emergent risk screening portrayed in Figure 3 should be used at all of the TYC facilities. Delinquent youth should be placed in a secure institutional environment on the basis of their potential risk to themselves or the community. Keeping youth in institutional settings on the basis of treatment or educational needs, rather than risk, is unwarranted and inefficient. Research demonstrates that it is more costly to keep youth in institutions than to supervise them in their own home environments. It is less costly and more effective if they are provided alternative services, such as day treatment and therapeutic foster care.

**Recommendation #2.11**

**Adopt the Juvenile Assessment and Intervention System (JAIS) at all TYC facilities**. JAIS, a low-cost, comprehensive assessment and treatment planning package is being used around the country, including Florida and California (www.nccd-crc.org/nccd/n_cj_jabout.html). Once initiated, it could be implemented within 45 to 60 days to drive risk assessment, placement, and treatment at TYC facilities. Such a model would result in individualized, objective, treatment matching. JAIS provides proven casework strategies for handling different types of offenders, with conclusive data on outcomes in institutional, parole, probation, and re-entry initiatives.

---

[10] Source: Potter, C. C., & Jenson, J. M. (2007). Assessment of mental health and substance abuse treatment needs in juvenile justice. In A. R. Roberts & D. W. Springer (Eds.), *Social work in juvenile and criminal justice settings* (3rd ed.) (pp. 133-150). Springfield, IL: Charles C Thomas.

**Figure 3: Screening and Assessment Emergent Risk Model**



**Recommendation #2.12**

**Create a regionalized system of care that supports the use of small facilities.** A regional system provides enhanced monitoring of credentialing, oversight, and training. Such a regional TYC system should emphasize a variety of settings, including day treatment, therapeutic foster care, and small residential facilities. Placements should be based on factors such as age, gender, individual needs, disability, and proximity to a youth's home.

Developing an effective system of care requires that youth be held and served as close to their home community as possible. Ideally, every region should have access to beds that are secure as well as multiple less restrictive environments and services, such as functional family therapy, foster homes, wraparound services, multisystemic therapy (MST), and day treatment (refer to Exhibit 4 for additional evidence-based and cost-effective services). Such a continuum of care allows for individualizing the service delivery system. Moving the youth along the continuum and working with his/her family and community is more efficient, more effective, and less costly.

One question that needs to be addressed at this point is how to transition the existing system of institutional care to one that emphasizes community-based alternatives and regional structures of care. (This question could be answered, in part, through a feasibility study.) The current institutions will obviously continue to exist for a while. The long-term strategy, however, is to create regional service centers in the different regions of the state, and those centers, as they grow and mature and enrich their service delivery systems, will reduce the state's reliance on institutions. Texas organizes its health, mental health, and developmental disability service delivery system using a regional structure. The State's public health and social service infrastructure is specifically comprised of 11 regions designed to support the effective provision of essential services at the local level. Using a similar structure might be feasible for the juvenile justice system.

Institutions can also be assigned to the different regions. If they are too large, some institutions can serve more than one region. Over time, the regional system will become stronger and should take over the operations. Such a strategy helps transfer the power and responsibility from the central institutional system to the regions. Transferring the authority and responsibility locally from the state can go a long way towards finding local solutions, local interventions, and reintegration of the youth into his or her community. It is important to note that some youth will still need institutional systems that are centralized; however, their numbers will be much fewer than the current number of youth in the TYC.

The Missouri Division of Youth Services (DYS) has received attention in the media and among juvenile justice experts as a system that stands out for its ability to provide successful intensive treatment across residential facilities, group homes, and aftercare services. For example, according to a study by DYS in 2003, approximately 11 to 29 percent of youth released from DYS custody in 1999 had recidivated within the following three years, and 8 percent of those released were sentenced to adult prison or short-term 120 adult confinement programs during the following three years (Roberts & Bender, 2008). According to the DYS FY2006 Annual Report, the juvenile recidivism rate was approximately 9 percent.

However, one must use caution in drawing direct comparisons between juveniles treated at TYC and Missouri's DYS.

According to the DYS 2006 Annual Report, just over half (51.4%) of DYS youth were committed for felony offenses (9.6% for serious felonies and 41.8% for less serious felonies), with the remaining youth being committed for juvenile offenses (e.g., status offenses, court order violations; 10.5%), and misdemeanors (38.1%).

According to the TYC Commitment Profile for 2006, this compares to 80% of TYC youth being committed for felonies and 20% for misdemeanors in 2006. Thus, it appears from this data that TYC had a greater number of felony commitments in 2006 than did Missouri's DYS by nearly 30 percent.

In addition to type of offense, there are other important demographic characteristics on which TYC and DYS youth might be compared, such as the percentages of youth in each system with mental health problems (41% in TYC, 46% in DYS), substance abuse problems (46% in TYC, 59% in DYS), and educational disabilities (40% in TYC, 32% in DYS).

Based on this cursory analysis, of course, it is not possible here to draw any hard or fast conclusions about which youth are more difficult to treat – TYC youth or DYS youth. Nor is this our intent. Reaching any scientifically sound conclusions in this regard will require more sophisticated analysis in the future. We are simply suggesting that there may be elements of the DYS regionalized system-of-care that are worth considering as the State of Texas explores the feasibility of adopting a regionalized juvenile justice system.

In other words, we ask not what program packages are most effective, but what characteristics are common to effective programs (Lipsey & Cullen, in press).

Accordingly, we provide a brief overview of DYS in an effort to unpack the critical elements of such a regionalized approach (see Exhibit 5). To more fully examine what characteristics are common to effective programs, we use the DYS regionalized system as a framework to underscore, what in our estimation, are fundamental elements of effective regionalization (see Table 2).

**Recommendation #2.13**

**Separate low-risk and high-risk offenders from one another, and separate vulnerable offenders from potential aggressors.** To effectively ensure this separation, see Recommendations 2.10, 2.11, and 2.12 above.

> **We ask not what program packages are most effective, but what characteristics are common to effective programs.**

**Exhibit 5: Brief Overview of the Missouri Division of Youth Services (DYS)**

Each region of the Missouri Division of Youth Services (DYS), in addition to small residential program capacities sufficient to handle youth of varied risk-levels, has at least one day treatment program for youth released from DYS. While all juveniles released go to day treatment, the emphasis is to get youth back into mainstream services (e.g., public schools) rather than keeping them segregated with other delinquent youth. Most DYS commitments are for indefinite terms.

The extensive services provided appear to be a result of keeping programs small in size and involving family members throughout the treatment process. Highly trained staff are available 24 hours a day and M.S.W. family therapists promote family involvement throughout residential treatment and home-based aftercare. The residential facility, targeting adjudicated youth with felony charges, and the group home programs, targeting status offenders, share a focus on treatment and rehabilitation in small settings as opposed to a focus on punishment. Residential treatment facilities offer extensive group therapy as well as multisystemic family therapy. A strength of this program is the use of day treatment transitional programs to bridge the residential setting to returning to the community.

DYS provides "aftercare" services for each committed youth lasting a minimum of 4 months, but often longer. The aftercare supervision is done by the youth's case worker, who is assigned upon commitment and who, therefore, has worked with the youth and his or her family throughout the period of commitment. (In our estimation, this is a key strength of this program, as DYS personnel have developed lengthy, relatively intimate relations with the youth's family during the residential period that then supports aftercare efforts considerably better than normal.)

In addition to case management, aftercare supervision is supported by "trackers," contract personnel who are responsible for basic monitoring of youth following release. This enables the case manager to focus on treatment goals and needs and leaves the monitoring activities to someone with less clinical training.

Institutional staff at DYS facilities have college degrees and are compensated proportionately. In other words, the basic human capital available to run these facilities and work with these youth is different from the average correctional system.

Regions have discretionary funds with which they can purchase services for selected youth whose needs or circumstances are not sufficiently covered by the routine services available in the region. So, if a particular youth is discharged and needs a very specialized kind of intervention or care, arrangements can be made to purchase those services with these discretionary funds.

At the most basic level, DYS facilities are set up to create a different environment, one that seeks to "normalize" the impact of institutional placement. When one enters one of their residential facilities, it simply does not feel like a correctional facility. There are no huge fences covered with razor wire. The entryways, while they usually have a metal detector that visitors go through, do not have sallyport-type entries for visitors. The main living areas feel like large living rooms (one secure center near Kansas City has a big fireplace, lovely couches and chairs in the main room). This is true even for their most secure facilities, including those that house offenders who have committed murders.

**Table 2: Fundamental Elements of Effective Regionalization**

The following set of beliefs and philosophies are congruent with decisions and interventions of a regionalized juvenile justice system.

*Fundamentals*

- Decentralized decision making that provides agency-wide ownership of the direction, philosophy and goals.
- Clear mission, vision, and values; mission-driven leadership.
- Leadership defined by supervision vs. function.
- Organization chart reflects regional structure (i.e., lean central office staff with sole goal to support the regions; flattened hierarchy; clear line of authority to and within the regions; clear line of authority at the program level between management, group leaders and the frontline staff).
- Decentralized budgets.
- Regional capacity to conduct training (staff at all levels of the organization receive the training necessary to skillfully perform their job duties).
- Check and balance systems at the program, regional and central office levels.
- Standardized reporting system; reviewed and supported by direct observation.
- Statewide Advisory Board and localized Community Liaison Councils.

**Structure and Service Delivery**

Each region has a similar continuum of community-based and residential services. Support functions of supervision, planning, evaluation, and training necessary for effective and efficient delivery of programmatic and contractual services are well maintained.

*Fundamentals*

- Regionalized continuum of services. Regardless of the security level, an overall emphasis is placed on meeting the individualized psychosocial, educational, vocational, and medical needs of the youth in a humane, structured, supportive, and therapeutic environment.
- Small residential programs with high staff to student ratios.
- Youth receive services in close proximity to their homes and families.
- Programs and services fit the needs of the youth and requirements of the law.
- Families are involved, engaged and active participants in the treatment process.
- All services are coordinated with and cognizant of the family.

**Team Philosophy and Structure**

The residential programs are divided into teams of 10-12 youth. The youth are assigned to one team, there to remain until completion of the residential treatment.

*Fundamentals*

- Stable and consistent teams with an assigned team leader.
- Consistent team assignment and leadership.
- 24-hour eyes, ears, heart and "brains" on supervision.
- Employees are empowered and supported to make decisions.
- Focus on continuous improvement.
- Ongoing training and staff development.

**Integrated Service Delivery System at the Site Level**

*Fundamentals*

- Rehabilitative treatment model vs. correctional model.
- Empowered leadership and empowered team.
- Treatment and educational program components work in harmony.
- Staff teams and program leaders are the brokers of supplemental services (e.g., supplemental services must align with agency mission, goals and objectives).

**Case Management**

The Case Manager serves as the primary advocate for youth and his/her family. To provide continuity and consistency, each youth remains with the same case manager throughout his/her commitment. Case managers are assigned to specific geographic areas of the state.

*Fundamental Responsibilities*

- Develop Individualized Treatment Plans (ITPs) for all youth assigned to their respective caseloads.
- Communicate with his/her supervisor and staff team to discuss the particulars of each case and formulate specific treatment interventions for the youth.
- Utilize an objective screening tool to determine the appropriate service.
- Work in cooperation with the family and service providers to determine when the youth is ready for release.
- Make the final recommendation for release and discharge.

**Intensive Case Monitors (Tracking)**

Trackers help the case managers maintain a high level of supervision on youth activities and they are a central component of the youth's successful transition back into the community.

*Fundamental Responsibilities*

- Monitor and supervise youth in the community.
- Maintain contact with designated youth through face-to-face meetings, home visits, phone calls and collateral contacts with others professionals who work directly with the youth.
- Regularly report progress and concerns to the case manager.

**Recommendation #2.14**

**Consider the particular needs of girls in the design of juvenile justice programs and facilities.** Considering that girls are the fastest growing segment of the juvenile justice population (OJJDP, 2000) and that they often have different problems and needs than boys, it is important that the Texas juvenile justice system in general, and TYC in particular, implement gender-specific policies, programs, and practices.

While the field of juvenile justice is in desperate need of interventions designed specifically for females, few specific interventions exist and most existing programs have not been evaluated empirically (American Bar Association, 2001). Instead, a variety of interventions including behavioral, cognitive, affective/dynamic, and systems perspectives are used in gender-specific programs (Bloom & Covington, 2001). Nevertheless, research *has* identified a number of common features of juvenile justice programming that should be considered in adapting juvenile justice systems to meet the unique needs of female offenders.

Gender-specific programming includes two important aspects: 1) *content* (treatment that addresses the issues impacting females' delinquency), and 2) *context* (an environment that is safe, connected and congruent with girls' needs) (Bloom & Covington, 2001).

**Content**

The following factors are especially prevalent and influential in the lives of female delinquents and should be addressed in female programming:

**Trauma.** Research demonstrates that one of the most prevalent and distinct issues common to female offenders is physical and sexual abuse, and corresponding posttraumatic-stress disorder (PTSD). Individual, group, and family counseling with masters-level professionals should be provided to address past trauma and help youth address such issues as domestic violence, family abuse, and coping methods (Patino, Ravoira, & Wolf, 2006). In developing group counseling programs, homogeneous groups should be used for females that have experienced similar traumas (Bloom & Covington, 2001).

**Research demonstrates that one of the most prevalent and distinct issues common to female offenders is physical and sexual abuse, and corresponding posttraumatic-stress disorder (PTSD).**

**Mental Health.** It is important to identify strategies for the re-allocation of resources to provide mental health services as all levels of the continuum from secure short-term, acute psychiatric placements to community mental health services. Mental health treatment should address the interconnectedness of mental health symptoms, past trauma, addiction, and delinquent behaviors (Patino et al., 2006).

**Substance Abuse.** Substance abuse plays a prominent role in female offending. Reports indicate that substance-abusing females are found in the criminal justice system four to ten times more than in the general population (Bloom & Covington, 1998). Substance abuse treatment resources should be available for all females whose criminal behavior is related to their chemical dependency (ISFOPG, 1995; Patino et al., 2006).

**Relationships.** Relationships with others are particularly important to the healthy development of female adolescents. Programs should help females to establish trusting positive relationships with staff, family members and other trusted females already present in their lives, including friends, relatives, neighbors or teachers. These individuals should be engaged in the treatment process (Patino et al., 2006). Family members, in particular, need to participate in treatment to build skills for successful parenting and conflict resolution in order for youth to be successful in their home communities. In addition to treatment, females need relationships with positive female role models and mentors. Mentoring relationships should be fostered and encouraged within the juvenile justice program (Bloom & Covington, 1998; ISFOPG, 1995).

**Pregnancy and Parenting Skills**. Females should receive specialized medical care including gynecological services and pregnancy/STD prevention programming. For those females who have children or are pregnant, parenting skills training should be made available (Beckman, 1994; Belknap et al., 1997).

**Traditional and Non-Traditional Educational and Vocational Programming**. Most females benefit greatly from formal education as well as training in other non-traditional areas such as relationship building, healthy boundaries, decision making, assertiveness, and anger management. Trainings should prepare females to function in their communities in educational or vocational settings of interest to them as well as social settings (Patino et al., 2006).

**Context**

In addition to including content relevant to female delinquency, gender-specific programs should take place within an environment that includes the following attributes:

**Proximity**. Programs, whether residential or community-based, should be provided in the communities where girls live. Proximity allows for building relationships through family visitation and family therapy, and girls can develop skills necessary for addressing the challenges within their home communities (Patino et al., 2006).

**Safety**. Programs for females should be provided in a safe, trusting and supportive environment (Bloom & Covington, 1998). Programs should be free of physical, emotional, and sexual harassment and re-victimization (Beckman, 1994). This includes establishing and enforcing appropriate boundaries and rules of conduct without resorting to the use of physical force. (See also Recommendation 2.26.)

**Continuum of Services**. Regardless of what point girls are in the system (minimum to maximum risk), mental health and substance abuse services should be available to female delinquents. Gender-specific services need to be available to girls at *all* program levels, from prevention to incarceration to aftercare services. Females should not have to be placed in more secure settings simply to gain access to treatment or services (Petino et al., 2006). Furthermore, collaboration and coordination between service providers and aftercare services is especially important for females as this supports taking a relational approach to treatment (Austin, Bloom, & Donahue, 1992).

**Least Restrictive Environment**. Females are disproportionately arrested for less serious crimes, and despite their low risk level, are placed in more restrictive settings (American Bar Association, 2001). It is important that only girls who pose a public safety risk be placed in residential programs, while recognizing that some of these girls may be at risk in their home environments (e.g., from abuse or neglect). Accommodations may need to be made for them, short of putting them in a detention or TYC setting. The least restrictive programming environment available should be used whenever possible, and placement in more secure placements should be based solely on level of concern for public safety and treatment needs (Bloom & Covington, 1998).

**Informed Staff**. Staff working with females should be educated about female development and service needs. Staff should reflect the client population in terms of gender, race/ethnicity, sexual identity and language spoken. Staff or successful peers should serve as positive role models and mentors and create opportunities for female delinquents to develop trusting relationships with them. It is important for staff members and facilitators to empower girls rather than using power over them (Bloom & Covington, 2001).

**Connection**. The environment should foster connections between staff members and female delinquents and should emphasize an interaction style comfortable to females, including relationship building, empowerment to express feelings, mutual power rather than authoritarian leadership (Bloom & Covington, 1998).

Many of the factors discussed above were supported in a review of over 100 community programs for women. This review found the most successful programs did not utilize a medical model of treatment that strives to cure offenders. Instead, successful programs employed an empowerment model that aimed to help women develop coping skills, improve decision making, and develop behavioral responses to meet their own needs. Within the empowerment approach, successful programs addressed a broad range of issues, including victimization, substance use, pregnancy, parenting, mental health, and healthy relationships. Furthermore, programs associated with positive outcomes provided safe environments with clear expectations, diverse staff, accountability for behavior, and connection to aftercare services (Austin et al., 1992).

Adapting current services to be gender-responsive requires several changes to program content and context. The National Council on Crime and Delinquency (NCCD) has developed short-term and longer-term recommendations for providing gender-specific services to girls in the juvenile justice system (see Table 3).

**Many of the factors discussed above were supported in a review of over 100 community programs for women.**

| Table 3. Gender-Specific Recommendations for Female Juvenile Offenders[11] |
|---|
| **Short-term Recommendations**<br><br>1. Reduce beds in residential delinquency programs by creating community treatment programs for at-risk girls.<br>2. Implement a uniform, gender-responsive screening and assessment process utilizing an instrument that identifies risk level, intervention needs, and supervision strategies.<br>3. Provide appropriate resources for the development and implementation of uniform gender-responsive training for all staff working with girls along the entire juvenile justice continuum as part of the required training.<br><br>**Longer-term Recommendations**<br><br>1. Provide specialized service options for pregnant and parenting girls.<br>2. Deliver health services such as gynecological care, prenatal and post-partum care for pregnant girls, and health education that address HIV and other sexually transmitted infections and diseases.<br>3. Offer specialized services to address family conflict and associated risk.<br>4. Implement aftercare and transitional services to ensure success for girls.<br>5. Provide traditional/non-traditional education and vocational programs that are gender-specific.<br>6. Explore the implementation of a female offender probation unit which would entail the reorganization of caseloads so all girls on probation would be supervised under one unit and probation officers would have all-girl caseloads. |

In keeping with the gender-specific treatment recommendations outlined in Table 4, the NCCD recommends creating community treatment programs for at-risk girls, thus reducing the need for beds in residential delinquency programs. Funding for new programs would need to be shifted from residential programs over time to avoid disrupting existing placement options while the new programs are being established.

Specific new program initiatives for TYC officials to consider include:

• *Create a pilot project for girls with self destructive and aggressive behaviors, mood disorders, and substance abuse.* Using the Family Integrated Transitions Program model developed by the Division of Public Behavioral Health and Justice Policy at the University of Washington would provide an alternative to residential placement for girls who have committed non-law violations or misdemeanors.

• *Combine PACE with Dialectical Behavioral Therapy and day treatment* for girls who are now being sent to commitment for non-law violations and misdemeanors.

• *Pilot a community-based project for girls with mental health and abuse issues* that works with families to address girls' multiple risk factors using the Multisystemic Therapy model.

• *Adopt the Seeking Safety Therapy (SS)* program for girls with co-morbid substance abuse and PTSD (Najavits, Gallop, & Weiss, in press). (See also Exhibit 6.)

[11] Source: Patino, V., Ravoira, L., & Wolf, A. (2006). *A rallying cry for change: Charting a new direction in the State of Florida's response to girls in the juvenile justice system.* Oakland, CA: National Council on Crime and Delinquency.

**Recommendation #2.15**
**Provide flexible and individualized care for youth in TYC.** Institutionalized care tends to be rigid and provides little opportunity to individualize and tailor the care for the youth. In reality, upon release from TYC facilities, many of these youth need a system that can give them increased supervision or even increased restrictions if they show signs of getting in trouble. This requires a more flexible system of care that regularly interacts with their community. The JAIS described in recommendation 2.11 could support this sort of flexible and individualized care, as would allowing advocacy and support groups to provide on-site services to incarcerated youth.

**Recommendation #2.16**
**Provide graduated levels of care (i.e., services and restrictions) within the TYC system that are driven by risk assessment and classification** (see Recommendations 2.10 and 2.11 above for more detail).

**Recommendation #2.17**
**Ground the juvenile justice system with a clear focus on education.** The importance of education opportunities for court involved youth cannot be overstated. Academic competence and educational attainment is inversely correlated with re-arrests and re-offending among youth.

There is a clear nexus between school failure and school exclusion and the increased risk for a youth's involvement in juvenile corrections. Nationally, data suggest that while school violence has remained relatively constant and/or has declined since 1995, the rate at which students are excluded from school via suspensions and/or expulsions has increased dramatically. Youth who are subject to increased numbers of disciplinary infractions are disproportionately minority students and students enrolled in special education programs. Some attribute this to "zero tolerance" policies that sweep up kids involved in serious disciplinary infractions, as well as youth whose transgressions in the past were handled by the assistant principal. In addition to involving local police in the "criminalization" of school misbehavior, schools set students up for involvement in the juvenile justice system by placing them out of school and providing limited, if any, alternatives. (See also Recommendations 1.2 and 1.3.)

Given that the median reading achievement level was 6th grade for youth at TYC (four years behind their peers), and congruent with NCCB and IDEA, all youth should be offered a scientifically-based reading program.

Incarcerated youth and youth under the supervision of the juvenile court or probation have a right to education services comparable to their peers who are not in trouble.[12] The problems are particularly acute for students with disabling conditions and for English language learners. In addition, recent national data suggest that the number of youth with special education needs in juvenile corrections is 3 to 5 times the number found in the public schools. Forty percent (40%) of youth at TYC facilities currently are eligible for federal special education programming (see Texas Education Agency [TEA] rule that governs the provision of special education services in pre- and post adjudication facilities - 19 Tex. Admin. Code 89.115).

---

[12] More than 23 states have experienced class-action litigation that included, in part, problems with the inadequate education services (Dr. Peter Leone, personal communication, June 2007).

**Recommendation #2.18**
**Begin aftercare planning, addressed more fully in the next section of the report, within the first 30 days of a youth being placed at TYC.** Treatment should follow the youth and limit the function of the institutional placement.

**Recommendation #2.19**
**Promote an integrated health care model - to include physical, behavioral, and mental health - across TYC facilities.** The goal should be to improve health, both physical and mental, for youth and promote maintenance of health following TYC involvement. In an effort to make health care available to youth in rural communities, the potential application of technology (i.e., telehealth) should be supported, not in lieu of providing on-site medical care, but rather as an adjunct to it.

In keeping with an integrated health care model, it is important to underscore the importance of adopting a bio-psycho-social perspective. In other words, a traditional or strict medical model for managing health care, particularly mental health and substance abuse issues, is not recommended. Health services are best delivered when there is appropriate and systematic coordination across disciplines, including medical, psychiatry, psychology, education, and social work. Whether the services are delivered by one provider or multiple providers, the delivery of services should be coordinated. The various treatment providers should have a working relationship with one another and engage in shared decision-making around treatment planning. Most parents would accept no less for their child. Furthermore, whenever possible, parents or caregivers should be actively involved in providing consent for health care.

According to the American Academy of Pediatrics' (AAP) Committee on Adolescence, adolescents entering correctional care facilities may be at higher risk than their non-incarcerated counterparts for a multitude of general health problems, including sexually transmitted diseases, drug use and abuse, issues regarding pregnancy, HIV or AIDS, and pre-existing mental health problems. Since the early 1970s, the AAP has published policy statements about health care for correctional care facilities. The AAP is also one of more than 30 organizations represented on the Board of the National Commission on Correctional Health Care, a not-for-profit organization comprised of representatives from the fields of corrections, law, law enforcement, medical, dental, and mental health care. The primary purpose of this organization is to work with correctional facilities to assist in improving their systems for providing health care. The commission produces national standards for correctional health services, offers a voluntary accreditation program, and publishes official position statements.

Youth incarcerated in TYC facilities should be provided with health care services as recommended by the AAP, and at least equivalent to those accepted as community standards of care commonly accepted in the community. Additionally, integrated health care in TYC facilities should comply with the American Correctional Association's Performance Based Juvenile Healthcare Standards (www.aca.org). TYC health care services should include age and gender appropriate periodic health examinations for health maintenance as well as recommended screening and testing for behavioral, dental, and medical issues (this should include preventive dental care and vaccinations for vaccine preventable illnesses).

One additional factor to consider in delivering health care and other treatment services to youth is that the neurobiology make-up of the adolescent brain is different than that of the adult brain (Schore, 2003). Applying adult models of criminal justice to delinquent youth is inappropriate, at best, and insufficient and negligent, at worst, as adolescents' neurodevelopment is still in process and not yet fully developed as an adult brain. Adolescents' brains continue to grow and mature into their mid-20s. The pre-frontal cortex, responsible for the hallmarks of adult behavior, such as impulse control, the regulation of emotions and moral reasoning, is the last part of the brain to mature. As a result, adolescents – in comparison to adults – utilize fewer parts of the brain to recognize others' emotions and to determine appropriate responses, often reacting to events instinctively. This developing yet immature wiring suggests that adolescents require a justice system sensitive to their unique developmental needs.

**Applying adult models of criminal justice to delinquent youth is inappropriate, at best, and insufficient and negligent, at worst, as adolescents' neurodevelopment is still in process and not yet fully developed as an adult brain.**

**Recommendation #2.20**
**Provide dually diagnosed youth – those identified as simultaneously having substance use disorders and comorbid psychiatric mental health disorders – with *integrated* treatment.** Integrated treatment, which involves treating both disorders concurrently, is considered most effective in comparison to serial treatment (treating one disorder before the other) or parallel treatment (treating both disorders simultaneously by separate clinicians).

Bender, Springer, and Kim (2006) conducted a systematic review on the effectiveness of current empirically supported treatments for dually diagnosed adolescents. Studies included in this review were those that met the following selection criteria established by the researchers: (1) randomized clinical trials, allowing researchers to determine effectiveness; (2) treatment for dually diagnosed disorders, meaning treatment for both substance abuse and mental health disorders concurrently; (3) peer reviewed in past 10 years, to provide the most current literature available; (4) treatments designed for youth with already existing dual diagnoses, excluding prevention studies; (5) studies published in English; and (6) treatment for youth ages 12 to 18, narrowing studies to those of adolescents only. The search identified seven interventions for dually diagnosed adolescents reported across six different studies that met this selection criteria. These included: Multisystemic Therapy (MST; Henggeler, Pickrel, & Brondino, 1999), Interactional Group Treatment (IT; Kaminer, Burleson, Blitz, Sussman, Rounsaville, 1998; Kaminer & Burleson, 1999), Family Behavior Therapy (FBT; Azrin, Donohue, & Teichner, 2001), Individual Cognitive Problem-Solving (ICPS; Azrin, Donohue, & Teichner, 2001); Cognitive Behavior Therapy (CBT; Kaminer, Burleson, & Goldberger, 2002), Ecologically Based Family Therapy (EBFT; Slesnick & Prestopnik, 2005), and Seeking Safety Therapy (SS; Najavits, Gallop, & Weiss, in press).

The results were broken down by three specific treatment outcomes: externalizing disorders (e.g., conduct disorder, aggression), internalizing disorders (e.g., depression, anxiety), and substance abuse. The results were analyzed and interpreted using a statistic called an effect size.

This statistic is commonly used in clinical outcome research. Effect size statistics portray the strength of association found in any study, no matter what outcome measure is used, in terms that are comparable across studies (Rubin & Babbie, 2008). Thus, they enable us to compare the effects of different interventions across studies that use different types of outcome measures. These treatment effects are interpreted as *large, moderate, or small*, which is simply a way to more easily interpret the effect size.

Table 4 shows those treatments that had large, moderate, and small effects at follow-up on externalizing, internalizing, and substance abuse outcomes. The table also indicates the follow-up time period, allowing the reader to interpret the effect in the context of the time period in which it was measured.

*Externalizing Disorders*. Externalizing effect sizes were large for the MST, FBT, and ICPS groups. Of interest is that youth receiving MST and ICPS showed moderate to large improvements in externalizing outcomes at posttest and these effects improved further to large effects at follow-up.

**Table 4. Treatments Organized by Effect Size and Treatment Outcome for Dually Diagnosed Adolescents.**

| | Dual Diagnosis Outcomes | | |
|---|---|---|---|
| Effect Size | Externalizing | Internalizing | Substance Abuse |
| Large | MST**<br>FBT**<br>ICPS** | IT****<br>CBT[1]****<br>FBT**<br>ICPS**<br>CBT[2]*** | FBT**<br>ICPS**<br>CBT[2]***<br>PET[3]*** |
| Moderate | EBFT**<br>SS* | PET[3]***<br>EBFT** | EBFT**<br>CBT[1]****<br>SS* |
| Small | | SS* | MST**<br>IT**** |

Asterisks indicate period of time between pretest and follow-up; *Pre to 3-month follow-up, **Pre to 6-month follow-up, ***Pre to 9-month follow-up, ****Pre to 15-month follow-up. [1]CBT from Study 2 (Kaminer et al., 1998); [2]CBT from Study 4 (Kaminer et al., 2002); [3]Psychoeducational Treatment (PET) was a control condition in the Kaminer et al (2002) study.

*Internalizing Disorders.* Internalizing effect sizes were large for the IT, CBT, FBT, and ICPS groups. The effects of all four of these interventions improved over time after treatment ended. Especially impressive among these treatments is the sustainability of internalizing outcomes for IT and CBT; youth in these groups demonstrated substantial changes even when evaluated as long as 15 months after treatment ended.

*Substance Abuse.* Lastly, substance abuse effect sizes were large for the FBT, ICPS, PET, and CBT groups. Worth noting is that newer, less established treatments such as EBFT and SS also had moderate effect sizes at posttest and sustained moderate reductions in substance abuse at follow-up.

While analysis identifying effective treatment modalities for individual outcomes is helpful, one challenge of treating dually diagnosed youth is their likely diagnosis with several or all of these conditions. Reviewing these results, FBT and ICPS appeared to be the only interventions to produce large treatment effect sizes across externalizing, internalizing, and substance abuse domains. Furthermore, the large effect sizes for these two treatments were evident at 9-months post-treatment demonstrating sustainability of effects over time.

After examining the common factors among treatments with demonstrated effectiveness, Bender and colleagues developed ten preliminary treatment guidelines for dually diagnosed adolescents (see Table 5). These guidelines might serve as a barometer, perhaps providing a general gauge of how to tailor treatment for dually diagnosed juvenile offenders.

| **Table 5. Ten Preliminary Treatment Guidelines for Dually Diagnosed Adolescents**[13] |
|---|
| 1. Assessment is multi-pronged, ongoing, and includes practitioner, parental and self monitoring so that treatment is responsive to the changing needs of the client. |
| 2. Treatment strategically enhances engagement and retention. |
| 3. Treatment plans are flexible and allow for client choice and voice. |
| 4. An integrated treatment approach is used to address both mental health and substance related disorders concurrently. |
| 5. Treatment is developmentally and culturally sensitive to match the unique needs of the client system. |
| 6. Treatment is ecologically grounded and systems oriented, including important individuals to the client such as family members, friends, and school personnel. |
| 7. Treatment taps several domains of the client's functioning to enhance the client's problem solving and decision-making skills, affect regulation, impulse control, communication skills, and peer and family relations. |
| 8. Treatment is goal-directed, here-and-now focused, and strength-based. |
| 9. Treatment requires active participation by all members involved, and includes homework assignments. |
| 10. Interventions aim to produce sustainable changes over the course of treatment. |

For detained youth and those leaving detention, collaboration between mental health, substance use, and juvenile justice service providers appears especially important in reducing delinquency. This type of collaboration requires graduate level clinicians with specialized training in patterns of behavior of dually diagnosed youth, which suggests a need for training clinicians on collaborative case management and techniques for integrating treatment for dually diagnosed juvenile offenders.

---

[13] Sources: Bender, K., Springer, D. W., & Kim, J. S. (2006). Treatment effectiveness with dually-diagnosed adolescents: A systematic review. *Brief Treatment and Crisis Intervention, 6*(3), 177-205; Bender, K., Kim, J. S., & Springer, D. W. (2007). Effectiveness of interventions for dually-diagnosed adolescents: Implications for juvenile offenders. In D. W. Springer & A. R. Roberts (Eds.), *Handbook of forensic mental health with victims and offenders: Assessment, treatment, and research* (pp. 173-203). New York, NY: Springer Publishing Company.

**Recommendation #2.21**

**Provide specialized treatment to juvenile sex offenders**. Programming should be based on currently accepted practices including the field's knowledge of approaches to assess and evaluate youth with general delinquent behavior, as well as current literature and research related to evaluating and treating youth who sexually offend. One recent meta-analysis by Reitzel and Carbonell (2006) found that programs for juvenile sex offenders resulted in a 46% reduction in recidivism.

Current practices suggest that treatment is guided by the risk, need and responsivity principles. *Risk* refers to matching intensity of treatment to the risk level of the youth, with the highest risk youth receiving the most intense services. The *need principle* refers to targeting specific dynamic risk factors that are related to recidivism, both sexual recidivism and general delinquent recidivism. *Responsivity* refers to delivering treatment in a style that the youth can learn from. In practice, this means adjusting program design and delivery based on a youth's developmental, learning, and social/emotional characteristics.

Consistent with the research and current practices within the field of juvenile sex offender treatment, programming should not assume certain cycles of abuse or triggers to offending, nor that all adolescent sex offenders need traditional relapse prevention approaches. Rather, the program should recognize that there are multiple pathways to offending and utilize an evolved view of relapse prevention that embraces the role of approach goals in striving towards overall prosocial functioning.

The program's supervisory staff should be knowledgeable of current approaches to adolescent sex offender treatment and familiar with approaches to general delinquent behavior. All staff involved in the program need appropriate levels of specialized training related to juvenile sex offenders, in addition to training focused on delinquent youth. The program should be cognitive behavioral in nature with a skills building focus, and have the capacity to address sex offender and general delinquent dynamic risk factors in addition to youth's other health, mental health, and educational needs. The current research also suggests that an effective treatment program is one that attends to therapist style and is most effective when treatment is delivered in a way that stresses respect and hope, versus earlier approaches to adolescent sex offenders which tended to be rather confrontational in nature.

The evaluation process should include recognized risk assessment instruments for both sex offending risk and general risk for delinquent reoffending. It is important to differentiate sex offender specific risk factors and factors unlikely linked to sexual reoffending (see Table 6). Accordingly, a progress rating scale that focuses on sex offender specific dynamic risk factors should be utilized throughout the youth's treatment. Sex offender specific tools to consider using include the Juvenile Sex Offender Assessment Protocol II (JSOAP-II) and the Estimate of Risk of Adolescent Sexual Offence Recidivism (ERASOR). A useful general delinquent and violence scale is the Youth Level of Service/Case Management Inventory (YLS/CMI). Release planning should be initiated when the youth enters the system and should be based on appropriateness for a lower level of care and not on "program completion."

| Table 6. Differentiating Risk Factors Linked and Unlinked to Sexual Offending | |
|---|---|
| <u>Sex Offender Specific Risk Factors</u> | <u>Factors Unlikely Linked to Sexual Reoffending</u> |
| Male Victims<br>Young Victims<br>Diverse Deviant Behavior<br>Prior Legally Charged Offenses<br>Multiple Victims<br>Poor Social Skills/Social Isolation<br>Attitudes Supportive of Offending<br>Difficulties Managing Emotions<br>Sexual Deviation/Preoccupation | Denial<br>Empathy for Specific Victim<br>Degree of Force Used in Offense<br>Degree of Intrusiveness of Offense<br>General Psychological Problems<br>Low Motivation at Intake |

The program should have the capacity to involve the family in the treatment process, as appropriate. For youth who have a release goal of returning home, appropriate family work will need to occur prior to the youth's release, with specific guidelines for youth under consideration of being returned to a home where children reside. Upon release, interventions should be offered in collaboration with probation officers who will provide supervision, link youth to appropriate treatment and interventions in the community, monitor compliance to safety guidelines and therapeutic recommendations, and assist in evaluation of risk levels and progress.

**Recommendation #2.22**

**Provide specialized treatment to substance-abusing juvenile offenders.** Adolescent substance abuse and juvenile delinquency are interrelated and complex problems. Research indicates a significant association between adolescent alcohol and other drug (AOD) use/abuse and delinquency. Incarcerated adolescents are three times more likely to have partaken in substance use in the past year than other adolescents. Because of the association between substance abuse and juvenile delinquency, the reduction of AOD use is critical to treating and preventing juvenile delinquency.

**Because of the association between substance abuse and juvenile delinquency, the reduction of alcohol and other drug use is critical to treating and preventing juvenile delinquency.**

Accordingly, we provide a matrix from the University of Washington Alcohol and Drug Abuse Institute that summarizes the evidence-based practices for treating substance use disorders (see Exhibit 6; matrix available from http://www.adai.washington.edu/ebp/matrix.pdf). Below, we briefly discuss one of the treatments from this exhibit, Node-link Mapping, which is highlighted in Exhibit 6 as an approach for both adolescent and adult offenders that is not specific to any one drug.

# Exhibit 6
## Evidence Based Practices for Treating Substance Use Disorders

*Click on intervention title for a detailed description.*

*Manual availability:*
*D = Download free from web*
*F = Free print copy (order)*
*$ = Cost to purchase print copy*
*N = No specific manual*

| Practice | | Population | | | | | | | | | | | | | | | | | | | | Drug Problem | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | *Manual: see note at left* | *Adolescents* | *Adults* | *African American* | *Am Indian/Alask Native* | *Asian/Pacific Islander* | *Children/Youth* | *College Student* | *Co-Occurring Patients* | *GLBT* | *Hispanic/Latino* | *HIV+/Hep C/STD* | *Homeless* | *IV Drug User* | *Low-income/Unemployed* | *Men* | *Offenders* | *Opiate Subst Clients* | *Polydrug Users* | *Pregnant Women* | *Women* | *Not Specific to One Drug* | *Alcohol Dependence* | *Alcohol Problem Drinking* | *Amphetamines* | *Cocaine / Crack* | *Heroin / Opiates* | *Marijuana* | *Methamphetamine* | *Polydrug Use* | *Prescription Meds* | *Tobacco* |
| **Cognitive and/or Behavioral Interventions** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 12-Step Facilitation Therapy | $6 | | X | | | | | | | | | | | | | | | | | | | | X | | | X | | | | | | |
| Anger Management for Substance Abuse and Mental Health Clients: Cognitive Behavioral Therapy | F/D | | X | | | | | | X | | | | | | | X | | | | | X | X | | | | | | | | | | |
| Behavioral Couples (Marital) Therapy | F | | X | | | | | | | | | | | | | X | | X | X | | X | X | X | | | X | X | | | | | |
| Behavioral Self-Control Training | N | | X | | | | | | | | | | | | | X | | | | | X | | | X | | | | | | | | |
| Behavioral Therapy for Adolescents | N | X | | | | | | | | | | | | | | | | | | | | X | | | | | | | | | | |
| Brief Alcohol Screening and Intervention for College Students (BASICS): A Harm Reduction Approach | $30 | | | | | | | X | | | | | | | | | | | | | | | | X | | | | | | | | |
| Brief Cognitive Behavioral Intervention for Amphetamine Users | D | | X | | | | | | | | | | | | | | | | X | | | | | | X | | | | | | | |
| Brief Intervention | D | X | X | | | | | X | | | | | | | | | | | | | | | | X | | | | | | | | X |
| Brief Marijuana Dependence Counseling (BMDC) | F/D | | X | X | | | | | | | X | | | | | | | | | | | | | | | | | X | | | | |
| Brief Strategic Family Therapy (BSFT) | D | X | X | | | | | | | | X | | | | | | | | | | | X | | | | | | | | | | |
| Cannabis Youth Treatment | F/D | X | | | | | | | | | | | | | | | | | | | | | | | | | | X | | | | |
| Cognitive Behavioral Coping Skills Therapy | $6 | | X | | | | | | | | | | | | | | | | | | | | X | | | | | | | | | |
| Combined Behavioral & Nicotine Replacement Therapy | F/D | | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | | X |

| Practice | | Population | | | | | | | | | | | | | | | | | | | | Drug Problem | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ***Click on intervention title for a detailed description.***<br>*Manual availability:*<br>*D = Download free from web*<br>*F = Free print copy (order)*<br>*$ = Cost to purchase print copy*<br>*N = No specific manual* | *Manual: see note at left* | *Adolescents* | *Adults* | *African American* | *Am Indian/Alask Native* | *Asian/Pacific Islander* | *Children/Youth* | *College Student* | *Co-Occurring Patients* | *GLBT* | *Hispanic/Latino* | *HIV+/Hep C/STD* | *Homeless* | *IV Drug User* | *Low-income/Unemployed* | *Men* | *Offenders* | *Opiate Subst Clients* | *Polydrug Users* | *Pregnant Women* | *Women* | *Not Specific to One Drug* | *Alcohol Dependence* | *Alcohol Problem Drinking* | *Amphetamines* | *Cocaine / Crack* | *Heroin / Opiates* | *Marijuana* | *Methamphetamine* | *Polydrug Use* | *Prescription Meds* | *Tobacco* |
| Combined Scheduled Reduced Smoking & Cognitive Behavioral Therapy | N | X | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | | X |
| Community Reinforcement Approach (CRA) with Vouchers | D | | X | | | | | | | | | | | X | | | | | | | | | X | | | X | X | | | | | |
| Contingency Management (Without CRA) | N | | X | X | | | | | | | | | | X | X | | | X | | | | | | | | X | X | | | | | |
| Day Treatment with Abstinence Contingencies and Vouchers | N | | X | | | | | | | | | | X | | | | | | | | | | | | | X | | | | | | |
| Dialectical Behavior Therapy | N | | X | | | | | | X | | | | | | | | | | | | X | X | | | | | | | | | | |
| Downward Spiral | $20 | | X | | | | | X | | | | | | | | | X | | | | | X | | | | | | | | | | |
| Family Support Network (FSN) for Adolescent Cannabis Users | F/D | X | | | | | | | | | | | | | | | | | | | | | | | | | | X | | | | |
| Group Drug Counseling for Cocaine Addiction: The Collaborative Cocaine Treatment Study Model | D | | X | | | | | | | | | | | | | X | | | | | X | | | | | X | | | | | | |
| Holistic Harm Reduction Program (HHRP+) | D | | X | X | | | | | | | | X | | X | | | | X | | | | | | | | X | X | | | | | |
| Individual Cognitive-Behavioral Therapy | D | | X | | | | | | | | | | | | | | | | | | | X | | | | X | | | | | | |
| Individual Drug Counseling to Treat Cocaine Addiction | D | | X | | | | | | | | | | | | | X | | | | | X | X | | | | X | | | | | | |
| Lower-Cost Contingency Management | N | | X | | | | | | | | | | | | | | | X | | | | | X | | | X | X | | | | | |
| Matrix Intensive Outpatient Program for the Treatment of Stimulant Abuse | $25-$60 | X | X | | | | | | | | | | | | | | | | | | | | | | | | | | X | | | |
| Motivational Enhancement Therapy and Cognitive Behavioral Therapy for Adolescent Cannabis Users | F/D | X | | | | | | | | | | | | | | | | | | | | | | | | | | X | | | | |

| Practice | | Population | | | | | | | | | | | | | | | | | | | | Drug Problem | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ***Click on intervention title for a detailed description.***<br>*Manual availability:*<br>*D = Download free from web*<br>*F = Free print copy (order)*<br>*$ = Cost to purchase print copy*<br>*N = No specific manual* | *Manual: see note at left* | *Adolescents* | *Adults* | *African American* | *Am Indian/Alask Native* | *Asian/Pacific Islander* | *Children/Youth* | *College Student* | *Co-Occurring Patients* | *GLBT* | *Hispanic/Latino* | *HIV+/Hep C/STD* | *Homeless* | *IV Drug User* | *Low-income/Unemployed* | *Men* | *Offenders* | *Opiate Subst Clients* | *Polydrug Users* | *Pregnant Women* | *Women* | *Not Specific to One Drug* | *Alcohol Dependence* | *Alcohol Problem Drinking* | *Amphetamines* | *Cocaine / Crack* | *Heroin / Opiates* | *Marijuana* | *Methamphetamine* | *Polydrug Use* | *Prescription Meds* | *Tobacco* |
| Motivational Enhancement Therapy (MET) for Problem Drinkers | $6 | | X | | | | | | | | | | | | | | | | | | | | X | X | | | | | | | | |
| Multidimensional Family Therapy (MDFT) | F/D | X | | X | | | | | | | | | | | | | | | | | | | | | | | | X | | X | | |
| Multisystemic Therapy (MST) | $40 | X | | | | | | | | | | | | | | | X | | | | | X | | | | | | | | | | |
| Node-Link Mapping: Mapping New Roads to Recovery: Cognitive Enhancements to Counseling | D/$15 | X | X | | | | | | | | | | | | | | | | | | | X | | | | | | | | | | |
| Relapse Prevention Therapy | D | X | X | | | | | | | | | | | | | | | | | | | X | X | | | X | | | | | | |
| Seeking Safety: A Psychotherapy for Trauma/PTSD and Substance Abuse | D/$20 | X | X | | | | | | X | | | | | | X | X | X | | | | X | X | | | | | | | | | | |
| Supportive-Expressive Psychotherapy | $27 | | X | | | | | | X | | | | | | | | | X | | | | | | | | X | X | | | | | |
| Time Out! for Me: An Assertiveness and Sexuality Workshop Specially Designed for Women | D/$19 | | X | | | | | | | | | | | | | | | | | | X | X | | | | | | | | | | |
| Time Out! for Men: A Communications Skills and Sexuality Workshop for Men | D/$19 | | X | | | | | | | | | | | | | X | | | | | | X | | | | | | | | | | |
| Treating Tobacco Use and Dependence. Clinical Practice Guideline | D/F | X | X | | | | X | | X | | | | | | | X | | | | X | X | | | | | | | | | | | X |
| **Pharmacological Therapies*** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Acamprosate (Campral) | $6 | | X | | | | | | | | | | | | | | | | | | | | X | | | | | | | | | |
| Buprenorphine (Suboxone and Subutex) | F/D | | X | | | | | | | | | | | | | | | | | | | | | | | | X | | | | | |
| Combined Behavioral & Nicotine Replacement Therapy | F/D | | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | | X |

| Practice | | Population | | | | | | | | | | | | | | | | | | | | Drug Problem | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ***Click on intervention title for a detailed description.***<br><br>*Manual availability:*<br>*D = Download free from web*<br>*F = Free print copy (order)*<br>*$ = Cost to purchase print copy*<br>*N = No specific manual* | *Manual: see note at left* | *Adolescents* | *Adults* | *African American* | *Am Indian/Alask Native* | *Asian/Pacific Islander* | *Children/Youth* | *College Student* | *Co-Occurring Patients* | *GLBT* | *Hispanic/Latino* | *HIV+/Hep C/STD* | *Homeless* | *IV Drug User* | *Low-income/Unemployed* | *Men* | *Offenders* | *Opiate Subst Clients* | *Polydrug Users* | *Pregnant Women* | *Women* | *Not Specific to One Drug* | *Alcohol Dependence* | *Alcohol Problem Drinking* | *Amphetamines* | *Cocaine / Crack* | *Heroin / Opiates* | *Marijuana* | *Methamphetamine* | *Polydrug Use* | *Prescription Meds* | *Tobacco* |
| Methadone Maintenance Treatment | N | | X | | | | | | | | | | | | | X | | | | | X | | | | | | X | | | | | |
| Naltrexone (for Alcohol) | $6 | | X | | | | | | | | | | | | | | | | | | | | X | | | | | | | | | |
| Naltrexone (for Opiates) | N | | X | | | | | | | | | | | | | | X | | | | | | | | | | X | | | | | |

*Washington State law requires that a behavioral therapy component is provided to patients receiving pharmacological therapies for substance use disorders.

CITATION: University of Washington Alcohol and Drug Abuse Institute. Evidence-Based Practices for Treating Substance Use Disorders: Matrix of Interventions, August 2006.
URL: http://adai.washington.edu/ebp/matrix.pdf

*Node-link Mapping* is particularly useful to enhance treatment readiness of substance-abusing offenders. Simpson and his colleagues (Pitre, Dansereau, Newbern, & Simpson, 1998; Simpson, Chatham, & Joe, 1993; Simpson, Dansereau, & Joe, 1997) at Texas Christian University have developed a series of treatment readiness interventions as part of the NIDA-supported CETOP (Cognitive Enhancements for the Treatment of Probationers) Project. These interventions are designed specifically for use with offenders early in the treatment process (i.e., those in the precontemplation or contemplation stages as depicted in Exhibit 7 and Figure 4), and can be used in groups of up to 35 participants.

Essentially, node-link mapping is a visualization tool, in which elements of ideas, feelings, actions or knowledge contained within "nodes" (circles, squares) are connected to each other by "links" (lines) that are named to specify relationships between the nodes. These maps are usually drawn by practitioners in collaboration with their clients during group or individual sessions.

Node-link mapping has produced moderately positive treatment effects across studies. Mapping appears to increase counseling efficiency, help clients focus their attention, facilitate the development of the therapeutic relationship, and increase counseling efficiency (Czuchry, Dansereau, Dees, & Simpson, 1995; Dansereau, Joe, & Simpson, 1995; Pitre, Dansereau, & Simpson, 1997). An examination by client subgroups indicates that the following types of individuals benefit the most strongly from mapping-enhanced counseling: clients with attention difficulties (Czuchry, Dansereau, Dees, & Simpson, 1995; Dansereau, Joe, & Simpson, 1995); African American and Mexican American clients (Dansereau, Joe, Dees, & Simpson, 1996); and clients who do not have a high school degree or GED certificate (Pitre, Dansereau, & Joe, 1996) (cited in Pitro, Dansereau, & Simpson, 1997).

Treatment Readiness Manuals are available through Lighthouse Institute, which is a part of the Chestnut Health Systems, for a charge of $15 to $20 per manual (see more information at http://www.chestnut.org). The manuals are also available for downloading from the website of the Institute of Behavioral Research (IBR) of the Texas Christian University (TCU) (http://www.ibr.tcu.edu), where Simpson and his colleagues are based.

**Recommendation #2.23**

**Adopt cognitive-behavioral therapy (CBT) as a core element of effective treatment.** The broad category of cognitive-behavioral therapies includes those therapeutic interventions designed to alter both a youth's cognitions and behaviors related to their poor conduct or offending. Cognitive behavioral therapy is an umbrella category for contingency management, cognitive behavioral treatment, guided-group interaction/positive peer culture, and milieu therapy (Pearson, Lipton, Cleland, & Yee, 2002); however, two subcategories are evident. First, behavioral modification is the administration of positive reinforcement when an appropriate behavior is exhibited by a person. For example, when a youth offender completes a classroom exercise without engaging in disruptive behaviors, such as talking out of turn, then the instructor will provide the youth with a reward, such as a favored activity. Essentially, reinforcement is meant to draw youths toward appropriate behaviors by rewarding them (Pearson, Lipton, Cleland, & Yee, 2002). The second subcategory is cognitive behavioral treatments. Cognitive behavior treatments are those interventions that target behavioral processes and lead to changes in a ways of thinking (Pearson, Lipton, Cleland, & Yee, 2002). Social skills training, problem-

solving education, and role modeling are all forms of cognitive behavioral treatments. Cognitive behavioral treatments can be coupled with other forms of treatment to enhance the range of interventions offered to juvenile offenders. For example, practitioners can include cognitive-behavioral treatments with family therapies to bring about changes in a youth's and family's functioning.

In their meta-analysis examining the effects of cognitive-behavioral therapy (CBT) programs for offenders, Landenberger and Lipsey (2005) found CBT to be equally effective with both adult and juvenile offenders. CBT was especially useful in reducing recidivism in high-risk offenders and was effective across secure and community settings. Two particular facets of CBT, the anger control and interpersonal problem-solving components, were associated with much larger effect sizes than were victim impact and behavior modification components. Other meta-analyses have found similar support for cognitive-behavioral interventions with juvenile offenders (Wilson, Bouffard, & MacKenzie, 2005), with some studies citing particular support for cognitive-behavioral rather than purely behavior modification treatment (Pearson, Lipton, Cleland, & Yee, 2002).

In short, TYC should consider adopting CBT approaches as part of the core treatment package.

**Recommendation #2.24**

**Engage families in treatment.** It is a truism that families should play a critical role in a juvenile offender's treatment. Research has demonstrated that involving families in the treatment of young offenders decreases the likelihood of further criminal behavior and reduces adolescent incarceration rates. In order to systematically analyze the literature on the effects of including family treatment to services for young offenders, Latimer (2001) conducted a meta-analysis with 35 experimental research studies. Compared to young offender programs that do not include family involvement, Latimer found that family intervention treatment significantly reduces the recidivism rate of young offenders.

There are many forms of family therapy from which to choose. For example, recall that Functional Family Therapy (FFT), highlighted in Exhibits 3 and 4, has been found to reduce a juvenile's recidivism rates by 15.9% (Aos et al., 2003).

Austin, Macgowan, and Wagner (2005) conducted a rigorous evaluation of family-based interventions for adolescent substance abuse populations. The purpose of the systematic review was to examine the level of efficacy and effectiveness of the most current family-based interventions. Austin and his colleagues found that two family-based interventions in particular were the most effective among the family-based interventions: Multidimensional Family Therapy and Brief Strategic Family Therapy (BSFT). We briefly summarize the latter below.

*Brief Strategic Family Therapy (BSFT)* was developed in response to an increase in Hispanic adolescent drug use in the 1970's (Robbins et al., 2003; Szapocznik, Hervis, & Schwartz, 2003), and has since become the primary model used to work with Hispanic families with behavior problem youth, including alcohol and other drugs (AOD). BSFT is based on three central constructs: systems, structure/patterns, and strategy. BSFT proponents believe that a family is a system comprised of individuals whose behaviors affect other family members. Structure and

patterns refer to the set of repetitive patterns of interactions that are idiosyncratic to a family. A maladaptive family structure contributes to behavior problems such as conduct disorder and AOD use. Strategy is the third central construct on which BSFT is based. Therapists that adhere to BSFT use family interventions that are practical, problem-focused, and deliberate (Robbins et al., 2003). Therapy sessions, which involve the entire family, are generally once a week for 8 to 12 weeks and last between an hour and an hour and a half.

Robbins et al. (2003) highlight three key assumptions to BSFT: (1) changing the family is the most effective way of changing an individual; (2) changing an individual and then returning him or her to a detrimental or negative environment does not allow the individual changes to remain in place; and (3) changes in one central or powerful individual can result in changes in the rest of his or her family.

These assumptions hold true for youth across the Texas juvenile justice system. We must prioritize the active engagement of families in treatment.

## SECURITY

**Recommendation #2.25**
**Maintain a safe place for youth that embraces a non-violent approach**. The classification system needs to address the security and safety of the juveniles while confined in TYC. To this aim, decisions for housing juveniles need to include, among other things, the age and vulnerability of the juvenile. Factors increasing a juvenile's vulnerability to assault include age, physical size, feminine appearance or demeanor (in a male), developmental disabilities, sexual identity, and commission of certain sexual offenses. To assure that the levels of disciplinary (and especially violent) acts are kept to a minimum, monitoring of assault offenses at the dorm, facility and agency level must be maintained. Superintendents of facilities must use the information to identify trouble spots, and move aggressive juveniles to more secure settings. Juveniles who have been targeted or who are vulnerable should be moved to safer environments, but should not be placed in highly restrictive settings except in unusual circumstances. Any juvenile who has complained of threats or assaults against him or her should be immediately separated from the juvenile(s) against whom he or she has complained. Agency administrators must use this information to assure that institutional administrators are monitoring the level of violence occurring in their facilities and are taking proper action.

**Recommendation #2.26**
**Develop goals to carefully ration, supervise, and document the use of seclusion, restraints, chemical control agents, and the use of force generally**. There is convincing evidence that lowering the size of living units and enriching staff resources at facilities like TYC can reduce violence within the facilities and promote better rehabilitative outcomes. Lowering the size of living units to no more than 50 wards has been shown to substantially improve correctional management and advance treatment goals. This research has been influential for the design of juvenile correctional facilities across the nation, and was important to establishing professional standards (e.g., ACA standards) on the appropriate size of living units.

At root, the new TYC executive leadership at Central Office in Austin should foster a "new organizational culture" that does not accept ward violence or staff use of force. Organizational culture change is aided by a new clarity of policy and procedure, but this must be strongly reinforced by ongoing training, as well as daily reaffirmation of the values of the new culture. It is admittedly very difficult for Central Office staff to effectively control the behavior of staff who work in institutions that are hundreds of miles from Austin. There is no substitute for continuous and regular communications of organizational values and expectations. There must also be opportunities for staff to learn new skills and participate in the new culture.

This Task Force unequivocally expresses its concern about TYC's new policy allowing the use of chemical control agents such as pepper spray. We recognize the high rate of worker injuries at TYC facilities and share with the TYC leadership the concern for and need to address worker safety. We also recognize that the youths often suffer significant injuries from the use of restraints. We understand that the new policy regarding pepper spray was implemented in an effort to decrease injuries to staff and juveniles; however, the ease with which pepper spray can be employed is exceptionally troubling. This is especially true in an environment that has not yet seen a shift in culture away from punishment and towards a treatment approach. While there could potentially be scenarios in which the use of pepper spray is the best alternative in dealing with a crisis situation, it is all too easy to employ this technique in dealing with recalcitrant youth who refuse to obey an order or in an effort to extract a juvenile from his or her cell. In neither situation would the use of pepper spray be appropriate.

**There is convincing evidence that lowering the size of living units and enriching staff resources at facilities like TYC can reduce violence within the facilities and promote better rehabilitative outcomes.**

Although public debates so far have framed this as a choice between the use of pepper spray and the use of restraints or physical force, we think that such a debate creates a false choice. The challenge is for TYC to find ways to decrease all uses of force through an emphasis on other methods. Specifically, greater priority should be given and resources allocated toward skills-based training using standardized approaches for workers on how to verbally de-escalate crisis situations. This will require a shift in culture that is congruent with treatment over punishment.

## COST-EFFECTIVENESS

**Recommendation #2.27**

**Evaluate cost-effectiveness of the TYC system and make decisions using the "best use of resources" principle.** In financial terms, this means identifying a range of policy and treatment choices that replace lower rate-of-return investments with strategies that produce higher rates of return on the taxpayer's dollar (e.g., see Exhibits 4 and 6).