## MANAGEMENT

**Recommendation #2.28**
**Ensure that the staff are an appropriately educated workforce who are youth-focused and strength-based in their approach.** Properly equip all TYC employees with sufficient education, training and credentials. In keeping with the shifting demographics underscored in the executive summary at the beginning of this report (i.e., with a current TYC population of 22% Anglo, 44% Hispanic, and 34% African American), it is essential that the executive leadership team of TYC is representative of the Hispanic and African American youth being treated.

This recommendation carries with it broader implications for health and mental health workforce development in the State of Texas. According to independent and recent reports by the Hogg Foundation for Mental Health (2007) and the Texas Health Care Policy Council (2006), there are shortages across the majority of the health-related and helping professions, particularly in rural and under served urban areas of Texas. This critical issue requires sustained attention.

**Recommendation #2.29**
**Properly screen applicants for jobs, but do not automatically eliminate ex-offenders.** Decisions about whether to retain or fire ex-felons or ex-misdemeanants should be made on a case-by-case basis, and should include consideration of the type of pre-existing offense and the amount of time lapsed since the offense was committed.

**Recommendation #2.30**
**Establish and maintain an adequate youth-to-staff ratio using national best practice standards, aiming for a 1:10 ratio.**

**It is a truism that families should play a critical role in a juvenile offender's treatment. Research has demonstrated that involving families in the treatment of young offenders decreases the likelihood of further criminal behavior and reduces adolescent incarceration rates.**

**Establish and maintain an adequate youth-to-staff ratio using national best practice standards, aiming for a 1:10 ratio.**

## III. AFTER

### WHAT IS THE PROBLEM?

There are several notable challenges related to the aftercare of youth released from TYC, including extended lengths of stay, misallocated and insufficient aftercare services, and a deteriorating "failure-based" parole system. Regarding extended lengths of stay in TYC, research shows that more time incarcerated is associated with higher recidivism rates. Furthermore, along with increasing the chances of recidivating, extending the length of stay for youth is very expensive, costing $60,000 per year for each youth.

Research indicates that proper aftercare provides the most utility per dollar spent and decreases recidivism rates. Despite the likelihood that aftercare services will decrease recidivism, the Task Force has identified several corresponding challenges in the Texas juvenile justice system: while TYC has specialized caseloads serving certain groups of offenders (females, sex offenders, VIO A offenders, determinate sentence offenders, and youth with a high level of mental health needs) in specific geographic regions (Austin, Dallas, Ft. Worth, Houston, Harlingen, and San Antonio), the capacity for specialized caseloads needs to be expanded; transitional planning could be enhanced with additional resources; there are no alternative reporting sites; TYC's day treatment programs have been eliminated; there are insufficient intermediate restriction sanction beds and independent living beds; and TYC does not provide aftercare risk-assessment (a parole risk-assessment instrument has been designed, but not implemented).

The "failure-based parole system" is deteriorating. Parole officers are mainly charged with surveillance, which is not conducive to the goal of re-entry. The parole officers are hard-working individuals committed to youth. These shortcomings are system-based, and should not be placed on the shoulders of the parole officers. Considering that parole officers generally have caseloads anywhere from 35 to 45 youth, they should be applauded for the successful outcomes that they do achieve with youth offenders.

It is vital that the juvenile justice system in Texas creates a system of accountability and improves collaborative work between probation and other agencies that service similar populations. It is in this spirit that the following recommendations are made.

## RECOMMENDATIONS

**Recommendation #3.1**

**Emphasize a community reentry model upon *entry to* TYC.** To this end, successful reentry into the community should become the central theme of a youth's entire stay within the TYC system. From the moment of the youth's arrival *to* TYC, an individualized service plan must be constructed that outlines the timeline for his/her release into the community. Each youth should also have a plan for aftercare services upon release from TYC. The aftercare process should focus on youth learning to live and be successful with their family and within their community.

**From the moment of the youth's arrival *to* TYC, an individualized service plan must be constructed that outlines the timeline for his/her release into the community.**

**Recommendation #3.2**

**Reduce lengths of stay at TYC.** All steps to reduce the length of stay at the TYC should be undertaken, and all aspects that lengthen stay should be scrutinized. More intensive and individualized treatment services should be implemented at the TYC to decrease the length of stay. Moreover, the state should shorten or eliminate time-adds and shorten minimum length of stay benchmarks.

**Recommendation #3.3**

**Establish a detailed, comprehensive, individualized plan 2 to 3 months in advance to seamlessly transition the youth from the TYC facility.** The plan must address community, family, education, special needs, and health care. The length of aftercare should be based upon meeting individualized benchmark behaviors established by the treatment plan and built with the input of all invested parties.

**Recommendation #3.4**

**Use Community Resource Coordination Groups (CRCGs) to facilitate transition planning.** CRCGs, which were created by the 70th Texas Legislature in 1987, and reauthorized again through the 77th Legislature, have as their primary purpose to establish a system of interagency coordination of services to children and youth and their families (and now adults) who often "fall through the cracks" due to having complex needs that require coordination across multiple agencies. Child or youth- serving CRCGs are available to all 254 Texas counties, although adult-serving CRCGs are still being implemented around the state. While there is one CRCG model with guiding principles, each local CRCG is customized according to the resources within that community and the creativity of the members that serve on the group. The strength of this flexible network is evidenced by a number of CRCGs serving as a catalyst in developing a stronger systems-of-care that incorporates a wraparound services delivery approach for a youth and his or her family. Thus, these existing provider networks can be tapped to help divert youth from a restrictive juvenile justice settings or to re-integrate youth back into their community. Currently there are over 160 local CRCGs that include child and youth-serving CRCGs, adult-serving groups (CRCGAs), or a combined group that serves any age of individual and families (CRCGF). Of note, there is no dedicated state funding directed to the operation of local CRCGs, therefore, the success of this interagency process is contingent upon the leadership

and innovation of the collective membership. According to 2006 data from the State Office of CRCGs, the highest rates of referrals into local CRCGs statewide are independent school districts followed by local juvenile probation departments. Thus, it is conceivable that CRCGs could also be used on the front-end to amplify diversion efforts.

**Recommendation #3.5**
**Use a Structured Decision Making (SDM) approach to transition and re-integration.** Structured Decision Making® (SDM) is an assessment, classification, and case management model designed to help agencies reduce recidivism among youth referred to the juvenile justice system (see Table 7). An SDM approach to transition can help correctional agencies maximize the use of limited resources and ensure public safety by tailoring transition efforts to different sub-groups in the correctional population. Factors to consider in transition and re-integration strategies include the youth's level of risk, treatment needs, length of stay in TYC, and the strength of the youth's community support system.

**Table 7. Model Transition Process for Youth Completing Placement in TYC**[14]

| **Risk of Offending** | **Length of Stay** | | |
|---|---|---|---|
| | **Less than 6 months** | **6 to 12 months** | **More than 12 months** |
| **Low** | 1. ISP: 30 days<br>2. Reassess risk and supervise accordingly | 1. ISP: 60 days<br>2. Reassess risk and supervise accordingly | 1. Day Treatment: 30 days<br>2. ISP: 30 days<br>3. Reassess risk and supervise accordingly |
| **Moderate** | 1. ISP: 30 days<br>2. Reassess risk and supervise accordingly | 1. Day treatment: 30 days<br>2. ISP: 30 days<br>3. Reassess risk and supervise accordingly | 1. Transition facility: 30 days<br>2. ISP: 30 days<br>3. Reassess risk and supervise accordingly |
| **High** | 1. Day treatment: 30 days<br>2. ISP: 60 days<br>3. Reassess risk and supervise accordingly | 1. Transition facility: 30 days<br>2. ISP: 60 days<br>3. Reassess risk and supervise accordingly | 1. Transition facility: 30 days<br>2. ISP: 60 days<br>3. Reassess risk and supervise accordingly |
| **Very High** | 1. Day treatment: 60-90 days<br>2. ISP: 90 days<br>3. Reassess risk and supervise accordingly | 1. Transition facility: 30 days<br>2. Day treatment: 30-60<br>3. ISP: 90 days<br>4. Reassess risk and supervise accordingly | 1. Transition facility: 60 days<br>2. Day treatment: 30-60 days<br>3. ISP: 90 days<br>4. Reassess risk and supervise accordingly |

[14] Source: National Council on Crime and Delinquency (NCCD) (2007): *Reforming juvenile justice SDM components: Youth transition and community re-integration protocols.* Oakland, CA: NCCD.

The higher the risk level, and the greater the length of stay in TYC, the greater the need for a gradual and extended step-down process. For example, using the SDM transition process outlined in Table 7, a youth who has been incarcerated for less than 6 months but who is deemed at high-risk of re-offending would receive day treatment for 30 days, Intensive Supervision Probation (ISP) for 60 days, followed by a reassessment of risk and supervision as needed.

**Recommendation #3.6**

**Shift from a Parole Model to a Local Boards (or Reentry) Model of aftercare.** Money saved on incarceration should then be re-allocated to the county level so that local organizations can offer aftercare services needed by youth. Local boards of community stakeholders should determine and submit for TYC's approval the necessary budget for community-based services. TYC should then develop an RFP process to contract for aftercare services from probation departments, individual providers, or nonprofit organizations. The community-based model will enable the shift from "surveillance and control" to "services and success."

**Recommendation #3.7**

**Encourage the 81st Texas Legislature to reconsider passing a mental health parity bill that would require health plans to cover all mental illnesses on equal terms with physical illness.** Texas is a "partial parity" state. While health plans must provide coverage for certain specified illnesses like schizophrenia, plans do not have to cover many mental disorders, such as eating disorders. Parity is one building block toward a system where every youth can access the mental health services he or she needs.

**Recommendation #3.8**

**Create a system of accountability.** Evidence-based practices should be infused within TYC facilities, but also incorporated into family- and community-based care. This may require an assessment of service delivery gaps. The current institutional culture must be diverted towards a new reentry model via proper financial incentives.

**Recommendation #3.9**

**Promote a strength-based rather than a failure-based model of aftercare.** Such a shift can be accomplished, in part, by replacing traditional parole with aftercare services, and distributing these aftercare services to community-based entities. These community-based providers (e.g., nonprofit and faith-based organizations, probation departments) should be allowed to subcontract in remote areas of the state with mentors, coaches, teachers, or churches to provide parole services. In this proposed system, parole officers would be responsible for brokering and monitoring time-limited aftercare services for youth to ensure that services are evidence-based, strength-based, client-centered, family-focused, gender-sensitive, disability-responsive, developmentally-congruent, and culturally-grounded.

**Recommendation #3.10**

**Assess and monitor a youth's readiness to change his or her behavior, and tailor aftercare services accordingly.** A youth's readiness to change, or stage-of-change, is in keeping with a client-centered approach to service delivery. Adopting aftercare strategies that are congruent with a stage-of-change model will help ensure that youth are only re-incarcerated for violent and serious offenses (see Exhibit 7 and Figure 4).

**Exhibit 7. Stages of Developing and Maintaining Change with Individuals, Families, Organizations, & Communities in an Ecological Context (IFOCEC) Model**

Youth present with different levels of readiness for change. Some are ready to fully engage in treatment, while others adamantly deny that there is anything wrong with the way they are living. Many juvenile offenders, at least initially, fall into the latter category. The stages-of-change model takes this into consideration when planning and delivering services.

As shown in Figure 4, the stages-of-change model can be expanded beyond the individual to examine readiness for change among families, organizations, and communities that may be the targets of change. Just as some juvenile offenders are more ready to change than others, organizations and communities will have differential level of readiness to change regarding how they deal with juvenile delinquency. This expanded model is named the Individuals, Families, Organizations and Communities in an Ecological Context (IFOCEC) Model.

The IFOCEC Model focuses on how individuals and populations adapt and maintain behavioral change. The success of behavior change lies in proactively applying stage-matched interventions across multiple systems, which will increase participation, retention, and progress, and impact change rates in entire populations at risk for unhealthy behaviors - in this case, juvenile offenders.

The IFOCEC Model posits six stages of change: 1) *Precontemplation*, in which there is no intention or motivation to change one's behavior; 2) *Contemplation*, in which there is awareness of a problem and a desire to overcome it, but no commitment to take the actions necessary to accomplish change; 3) *Preparation*, involving a decision to take action sometime in the near future, but without a specific plan for accomplishing this goal; 4) *Action,* in which the individual makes changes in behavior and/or lifestyle and sustains those from one day to six months; 5) *Maintenance*, involving activities necessary to maintain change and avoid relapse; and 6) *Evaluation,* focusing on assessing results and obtaining feedback. Individuals who prematurely terminate treatment are mostly in the precontemplation stage, while those who remain consistent in treatment are in the maintenance stage, and those who terminate appropriately are typically in the action stage.

In addition, though this model has been used to describe changing undesirable behaviors like juvenile delinquency and drug use, we propose that it can also be thought of in terms of a strength perspective to identify protective factors in preventing and mitigating delinquent behavior. For example, an adolescent may never seriously contemplate adopting drug use behaviors because of micro influences (such as family support and supervision), mezzo influences (such as community youth activities and church and cultural activities), and macro influences (such as respect for laws punishing drug use).

Note that the IFOCEC model in Figure 4 is presented using spirals. Clients do not simply pass through these stages in a linear fashion. A juvenile offender that has successfully completed one treatment program may relapse or reoffend, and revisit an earlier stage (e.g., slipping from the action stage to the contemplation stage). Anyone who has ever tried to quit smoking or lose weight can attest to the reality of this spiral effect. Likewise, aftercare planning should account for this spiral effect, as should corresponding decisions about parole revocation and re-incarceration of juvenile offenders. Emphasizing a youth's readiness for change, and matching services accordingly to maximize the likelihood for change, is congruent with a rehabilitative juvenile justice framework.

**Figure 4:**

**Individuals, Families, Organizations & Communities in an Ecological Context (IFOCEC) Model[15]**

Stages of Developing and Maintaining Change with
Individuals, Families, Organizations, & Communities in an Ecological Context
(IFOCEC) Model




***Ecological System***

- INDIVIDUAL: Person, family, organization, community, and other entities such as legislative bodies subject to the change process in the context of the ecological sytem.
- MICRO LEVEL: Family (nuclear, extended, other), peers, and other immediate social contacts that encourage or discourage the use of drugs and promote or inhibit recovery.

MEZZO LEVEL: Organizations, communities, neighborhoods and cultural, religious, social, athletic and civic groups. Includes shared cultural values and beliefs such as the approprate/inappropriate use of drugs, the times and places (if any) that alcohol or other drugs are used, forms of substance use by youth, adults, and older adults, the role of churches and other cultural institutions in preventing or treating drug use, and the use of informal and formal helping resources to address drug problems.

MACRO LEVEL: Societal prescriptions/proscriptions/prohibitions, governmental policies, institutional policies and their effects such as institutional discrimination, cultural values and norms that promote or diminish drug use and encourage or discourage participation in treatment and promote recovery; general population characteristics such as urban/rural, age, isolation, impoverishment, education, and income levels.

---

[15] The IFOCEC Model was developed by faculty (Dr. Clayton Shorkey and Dr. Diana M. DiNitto) and a former graduate student (Ryan Koch) at The University of Texas at Austin, School of Social Work. Barber (1995) initially integrated the ecological meta-theory with the Transtheoretical Model (TTM) and Stages-of-Change Model developed by Prochaska, DiClemente, and Norcross (1992), upon which the IFOCEC Model is based.

## CONCLUSION: A NEW REFORM MOVEMENT?

The juvenile justice system in Texas is at a crossroad. We are facing a critical turning point, which presents a unique opportunity to shape Texas history. More often than not, reform movements are triggered by high-profile cases of abuse or neglect, or critical reports from outside entities such as the media. In recent years, there have been many such high-profile cases and critical reports: Nathaniel Abraham, Lionel Tate, Columbine, and Jonesboro.

In Missouri, a reform movement was launched in the early 1970s following a federal report critical of one of the state's large training schools. Louisiana's reform movement was launched through state legislation and the involvement of the Annie E. Casey foundation in 2003, in the wake of exposes of rampant violence in facilities, lawsuits, and the death of an incarcerated child. After a major lawsuit and years of criticism for harsh, violent, neglectful conditions in California Youth Authority facilities, including the widespread practice of placing youth in small cages while they attended counseling sessions and school, the California juvenile justice system announced reform plans. In early 2005, the California Youth Authority issued a statement announcing that "The California Youth Authority is completely broken and can't be fixed."[16]

It has been suggested by many that the same holds true for the Texas juvenile justice system. The leaders, citizens, and advocates of Texas no doubt have the resolve to reform the state's juvenile justice system. In fact, this reform movement has already started.

Collectively, the recommendations and strategies laid out in the Before, During, and After sections of this report may well enable the State of Texas to fully realize the reform movement that is already underway, and thus lower its juvenile crime rate, reduce the victimization of citizens, more efficiently and effectively spend its pecuniary resources, and enable these youth to be productive contributors to the State of Texas.

**The leaders, citizens, and advocates of Texas no doubt have the resolve to reform the state's juvenile justice system. In fact, this reform movement has already started.**

[16] In August of 2007, twelve years after the California Youth Authority was deemed broken, the California Governor signed SB 81—a major juvenile justice reform package which shifts non-violent juvenile offenders out of secure facilities operated by the state Division of Juvenile Justice (DJJ) and into county facilities and programs. The reform measure provides counties with block grant funds to pay for local alternatives to state commitment.

## References

American Bar Association and the National Bar Association (2001). *A report: Justice by gender: The lack of appropriate prevention, diversion and treatment alternatives for girls in the justice system.*

American Academy of Pediatrics (2001). Health care for children and adolescents in the juvenile correctional care system. *Pediatrics*, 4, 799-803.

Aos, S., Miller, M., & Drake, E. (2006). *Evidence-based public policy options to reduce future prison construction, criminal justice costs, and crime rates*. Olympia: Washington State Institute for Public Policy. Retrieved July 5, 2007 on line: www.wsipp.wa.gov/rptfiles/06-10-1201.pdf

Armour, M. P., & Umbreit, M. S. (2007). Victim-offender mediation and forensic practice. In D. W. Springer & A. R. Roberts (Eds.), *Handbook of forensic mental health with victims and offenders: Assessment, treatment, and research* (pp. 519-539). NY: Springer Publishing Company.

Austin, A. M., Macgowan, M. J., & Wagner, E. F. (2005). Effective family-based interventions for adolescents with substance abuse problems: A systematic review. *Research on Social Work Practice, 15,* 67-83.

Austin, J., Bloom, B., & Donahue, T. (1992*). Female offenders in the community: An analysis of innovative strategies and programs*. Washington, DC: National Institute of Corrections.

Azrin, N. H., Donohue, B., Teichner, G. A., Crum, T., Howell, J., & DeCato, L. A. (2001). A controlled evaluation and description of Individual-Cognitive Problem Solving and Family-Behavior Therapies in dually-diagnosed conduct-disordered and substance-dependent youth. *Journal of Child & Adolescent Substance Abuse, 11*(1), 1-43.

Barber, J. G. (1995). *Social work with addictions.* London: Macmillan.

Beckman, L. (1994). Treatment needs of women with alcohol problems. *Alcohol, Health & Research World*, 18(3), 206-211.

Belenko, S., DeMatteo, D., & Patapis, N. (2007). Drug courts. In D. W. Springer & A. R. Roberts (Eds.), *Handbook of forensic mental health with victims and offenders: Assessment, treatment, and research* (pp. 385-423). New York, NY: Springer Publishing Company.

Belenko, S. (1998). Research on drug courts: A critical review. *National Drug Court Institute Review, 1,* 1-26.

Belknap, J., Dunn, M., & Holsinger. (1997). *Moving toward juvenile justice and youth serving systems that address the distinct experience of the adolescent female*. Ohio: Gender Specific Services Work Group Report.

Bender, K. (2007). *Interrupting the cycle of violence: Identifying gender-specific pathways from childhood victimization to juvenile delinquency.* The University of Texas at Austin, School of Social Work: Unpublished Dissertation Manuscript.

Bender, K., Kim, J. S., & Springer, D. W. (2007). Effectiveness of interventions for dually-diagnosed adolescents: Implications for juvenile offenders. In D. W. Springer & A. R. Roberts (Eds.), *Handbook of forensic mental health with victims and offenders: Assessment, treatment, and research* (pp. 173-203). New York, NY: Springer Publishing Company.

Bender, K., Springer, D. W., & Kim, J. S. (2006). Treatment effectiveness with dually-diagnosed adolescents: A systematic review. *Brief Treatment and Crisis Intervention, 6*(3), 177-205.

Bloom, B. E., & Covington, S. S. (1998, November). *Gender-specific programming for female offenders: What is it and why is it important?* Presented at the 50th Annual Meeting of the American Society of Criminology, Washington, D.C.

Bloom, B. E., & Covington, S. S. (2001, November). *Effective gender-responsive interventions in juvenile justice: Addressing the lives of delinquent girls.* Paper presented at the 2001 Annual Meeting of the American Society of Criminology, Atlanta, Georgia.

Boesky, L. (2002). *Juvenile offenders with mental health disorders: Who are they and what do we do with them?* Lanham, MD: American Correctional Association.

Brook, R. H., Chassin, M.R., Fink, A., Solomon, D. H., Kosecoff, J., & Park, R. E. (1986). A method for the detailed assessment of the appropriateness of medical technologies. *International Journal of Technology Assessment in Health Care, 2*, 53-63.

Carmichael, D., Whitten, G., & Voloudakis, M. (2005). *Study of minority over-representation in the Texas juvenile justice system.* Submitted to the Office of the Governor, Criminal Justice Division. Public Policy Research Institute, Texas A & M University.

Center for Substance Abuse Prevention (CSAP) (2000). *Strengthening America's families: Model family programs for substance abuse and delinquency prevention.* Salt Lake City, Utah: Department of Health Promotion and Education, University of Utah.

Czuchry, M., Dansereau, D. F., Dees, S. M., & Simpson, D. D. (1995). The use of node-link mapping in drug abuse counseling: The role of attentional factors. *Journal of Psychoactive Drugs, 27,* 161-166.

Dansereau, D. F., Joe, G. W., & Simpson, D. D. (1995). Attentional difficulties and the effectiveness of a visual representation strategy for counseling drug-addicted clients. *International Journal of the Addictions, 30,* 371-386.

Dansereau, D. F., Joe, G. W., Dees, S. M., & Simpson, D. D. (1996). Ethnicity and the effects of mapping-enhanced drug abuse counseling. *Addictive Behaviors, 21,* 363-376.

Dansereau, D. F., Joe, G. W., & Simpson, D. D. (1993). Node-link mapping: A visual representation strategy for enhancing drug abuse counseling. *Journal of Counseling Psychology, 40,* 385-395.

Edelman, P., Holzer, H. J., Offner, P. (Eds.). (2006). *Reconnecting disadvantaged young men.* Washington DC: Urban Institute Press.

Henggeler, S. W. (1999). Multisystemic therapy: An overview of clinical procedures, outcomes, and policy implications. *Child Psychology & Psychiatry, 4*(1), 2-10.

Henggeler, S. W., Pickrel, S. G., & Brondino, M. J. (1999). Multisystemic treatment of substance-abusing and –dependent delinquents: Outcomes, treatment, fidelity, and transportability. *Mental Health Services Research, 1*(3), 171-184.

Henggeler, S. W., Pickrel, S. G., Brondino, M. J., & Crouch, J. L. (1996). Eliminating (almost) treatment dropout of substance abusing or dependent delinquents through home-based multisystemic therapy. *American Journal of Psychiatry, 153,* 427-428.

Henggeler, S. W., Schoenwald, S. K., Borduin, C. M., Rowland, M. D., & Cunningham, P. B. (1998). *Multisystemic treatment of antisocial behavior in children and adolescents.* New York: Guilford Press.

Henggeler, S. W., Sheidow, A. J., & Lee, T. (2007). Multisystemic treatment of serious clinical problems in youths and their families. In D. W. Springer & A. R. Roberts (Eds.), *Handbook of forensic mental health with victims and offenders: Assessment, treatment, and research* (pp. 315-345). New York: Springer Publishing.

Hogg Foundation for Mental Health (2007). *The mental health workforce in Texas: A snapshot of the issues.* Austin, TX: Hogg Foundation for Mental Health, The University of Texas at Austin.

Intermediate Sanctions for Female Offenders Policy Group. (1995). *Intermediate sanctions for women offenders.* Oregon Criminal Justice Council and the Oregon Department of Corrections.

Jeffords, C., Alexander, L., Fredlund, E., White, R., & Mooney, C (2006). *Texas Youth Commission: 2006 review of agency treatment effectiveness.* Texas Youth Commission: Austin, TX.

Jenson, J. M., & Potter, C. C. (2003). The effects of cross-system collaboration on mental health and substance abuse problems of detained youth. *Research on Social Work Practice, 13*(5), 588-607.

Johnstone, G. (2002). *Restorative justice: Ideas, values, debates.* Devon, UK: Willan.

Jung, S. (2007). Understanding racial-ethnic disparities in internal school suspension and identifying compensatory and protective factors. *Dissertation Abstracts* (UMI No. AAT 3226969). The University of Texas at Austin, School of Social Work.

Kaminer, Y., Burleson, J. A., & Goldberger, R. (2002). Cognitive-behavioral coping skills and psychoeducation therapies for adolescent substance abuse. *The Journal of Nervous and Mental Disease, 190*(11), 737-745.

Kaminer, Y., & Burleson, J. A. (1999). Psychotherapies for adolescent substance abusers: 15-month follow-up of a pilot study. *American Journal on Addictions, 8,* 114-119.

Kaminer, Y. Burleson, J. A., Blitz, C., Sussman, J., & Rounsaville, B. J. (1998). Psychotherapies for adolescent substance abusers: A pilot study. *Journal of Nervous and Mental Disease, 186*(11), 684-690.

Katzmann, G. S. (Ed). (2002). *Securing our children's future: New approaches to juvenile justice and youth violence.* Washington, DC: Brookings Institution Press.

Kimbrough, J. (2007, May). *Texas Youth Commission: Report from the Conservator.* Austin, TX: Texas Youth Commission.

Krisberg, B. (2003). *General corrections review of the California Youth Authority.* Oakland, CA: National Council on Crime and Delinquency.

Landenberger, N. A., & Lipsey, M. W. (2005). The positive effects of cognitive-behavioral programs for offenders: A meta-analysis of factors associated with effective treatment. *Journal of Experimental Criminology, 1,* 451-476.

Latimer, J. (2001). A meta-analytic examination of youth delinquency, family treatment, and recidivism. *Canadian Journal of Criminology, 43,* 237-253.

Leone, P. E., Meisel, S. M., & Drakeford, W. (2002). Special education programs for youth with disabilities in juvenile corrections. *Journal of Correctional Education, 53*(2), 46-50.

Lipsey, M. W., & Cullen, F. T. (in press). The effectiveness of correctional rehabilitation: A review of systematic reviews. *Annual Review of Law and Social Science, 3*(6), 6.1-6.24.

Males, M., Stahlkopf, C., & Macallair, D. (2007, June). *Crime rates and youth incarceration in Texas and California compared: Public safety or public waste?* Center on Juvenile and Criminal Justice.

McNeece, C. A., Tyson, E., & Jackson, S. (2007). Juvenile justice policy: Trends and Issues. In A. R. Roberts & D. W. Springer (Eds.), *Social work in juvenile and criminal justice settings* (3rd., pp. 170-185). Springfield, Illinois: Charles C Thomas.

Mears, D. P., & Travis, J. (2004, January). *The dimensions, pathways, and consequences of youth reentry.* Urban Institute, Justice Policy Center. Retrieved January 30, 2006: http://www.urbanl.org.

Missouri Department of Social Services (2006). *Annual report: FY 2006.* Jefferson City, MO: Missouri Department of Social Services, Division of Youth Services. Retrieved August 31, 2007: www.dss.mo.gov/re/pdf/dys/dysfy06/pdf.

Najavits, L. M., Gallop, R. J., & Weiss, R. D. (in press). Seeking Safety therapy for adolescent girls with PTSD and substance use disorder: A randomized controlled trial. *Journal of Behavioral Health Services and Research.*

Najavits, L. M. (2002). Seeking Safety: A new psychotherapy for posttraumatic stress disorder and substance use disorder. In P. Ouimette & P. J. Brown (Eds.), *Trauma and substance abuse: Causes, consequences, and treatment of comorbid disorders* (pp. 147-170). Washington, DC: American Psychological Association.

National Alliance for the Mentally Ill (Fall, 2003). *NAMI Beginnings.* Arlington, VA: Author.

National Institute on Drug Abuse. (1999). *Principles of drug addiction treatment: A research-based guide.* NIH Publication No. 99-4180.

National Institutes of Health (2004). *Preventing violence and related health-risking social behaviors in adolescents: An NIH State-of-the-Science Conference.* Bethesda, MD.

National Mental Health Association (2004). *Mental health treatment for youth in the juvenile justice system: A compendium of promising practices.* Alexandria, VA: Author.

National Council on Crime and Delinquency (NCCD) (2007): *Reforming juvenile justice SDM components: Youth transition and community re-integration protocols.* Oakland, CA: Retrieved July 5, 2007: www.nccd-crc.org/nccd/n_reform_sdmreintegration.html

Novy, F. A., & Fredlund, E., (2006). Accelerated, differentiated instruction on the reading achievement of incarcerated youth with disabilities: Unexpected progress in a time of skepticism. *Perspectivas Sociales/Social Perspectives, 8*(1), 131-149.

Nugent, W. R., Williams, M., & Umbreit, M. S. (2003). Participation in victim-offender mediation and the prevalence of subsequent delinquent behavior: A meta-analysis. *Utah Law Review, 137,* 137-166.

Office of Juvenile Justice and Delinquency Prevention (OJJDP). (2006). *Offenders and victims: 2006 national report.* Washington, DC: U.S. Department of Justice, Office of Justice Programs.

Office of Juvenile Justice and Delinquency Prevention (OJJDP) (2000). *Female delinquency cases, 1997.* Washington, DC: U.S. Department of Justice, Office of Justice Programs.

Patino, V., Ravoira, L., & Wolf, A. (2006). *A rallying cry for change: Charting a new direction in the State of Florida's response to girls in the juvenile justice system.* Oakland, CA: National Council on Crime and Delinquency.

Pearson, F. S., Lipton, D. S., Cleland, C., & Yee, D. S. (2002). The effects of behavioral/cognitive-behavioral programs on recidivism. *Crime and Delinquency, 48*(3), 476-496.

Peterson, D., & Assanie, L. (2005). *The face of Texas: Population, projections, and implications.* Dallas, TX: Federal Reserve Bank of Dallas. Retrieved July 5, 2007: www.dallasfed.org/research/pubs/fotexas/fotexas_petersen.html.

Pitre, U., Dansereau, D. F., Newbern, D., & Simpson, D. D. (1998). Residential drug abuse treatment for probationers: Use of node-link mapping to enhance participation and progress. *Journal of Substance Abuse Treatment, 15*(6), 535-543.

Pitre, U., Dansereau, D. F., & Joe, G. W. (1996). Client education levels and the effectiveness of node-link maps. *Journal of Addictive Disorders, 15,*(3), 27-44.

Pitre, U., Dansereau, D. F., & Simpson, D. D. (1997). The role of node-link maps in enhancing counseling efficiency. *Journal of Addictive Diseases, 16,* 39-49.

Potter, C. C., & Jenson, J. M. (2007). Assessment of mental health and substance abuse treatment needs in juvenile justice. In A. R. Roberts & D. W. Springer (Eds.), *Social work in juvenile and criminal justice settings* (3rd ed.) (pp. 133-150). Springfield, IL: Charles C Thomas.

President's New Freedom Commission on Mental Health (2003). *Achieving the promise: Transforming mental health care in America* -- Final Report. Rockville, MD: DHHS.

Prochaska, J. O., DiClemente, C. C., & Norcross, J. C. (1992). In search of how people change: Applications to additive behaviors. *American Psychologist, 47*, 1102 - 1114.

Prochaska, J. O., Velicer, W. F., Rossi, J. S., Goldstein, M. G., Marcus, B. H., Rakowski, W., Fiore, C., Harlow, L. L., Redding, C. A., Rosenbloom, D., & Rossi, S. R. (1994). Stages of change and decisional balance for twelve problem behaviors. *Health Psychology, 13*(1), 39-46.

Reitzel, L. R., & Carbonell, J. L. (2006). The effectiveness of sexual offender treatment for juveniles as measured by recidivism: A meta-analysis. *Sex Abuse, 18,* 401-421.

Ridgely, M. S., Morrissey, J. P., Paulson, R. I., & Goldman, H. H. (1996). Characteristics and activities of case managers in the RWJ foundation program on chronic mental illness. *Psychiatric Services, 47*(7), 737-743.

Roberts, A. R., & Bender, K. (2008). Finding evidence-based juvenile offender treatment programs: A national survey (2008). In A. R. Roberts (Ed.), *Correctional counseling and treatment* (pp. 91-111). Upper Saddle River, NJ: Pearson.

Roberts, A. R. (Ed.) (2004). *Juvenile justice sourcebook: Past, present, and future.* New York, NY: Oxford University Press.

Roberts, A. R., & Springer, D. W. (Eds.) (2007). *Social work in juvenile and criminal justice settings* (3rd ed.). Springfield, IL: Charles C Thomas.

Robins, M. S., Szapocznik, J., Santisteban, D. A., Hervis, O. E., Mitrani, V. B., & Schwartz, S. J. (2003). Brief strategic family therapy for Hispanic youth. In A. E. Kazdin & J. R. Weisz (Eds.), *Evidence-based psychotherapies for children and adolescents* (pp. 407-424). New York: Guildford Press.

Rubin, A., & Babbie, E. R. (2008). *Research methods for social work* (6th ed). Belmont, CA; Brooks/Cole.

Schore, A. N. (2003). *Affect disregulation and disorders of the self.* New York: W. W. Norton and Company.

Slesnick, N., & Prestopnik, J. L. (2005). Ecologically based family therapy outcome with substance abusing runaway adolescents. *Journal of Adolescence, 28,* 277-298.

Simpson, D. D., Chatham, L. R., & Joe, G. W. (1993). Cognitive enhancements to treatment in DATAR: Drug abuse treatment for AIDS risk-reduction. In J. Inciardi, F. Tims, & B. Fletcher (Eds.), *Innovative approaches to the treatment of drug abuse: Program models and strategies* (pp. 161-177). Wesport, CT: Greenwood Press.

Simpson, D. D., Dansereau, D. F., & Joe, G. W. (1997). The DATAR project: Cognitive and behavioral enhancements to community-based treatments. In F. M. Tims, J. A. Inciardi, B. W. Fletcher, & A. M. Horton, Jr. (Eds.), *The effectiveness of innovative approaches in the treatment of drug abuse* (pp. 182-203). Westport, CT: Greenwood Press.

Springer, D. W., & Roberts, A. R. (Eds.) (2007). *Handbook of forensic mental health with victims and offenders: Assessment, treatment, and research.* New York, NY: Springer Publishing Company.

Springer, D. W., Rivaux, S. L., Bohman, T., & Yeung, A. (2006). Predicting retention in three substance abuse treatment modalities among Anglo, African American, and Mexican American juvenile offenders. *Journal of Social Service Research, 32*(4), 135-155.

Springer, D. W., McNeece, C. A., & Arnold, E. M. (2003). *Substance abuse treatment for criminal offenders: An evidence-based guide for practitioners.* Washington, DC: American Psychological Association.

Springer, D. W., Sharp, D. S., & Foy, T. A. (2000). Coordinated service delivery and children's well-being: Community Resource Coordination Groups of Texas. *Journal of Community Practice, 8*(2), 39-52.

Szapocznik, J., Hervis, O. E., & Schwartz, S. (2003). *Brief strategic family therapy for adolescent drug abuse* (NIH Publication No. 03-4751). NIDA Therapy Manuals for Drug Addiction: Rockville, MD: National Institute on Drug Abuse.

Texans Care for Children (2007). *The children's campaign: 2007 update.* Austin, TX. Author.

Texas Health Care Policy Council (2006). *Commitment to health workforce planning: A strategy for addressing Texas' health workforce needs.* Austin, TX: Texas Health Care Policy Council.

Texas Youth Commission (2006). *Who are TYC Offenders*? Retrieved August 31, 2007: http://www.tyc.state.tx.us/research/youth_stats.html.

Tracy, P. E., & Kempf-Leonard, K. (1998). *Sanctioning serious juvenile offenders: A review of alternative models.* In F. Adler & W. Laufer (Eds.), *Advances in criminological theory, Volume 8, The criminology of criminal law.*

Tripodi, S. J., & Springer, D. W. (2007). Mental health and substance abuse treatment of juvenile delinquents. In A. R. Roberts & D. W. Springer (Eds.), *Social work in juvenile and criminal justice* (3rd ed.). Springfield, IL: Charles C Thomas.

Tyler, J. L., Ziedenberg, J, & Lotke, E (2006). *Cost effective corrections: The fiscal architecture of rational juvenile justice systems.* Washington, DC: The Justice Policy Institute.

Umbreit, M. S., Vos, B., & Coates, R. B. (2006). Restorative justice in the 21st century: A social movement full of opportunities and pitfalls. *Marquette University Law Review, 89*(2), 257-304.

University of Washington Alcohol and Drug Abuse Institute. *Evidence-Based Practices for Treating Substance Use Disorders: Matrix of Interventions.* Retrieved on-line August 2006 from http://adai.washington.edu/ebp/matrix.pdf.

U.S. Department of Health and Human Services (1999). *Mental health: A report of the Surgeon General.* Rockville, MD: U.S. Department of Health and Human Services, National Institutes of Health, National Institute of Mental Health.

U.S. Public Health Service (2001). *Youth violence: A report of the Surgeon General.* Washington, DC: Author.

van Wormer, K., & Jenkins, M. (2007). Restorative justice: Cultural and gender considerations. In D. W. Springer & A. R. Roberts (Eds.), *Handbook of forensic mental health with victims and offenders: Assessment, treatment, and research* (pp. 541-562). NY: Springer Publishing Company.

Wasserman, G.A., Jensen, P.S., Ko, S. J., Cocozza, J., Trupin, E., Engold, A., Cauffman, E., & Grisso, T. (2002). Mental health assessments in juvenile justice: Report on the Consensus Conference. *Journal of the American Academy of Child and Adolescent Psychiatry, 42,* 752-761.

Wilson, D. B., Bouffard, L. A., & MacKenzie, D. L. (2005). A quantitative review of structured, group-oriented, cognitive-behavioral programs for offenders. *Journal of Criminal Justice and Behavior,* 32(2), 172-204.

Zavlek, S. (2005). *Planning community-based facilities for violent juvenile offenders as part of a system of graduated sanctions*. Washington DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

| Appendix: List of All Recommendations Across the Before, During, and After Sections of Report |
|---|
| **BEFORE** |
| **Recommendation #1.1**<br>**Emphasize keeping youth in the community.** |
| **Recommendation #1.2**<br>**Prioritize prevention for at-risk youth through integrated services including schools, faith-based institutions, community policing, and children and family services.** |
| **Recommendation #1.3**<br>**Prioritize youth education and vocational training that equip youth to be self-sufficient.** |
| **Recommendation #1.4**<br>**Fund community-based substance abuse and mental health programs to address the needs of at-risk youth so that these youth never enter the juvenile justice system.** |
| **Recommendation #1.5**<br>**Offer special programs for children of incarcerated parents to help them develop a path to positive adulthood.** |
| **Recommendation #1.6**<br>**Require counties to primarily use evidence-based practices through financial incentives.** |
| **Recommendation #1.7**<br>**Ensure that youth and their families have adequate legal representation.** |
| **Recommendation #1.8**<br>**Fund, develop, and use alternatives to incarceration where appropriate, including mental health courts and drug courts.** |
| **Recommendation #1.9**<br>**Restrict detention to only those youth who have committed violent crimes and who are at-risk of flight and/or re-offending.** |
| **Recommendation #1.10**<br>**Detain youth for the shortest time-period possible, in cases where detention is essential.** |
| **Recommendation #1.11**<br>**Deter counties from using detention as an alternative to TYC placement.** |
| **Recommendation #1.12**<br>**Use consistent and accurate (i.e., reliable and validated) standardized risk and need assessment instruments to inform hearings (detention and otherwise) of juvenile offenders.** |
| **Recommendation #1.13**<br>**Assure that youth in juvenile detention who are eligible for Children's Health Insurance Program (CHIP) or Children's Medicaid receive health coverage immediately upon release so that they experience no delay in accessing health care, particularly community mental health services.** |
| **Recommendation #1.14**<br>**Redirect money saved on decreasing detention to prevention and community-based programs.** |
| **Recommendation #1.15**<br>**Ensure that all youth in detention receive appropriate federal and state mandated education services. Enrollment for services should not be delayed.** |
| **Recommendation #1.16**<br>**Monitor the use and construction of local detention facilities.** |
| **Recommendation #1.17**<br>**Rely more on probation at the county level, with an emphasis on the use of evidence-based community-based interventions.** |

| |
|---|
| **Recommendation #1.18**<br>**Avoid "Trail 'em. Nail 'em. and Jail 'em." supervision and surveillance strategies.** |
| **Recommendation #1.19**<br>**Consider expanding the use of specialized case loads for probation officers.** |
| **Recommendation #1.20**<br>**Carefully narrow the category of which juveniles may be sent to TYC.** |
| **Recommendation #1.21**<br>**Retain determinate sentencing but reserve it for the most serious youth.** |
| **Recommendation #1.22**<br>**Reform the certification of youth into the adult system so that anybody certified spends his or her youthful years (ages 14 to 19) in TYC prior to transfer to an adult correctional facility.** |
| **Recommendation #1.23**<br>**Implement a reverse transfer provision in order to provide judicial authority to send the case back to the juvenile system.** |
| **Recommendation #1.24**<br>**Improve information sharing between TYC and the Texas Department of Criminal Justice (TDCJ) to enable TDCJ to know which youth are being transferred pursuant to a determinate sentence, and in which programs they participated while in TYC.** |
| **DURING** |
| **Recommendation #2.1**<br>**Allocate adequate funding for facilities, rehabilitation and treatment programs, appropriate staffing ratios, education, and the training of employees.** |
| **Recommendation #2.2**<br>**Ensure that any appointed board and management receive adequate training in order to provide proper oversight and management of TYC facilities.** |
| **Recommendation #2.3**<br>**Formulate a Transitional Advisory Committee.** |
| **Recommendation #2.4**<br>**Convene an Advisory Board, regardless of structure, that is well-versed in the juvenile justice system, adolescent health and mental health treatment, law enforcement and education.** |
| **Recommendation #2.5**<br>**Create an entity within the state government or academia to provide objective research to state policymakers on juvenile and criminal justice issues, and to provide population and racial impact analyses of all proposed adult and juvenile justice legislation.** |
| **Recommendation #2.6**<br>**Create a system of accountability that allows an independent governmental office to investigate allegations of impropriety and to conduct routine inspections of facilities to assess conditions and the treatment of juveniles.** |
| **Recommendation #2.7**<br>**Support the newly established office of the Ombudsman.** |
| **Recommendation #2.8**<br>**Require that TYC facilities and programs be properly accredited and that the agency complies with a set of appropriate standards.** |
| **Recommendation #2.9**<br>**Administer a consumer satisfaction survey to youth currently housed in TYC facilities and at least one family member.** |
| **Recommendation #2.10**<br>**Make decisions on whether to admit youth to TYC facilities using objective, research-based risk** |

| |
|---|
| **assessment and classification.** |
| **Recommendation #2.11**<br>**Adopt the Juvenile Assessment and Intervention System (JAIS) at all TYC facilities.** |
| **Recommendation #2.12**<br>**Create a regionalized system of care that supports the use of small facilities.** |
| **Recommendation #2.13**<br>**Separate low-risk and high-risk offenders from one another, and separate vulnerable offenders from potential aggressors.** |
| **Recommendation #2.14**<br>**Consider the particular needs of girls in the design of juvenile justice programs and facilities.** |
| **Recommendation #2.15**<br>**Provide flexible and individualized care for youth in TYC.** |
| **Recommendation #2.16**<br>**Provide graduated levels of care (i.e., services and restrictions) within the TYC system that are driven by risk assessment and classification.** |
| **Recommendation #2.17**<br>**Ground the juvenile justice system with a clear focus on education.** |
| **Recommendation #2.18**<br>**Begin aftercare planning within the first 30 days of a youth being placed at TYC.** |
| **Recommendation #2.19**<br>**Promote an integrated health care model - to include physical, behavioral, and mental health - across TYC facilities.** |
| **Recommendation #2.20**<br>**Provide dually diagnosed youth – those identified as simultaneously having substance use disorders and comorbid psychiatric mental health disorders – with *integrated* treatment.** |
| **Recommendation #2.21**<br>**Provide specialized treatment to juvenile sex offenders.** |
| **Recommendation #2.22**<br>**Provide specialized treatment to substance-abusing juvenile offenders.** |
| **Recommendation #2.23**<br>**Adopt cognitive-behavioral therapy (CBT) as a core element of effective treatment.** |
| **Recommendation #2.24**<br>**Engage families in treatment.** |
| **Recommendation #2.25**<br>**Maintain a safe place for youth that embraces a non-violent approach.** |
| **Recommendation #2.26**<br>**Develop goals to carefully ration, supervise, and document the use of seclusion, restraints, chemical control agents, and the use of force generally.** |
| **Recommendation #2.27**<br>**Evaluate cost-effectiveness of the TYC system and make decisions using the "best use of resources" principle.** |
| **Recommendation #2.28**<br>**Ensure that the staff are an appropriately educated workforce who are youth-focused and strength-based in their approach.** |
| **Recommendation #2.29**<br>**Properly screen applicants for jobs, but do not automatically eliminate ex-offenders.** |
| **Recommendation #2.30**<br>**Establish and maintain an adequate youth-to-staff ratio using national best practice standards, aiming for a 1:10 ratio.** |

| **AFTER** |
|---|
| **Recommendation #3.1**<br>**Emphasize a community reentry model upon *entry* to TYC.** |
| **Recommendation #3.2**<br>**Reduce lengths of stay at TYC.** |
| **Recommendation #3.3**<br>**Establish a detailed, comprehensive, individual- ized plan 2 to 3 months in advance to seamlessly transition the youth from the TYC facility.** |
| **Recommendation #3.4**<br>**Use Community Resource Coordination Groups (CRCGs) to facilitate transition planning.** |
| **Recommendation #3.5**<br>**Use a Structured Decision Making (SDM) approach to transition and re-integration.** |
| **Recommendation #3.6**<br>**Shift from a Parole Model to a Local Boards (or Reentry) Model of aftercare.** |
| **Recommendation #3.7**<br>**Encourage the 81st Texas Legislature to reconsider passing a mental health parity bill that would require health plans to cover all mental illnesses on equal terms with physical illness.** |
| **Recommendation #3.8**<br>**Create a system of accountability.** |
| **Recommendation #3.9**<br>**Promote a strength-based rather than a failure-based model of aftercare.** |
| **Recommendation #3.10**<br>**Assess and monitor a youth's readiness to change his or her behavior, and tailor aftercare services accordingly.** |

# EXHIBIT B

# NUMBER OF REFERRALS AND ADMISSIONS TO SECURITY UNIT AT CORSICANA, RON JACKSON UNIT I AND UNIT 2

| | | | | | | | REASONS FOR ADMISSION (SEE KEY AT BOTTOM) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| INSTITUTION | MONTH | FACILITY ADP | SEX | REFERRALS TO SEC | ADMISSIONS TO SEC | AVE HRS HELD IN SEC | AH | BM | DO | DP | DS | EA | FT | IS | SR | VS | ZZ |
| CORSICANA RTC | 2004/09 | 197.40 | FEMALE | 212 | 65 | 34.38 | . | . | 6 | 1 | 34 | 1 | . | 23 | . | . | 147 |
| | | | MALE | 516 | 153 | 51.37 | 5 | . | 37 | . | 86 | 2 | . | 18 | 4 | 1 | 363 |
| | 2004/10 | 201.52 | FEMALE | 245 | 92 | 28.65 | 1 | . | 7 | . | 48 | . | . | 33 | 2 | 1 | 153 |
| | | | MALE | 651 | 207 | 44.49 | 5 | . | 35 | 2 | 110 | 5 | . | 38 | 5 | 7 | 444 |
| | 2004/11 | 198.33 | FEMALE | 178 | 78 | 42.56 | . | . | 12 | . | 43 | 2 | . | 21 | . | . | 100 |
| | | | MALE | 536 | 185 | 41.02 | . | . | 41 | . | 92 | 2 | . | 47 | 3 | . | 351 |
| | 2004/12 | 197.16 | FEMALE | 261 | 88 | 35.76 | . | . | 16 | . | 50 | . | . | 22 | . | . | 173 |
| | | | MALE | 511 | 126 | 88.13 | 1 | . | 24 | . | 68 | 4 | . | 24 | 5 | . | 385 |
| | 2005/01 | 197.32 | FEMALE | 294 | 98 | 41.28 | . | . | 14 | . | 52 | . | . | 30 | . | 2 | 196 |
| | | | MALE | 584 | 155 | 37.14 | 3 | . | 27 | . | 86 | 1 | . | 32 | 2 | 4 | 429 |
| | 2005/02 | 195.43 | FEMALE | 196 | 71 | 41.17 | 1 | . | 4 | . | 53 | . | . | 13 | . | . | 125 |
| | | | MALE | 561 | 126 | 44.67 | 1 | . | 24 | . | 65 | . | . | 33 | 3 | . | 435 |
| | 2005/03 | 197.16 | FEMALE | 206 | 83 | 76.71 | 4 | . | 7 | . | 51 | . | . | 18 | 1 | 2 | 123 |
| | | | MALE | 711 | 185 | 58.14 | . | 1 | 31 | 2 | 112 | . | . | 37 | 2 | . | 526 |
| | 2005/04 | 185.70 | FEMALE | 296 | 122 | 22.51 | 1 | . | 5 | . | 82 | 1 | . | 32 | 1 | . | 174 |
| | | | MALE | 470 | 140 | 66.04 | 2 | 2 | 21 | . | 81 | . | . | 32 | 2 | . | 330 |
| | 2005/05 | 191.74 | FEMALE | 306 | 158 | 42.30 | . | . | 6 | 1 | 125 | . | . | 25 | . | 1 | 148 |
| | | | MALE | 598 | 216 | 27.20 | . | . | 14 | . | 165 | 1 | . | 33 | 1 | 2 | 382 |
| | 2005/06 | 197.17 | FEMALE | 279 | 118 | 42.03 | 1 | . | 4 | . | 87 | . | . | 21 | 2 | 3 | 161 |
| | | | MALE | 531 | 185 | 56.02 | 1 | . | 25 | . | 124 | . | . | 32 | 2 | 1 | 346 |
| | 2005/07 | 195.29 | FEMALE | 234 | 122 | 24.80 | . | . | 2 | . | 105 | . | . | 13 | 1 | 1 | 112 |
| | | | MALE | 432 | 102 | 62.65 | . | . | 19 | . | 65 | . | . | 18 | . | . | 330 |
| | 2005/08 | 196.48 | FEMALE | 243 | 98 | 67.14 | 1 | . | 8 | . | 71 | . | . | 15 | 2 | 1 | 145 |
| | | | MALE | 487 | 152 | 66.72 | 1 | 1 | 32 | . | 95 | . | . | 21 | 1 | 1 | 335 |
| | 2005/09 | 206.83 | FEMALE | 196 | 100 | 32.36 | . | . | 8 | . | 71 | . | . | 19 | 2 | . | 96 |
| | | | MALE | 565 | 196 | 22.98 | 1 | . | 39 | 4 | 132 | . | . | 18 | 2 | . | 369 |
| | 2005/10 | 196.16 | FEMALE | 218 | 118 | 21.05 | . | . | 4 | . | 94 | . | . | 19 | 1 | . | 100 |
| | | | MALE | 498 | 185 | 51.38 | . | 1 | 29 | 1 | 133 | 1 | . | 19 | 1 | . | 313 |
| | 2005/11 | 194.80 | FEMALE | 198 | 98 | 20.24 | . | . | 11 | . | 61 | . | . | 23 | 2 | 1 | 100 |
| | | | MALE | 434 | 140 | 24.69 | . | 1 | 23 | . | 92 | . | . | 20 | 2 | 2 | 294 |
| | 2005/12 | 193.03 | FEMALE | 228 | 91 | 75.78 | . | . | 10 | . | 66 | . | . | 11 | 4 | . | 137 |
| | | | MALE | 516 | 162 | 33.91 | . | 1 | 29 | . | 93 | . | . | 30 | 9 | . | 354 |
| | 2006/01 | 195.71 | FEMALE | 151 | 49 | 59.22 | . | 1 | 10 | . | 24 | . | . | 14 | . | . | 102 |
| | | | MALE | 594 | 224 | 71.26 | 1 | 1 | 39 | . | 139 | 1 | . | 33 | 10 | . | 370 |
| | 2006/02 | 202.39 | FEMALE | 129 | 60 | 25.45 | . | . | 8 | . | 44 | . | . | 8 | . | . | 69 |
| | | | MALE | 504 | 244 | 33.82 | 5 | . | 52 | 2 | 150 | . | . | 19 | 16 | . | 260 |
| | 2006/03 | 199.42 | FEMALE | 175 | 69 | 40.68 | 3 | 1 | 6 | . | 47 | . | . | 10 | 2 | . | 106 |
| | | | MALE | 663 | 222 | 43.05 | 2 | . | 51 | 1 | 131 | 2 | . | 25 | 8 | 2 | 441 |
| | 2006/04 | 195.63 | FEMALE | 74 | 25 | 22.64 | . | . | 3 | . | 15 | . | . | 7 | . | . | 49 |
| | | | MALE | 452 | 160 | 59.56 | 1 | 1 | 48 | 1 | 94 | 2 | . | 11 | 2 | . | 292 |
| | 2006/05 | 195.13 | FEMALE | 129 | 62 | 21.18 | . | . | 7 | . | 38 | . | . | 17 | . | . | 67 |
| | | | MALE | 481 | 138 | 34.38 | 2 | 2 | 44 | . | 65 | . | . | 17 | 8 | . | 343 |
| | 2006/06 | 198.70 | FEMALE | 118 | 64 | 69.39 | . | . | 4 | . | 51 | . | . | 8 | 1 | . | 54 |
| | | | MALE | 458 | 141 | 71.23 | . | 2 | 53 | 1 | 73 | . | . | 10 | 2 | . | 317 |
| | 2006/07 | 198.97 | FEMALE | 71 | 46 | 49.04 | . | . | 2 | . | 33 | . | . | 8 | 2 | 1 | 25 |
| | | | MALE | 490 | 153 | 32.48 | . | 1 | 67 | 1 | 72 | . | . | 10 | 1 | 1 | 337 |
| | 2006/08 | 196.58 | FEMALE | 77 | 36 | 43.08 | . | . | 7 | . | 23 | . | . | 6 | . | . | 41 |

***ADMISSION CODES: DS=Disruption of Program, DO=Danger or Injury to Others, AH=Awaiting Hearing/ Transportation, BM=BMP, DP=Destruction of Property, FO=Arrest for Felony Offense, VS=Violating Security Program/Rules, SR=Self ReferralEA=Escape or Attempt, FT=Failure to Report, AR=Arrest for Other than Felony Offense, AD=Abscond, IS=Danger or Injury to Self/ Suicide Alert. ZZ=No Admission/Reason (referral only). Codes from CCS225 Incident form.***

***RUN 12OCT2007***

# NUMBER OF REFERRALS AND ADMISSIONS TO SECURITY UNIT AT CORSICANA, RON JACKSON UNIT I AND UNIT 2

| | | | | | | | REASONS FOR ADMISSION (SEE KEY AT BOTTOM) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| INSTITUTION | MONTH | FACILITY ADP | SEX | REFERRALS TO SEC | ADMISSIONS TO SEC | AVE HRS HELD IN SEC | AH | BM | DO | DP | DS | EA | FT | IS | SR | VS | ZZ |
| | | | MALE | 613 | 224 | 52.08 | . | . | 60 | 1 | 135 | . | . | 22 | 6 | . | 389 |
| | 2006/09 | 194.70 | FEMALE | 112 | 76 | 63.55 | . | 1 | 12 | . | 46 | . | . | 15 | 2 | . | 36 |
| | | | MALE | 383 | 143 | 51.73 | 2 | . | 33 | 2 | 91 | . | . | 9 | 5 | 1 | 240 |
| | 2006/10 | 196.81 | FEMALE | 113 | 37 | 46.38 | . | . | 4 | 1 | 18 | . | . | 14 | . | . | 76 |
| | | | MALE | 541 | 167 | 27.47 | 2 | 1 | 29 | . | 109 | 1 | . | 19 | 4 | 2 | 374 |
| | 2006/11 | 196.17 | FEMALE | 113 | 41 | 73.56 | 1 | 1 | 16 | . | 17 | . | . | 6 | . | . | 72 |
| | | | MALE | 417 | 168 | 44.58 | . | 1 | 41 | . | 109 | . | . | 12 | 3 | 2 | 249 |
| | 2006/12 | 195.32 | FEMALE | 116 | 51 | 61.41 | . | 1 | 8 | . | 29 | . | . | 13 | . | . | 65 |
| | | | MALE | 498 | 212 | 42.72 | . | 3 | 37 | . | 155 | 1 | . | 12 | 1 | 3 | 286 |
| | 2007/01 | 194.65 | FEMALE | 166 | 69 | 24.99 | . | . | 14 | . | 40 | . | . | 13 | 1 | 1 | 97 |
| | | | MALE | 598 | 272 | 28.64 | 3 | 3 | 46 | . | 193 | . | . | 24 | 3 | . | 326 |
| | 2007/02 | 193.32 | FEMALE | 137 | 69 | 72.23 | . | . | 15 | . | 36 | . | . | 17 | 1 | . | 68 |
| | | | MALE | 533 | 229 | 19.81 | . | 1 | 54 | . | 153 | 1 | . | 20 | . | . | 304 |
| | 2007/03 | 194.29 | FEMALE | 140 | 61 | 27.51 | 2 | . | 9 | . | 40 | . | . | 9 | 1 | . | 79 |
| | | | MALE | 635 | 240 | 29.60 | . | 1 | 53 | 4 | 146 | 2 | . | 29 | 5 | . | 395 |
| | 2007/04 | 175.03 | FEMALE | 245 | 72 | 40.60 | 1 | . | 6 | . | 48 | . | . | 9 | 8 | . | 173 |
| | | | MALE | 727 | 228 | 35.29 | . | 1 | 39 | 7 | 134 | . | . | 37 | 9 | 1 | 499 |
| | 2007/05 | 154.87 | FEMALE | 216 | 68 | 42.62 | 1 | 1 | 11 | . | 40 | . | . | 11 | 2 | 2 | 148 |
| | | | MALE | 721 | 127 | 22.93 | . | 1 | 37 | . | 66 | . | . | 20 | 2 | 1 | 594 |
| | 2007/06 | 145.43 | FEMALE | 160 | 39 | 67.51 | . | . | 6 | . | 23 | . | . | 10 | . | . | 121 |
| | | | MALE | 727 | 140 | 33.58 | . | 1 | 28 | 3 | 87 | . | . | 17 | 4 | . | 587 |
| | 2007/07 | 127.90 | FEMALE | 93 | 25 | 50.52 | . | . | 4 | . | 12 | . | . | 9 | . | . | 68 |
| | | | MALE | 395 | 78 | 28.22 | . | . | 24 | 1 | 38 | . | . | 14 | 1 | . | 317 |
| | 2007/08 | 144.55 | FEMALE | 107 | 23 | 43.39 | 1 | . | 3 | 1 | 12 | . | . | 6 | . | . | 84 |
| | | | MALE | 598 | 140 | 29.93 | . | 1 | 40 | 3 | 68 | . | . | 25 | 2 | 1 | 458 |
| | 2007/09 | 144.13 | FEMALE | 100 | 30 | 61.97 | 2 | . | 3 | . | 18 | . | . | 5 | 2 | . | 70 |
| | | | MALE | 503 | 146 | 24.55 | 1 | 1 | 54 | . | 68 | . | . | 20 | 2 | . | 357 |
| RON JACKSON SJCC UT1 | 2004/09 | 365.23 | FEMALE | 212 | 67 | 13.09 | . | . | 13 | . | 39 | . | . | 14 | 1 | . | 145 |
| | | | MALE | 904 | 262 | 37.31 | 8 | 1 | 88 | 3 | 124 | . | . | 7 | 31 | . | 642 |
| | 2004/10 | 363.39 | FEMALE | 260 | 95 | 19.58 | 1 | . | 15 | . | 58 | . | . | 15 | 6 | . | 165 |
| | | | MALE | 865 | 246 | 33.11 | 16 | 1 | 72 | 1 | 136 | 1 | . | 5 | 14 | . | 619 |
| | 2004/11 | 363.90 | FEMALE | 270 | 75 | 17.99 | . | . | 16 | . | 39 | . | . | 16 | 4 | . | 195 |
| | | | MALE | 769 | 286 | 47.99 | 21 | 1 | 84 | 2 | 148 | 3 | . | 16 | 11 | . | 483 |
| | 2004/12 | 351.10 | FEMALE | 257 | 92 | 37.68 | 1 | . | 24 | . | 46 | . | . | 12 | 9 | . | 165 |
| | | | MALE | 981 | 318 | 57.78 | 4 | 2 | 86 | . | 198 | 1 | . | 12 | 15 | . | 663 |
| | 2005/01 | 351.13 | FEMALE | 272 | 77 | 12.75 | . | . | 27 | . | 32 | . | . | 15 | 3 | . | 195 |
| | | | MALE | 770 | 224 | 48.83 | 2 | . | 52 | 1 | 151 | . | . | 12 | 6 | . | 546 |
| | 2005/02 | 347.14 | FEMALE | 337 | 116 | 23.61 | 1 | . | 41 | . | 58 | . | . | 15 | 1 | . | 221 |
| | | | MALE | 796 | 254 | 29.54 | 10 | . | 87 | . | 133 | . | . | 9 | 15 | . | 542 |
| | 2005/03 | 351.13 | FEMALE | 361 | 128 | 17.98 | . | . | 38 | . | 62 | . | . | 24 | 4 | . | 233 |
| | | | MALE | 929 | 269 | 41.35 | 18 | 2 | 73 | . | 124 | 1 | . | 11 | 40 | . | 660 |
| | 2005/04 | 368.47 | FEMALE | 397 | 88 | 21.89 | . | . | 17 | . | 52 | . | . | 13 | 6 | . | 309 |
| | | | MALE | 990 | 266 | 56.85 | 24 | 1 | 85 | 2 | 114 | 1 | . | 13 | 26 | . | 724 |
| | 2005/05 | 389.87 | FEMALE | 420 | 94 | 16.14 | . | . | 18 | . | 48 | . | . | 25 | 3 | . | 326 |
| | | | MALE | 963 | 287 | 50.61 | 19 | 1 | 116 | . | 121 | . | . | 12 | 18 | . | 676 |
| | 2005/06 | 391.93 | FEMALE | 332 | 76 | 16.26 | . | . | 17 | . | 42 | . | . | 15 | 2 | . | 256 |
| | | | MALE | 901 | 259 | 59.21 | 14 | 1 | 101 | . | 126 | . | . | 10 | 7 | . | 642 |

***ADMISSION CODES: DS=Disruption of Program, DO=Danger or Injury to Others, AH=Awaiting Hearing/ Transportation, BM=BMP, DP=Destruction of Property, FO=Arrest for Felony Offense, VS=Violating Security Program/Rules, SR=Self ReferralEA=Escape or Attempt, FT=Failure to Report, AR=Arrest for Other than Felony Offense, AD=Abscond, IS=Danger or Injury to Self/ Suicide Alert. ZZ=No Admission/Reason (referral only). Codes from CCS225 Incident form.***

***RUN 12OCT2007***

# NUMBER OF REFERRALS AND ADMISSIONS TO SECURITY UNIT AT CORSICANA, RON JACKSON UNIT I AND UNIT 2

| | | | | | | | REASONS FOR ADMISSION (SEE KEY AT BOTTOM) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| INSTITUTION | MONTH | FACILITY ADP | SEX | REFERRALS TO SEC | ADMISSIONS TO SEC | AVE HRS HELD IN SEC | AH | BM | DO | DP | DS | EA | FT | IS | SR | VS | ZZ |
| | 2005/07 | 388.97 | FEMALE | 316 | 92 | 16.50 | . | . | 15 | . | 51 | . | . | 26 | . | . | 224 |
| | | | MALE | 767 | 224 | 36.18 | 14 | 1 | 83 | 2 | 107 | . | . | 7 | 10 | . | 543 |
| | 2005/08 | 387.61 | FEMALE | 337 | 76 | 15.70 | . | . | 9 | . | 48 | . | . | 11 | 8 | . | 261 |
| | | | MALE | 807 | 236 | 88.66 | 8 | 2 | 101 | 2 | 103 | . | . | 3 | 17 | . | 571 |
| | 2005/09 | 396.13 | FEMALE | 321 | 101 | 32.64 | . | 1 | 26 | . | 49 | . | . | 18 | 7 | . | 220 |
| | | | MALE | 615 | 199 | 56.32 | 14 | 1 | 81 | . | 89 | . | . | 11 | 3 | . | 416 |
| | 2005/10 | 373.03 | FEMALE | 244 | 56 | 11.98 | . | . | 12 | . | 35 | . | . | 9 | . | . | 188 |
| | | | MALE | 851 | 241 | 42.26 | 2 | 3 | 111 | . | 112 | . | . | 6 | 7 | . | 610 |
| | 2005/11 | 374.30 | FEMALE | 240 | 62 | 10.31 | . | . | 11 | . | 37 | . | . | 12 | 2 | . | 178 |
| | | | MALE | 851 | 276 | 47.19 | 6 | 2 | 113 | 1 | 143 | . | . | 5 | 5 | 1 | 575 |
| | 2005/12 | 376.42 | FEMALE | 250 | 86 | 62.99 | . | . | 18 | . | 45 | . | . | 22 | 1 | . | 164 |
| | | | MALE | 1039 | 280 | 61.39 | 12 | 2 | 100 | 2 | 138 | 9 | 1 | 6 | 10 | . | 759 |
| | 2006/01 | 377.29 | FEMALE | 293 | 93 | 15.87 | . | . | 15 | . | 45 | . | . | 32 | . | 1 | 200 |
| | | | MALE | 858 | 315 | 53.79 | 19 | 4 | 129 | 1 | 147 | 1 | . | 7 | 7 | . | 543 |
| | 2006/02 | 382.21 | FEMALE | 200 | 60 | 14.78 | . | . | 11 | . | 35 | . | . | 14 | . | . | 140 |
| | | | MALE | 798 | 296 | 57.56 | 7 | 1 | 127 | . | 154 | 2 | . | 5 | . | . | 502 |
| | 2006/03 | 386.29 | FEMALE | 301 | 98 | 16.43 | . | . | 14 | . | 68 | . | . | 12 | 4 | . | 203 |
| | | | MALE | 885 | 388 | 27.84 | 9 | 1 | 151 | 2 | 207 | 2 | . | 9 | 7 | . | 497 |
| | 2006/04 | 365.27 | FEMALE | 273 | 91 | 25.18 | . | 1 | 17 | . | 60 | . | . | 10 | 3 | . | 182 |
| | | | MALE | 818 | 332 | 26.93 | 8 | 2 | 128 | 1 | 181 | . | . | 1 | 11 | . | 486 |
| | 2006/05 | 373.06 | FEMALE | 176 | 77 | 19.78 | . | 1 | 14 | . | 44 | . | . | 15 | 3 | . | 99 |
| | | | MALE | 698 | 289 | 38.95 | 20 | 1 | 82 | 1 | 171 | . | . | 8 | 6 | . | 409 |
| | 2006/06 | 367.23 | FEMALE | 219 | 78 | 40.86 | 1 | 2 | 15 | . | 48 | . | . | 9 | 2 | 1 | 141 |
| | | | MALE | 808 | 310 | 37.28 | 14 | . | 92 | 4 | 184 | 2 | . | 5 | 9 | . | 498 |
| | 2006/07 | 361.68 | FEMALE | 180 | 69 | 13.59 | . | . | 16 | 1 | 46 | . | . | 6 | . | . | 111 |
| | | | MALE | 841 | 266 | 49.08 | 4 | 3 | 113 | 2 | 134 | . | . | 7 | 3 | . | 575 |
| | 2006/08 | 369.87 | FEMALE | 213 | 64 | 31.36 | . | 1 | 20 | 1 | 35 | . | . | 3 | 4 | . | 149 |
| | | | MALE | 978 | 279 | 36.93 | 9 | 1 | 115 | 1 | 127 | . | . | 13 | 13 | . | 699 |
| | 2006/09 | 369.90 | FEMALE | 164 | 69 | 10.45 | . | . | 17 | . | 43 | . | . | 6 | 3 | . | 95 |
| | | | MALE | 944 | 284 | 22.90 | 1 | . | 104 | 1 | 152 | . | . | 10 | 16 | . | 660 |
| | 2006/10 | 368.94 | FEMALE | 144 | 54 | 23.44 | . | . | 15 | . | 28 | . | . | 10 | 1 | . | 90 |
| | | | MALE | 1106 | 325 | 28.42 | 3 | 1 | 121 | 1 | 179 | . | . | 5 | 15 | . | 781 |
| | 2006/11 | 378.17 | FEMALE | 155 | 55 | 29.65 | . | . | 15 | . | 30 | . | . | 7 | 3 | . | 100 |
| | | | MALE | 975 | 322 | 48.45 | 10 | . | 125 | 1 | 165 | . | . | 10 | 11 | . | 653 |
| | 2006/12 | 377.26 | FEMALE | 152 | 54 | 11.50 | . | . | 7 | 1 | 35 | . | . | 6 | 5 | . | 98 |
| | | | MALE | 821 | 259 | 52.92 | 6 | 2 | 100 | . | 135 | . | . | 6 | 10 | . | 562 |
| | 2007/01 | 378.29 | FEMALE | 169 | 57 | 20.30 | 1 | . | 13 | . | 37 | . | . | 3 | 3 | . | 112 |
| | | | MALE | 824 | 256 | 31.21 | 3 | 1 | 94 | . | 144 | 1 | . | 3 | 10 | . | 568 |
| | 2007/02 | 356.18 | FEMALE | 144 | 70 | 26.23 | . | 1 | 13 | 1 | 50 | . | . | 4 | 1 | . | 74 |
| | | | MALE | 824 | 302 | 26.94 | 9 | . | 124 | 3 | 149 | . | . | 9 | 8 | . | 522 |
| | 2007/03 | 355.74 | FEMALE | 154 | 50 | 71.34 | . | 1 | 20 | . | 23 | . | . | 6 | . | . | 104 |
| | | | MALE | 953 | 259 | 23.53 | 10 | . | 120 | 2 | 105 | 1 | . | 2 | 19 | . | 694 |
| | 2007/04 | 314.10 | FEMALE | 152 | 54 | 14.17 | . | . | 10 | . | 35 | . | . | 7 | 2 | . | 98 |
| | | | MALE | 1059 | 379 | 13.98 | 8 | 1 | 110 | 1 | 209 | . | . | 17 | 32 | 1 | 680 |
| | 2007/05 | 257.58 | FEMALE | 211 | 97 | 17.64 | . | . | 13 | . | 64 | . | . | 17 | 3 | . | 114 |
| | | | MALE | 560 | 294 | 21.23 | 13 | 1 | 108 | . | 164 | . | . | 4 | 3 | 1 | 266 |
| | 2007/06 | 201.37 | FEMALE | 298 | 141 | 13.07 | . | . | 18 | . | 99 | . | . | 14 | 10 | . | 157 |

***ADMISSION CODES: DS=Disruption of Program, DO=Danger or Injury to Others, AH=Awaiting Hearing/ Transportation, BM=BMP, DP=Destruction of Property, FO=Arrest for Felony Offense, VS=Violating Security Program/Rules, SR=Self ReferralEA=Escape or Attempt, FT=Failure to Report, AR=Arrest for Other than Felony Offense, AD=Abscond, IS=Danger or Injury to Self/ Suicide Alert. ZZ=No Admission/Reason (referral only). Codes from CCS225 Incident form.***

***RUN 12OCT2007***

# NUMBER OF REFERRALS AND ADMISSIONS TO SECURITY UNIT AT CORSICANA, RON JACKSON UNIT I AND UNIT 2

| | | | | | | | REASONS FOR ADMISSION (SEE KEY AT BOTTOM) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| INSTITUTION | MONTH | FACILITY ADP | SEX | REFERRALS TO SEC | ADMISSIONS TO SEC | AVE HRS HELD IN SEC | AH | BM | DO | DP | DS | EA | FT | IS | SR | VS | ZZ |
| | | | MALE | 195 | 80 | 29.11 | 8 | . | 14 | . | 53 | . | . | . | 5 | . | 115 |
| | 2007/07 | 191.23 | FEMALE | 438 | 188 | 18.24 | 1 | . | 40 | 1 | 115 | . | . | 21 | 9 | 1 | 250 |
| | | | MALE | 139 | 73 | 28.77 | 13 | . | 5 | . | 51 | . | . | . | 4 | . | 66 |
| | 2007/08 | 216.13 | FEMALE | 341 | 119 | 21.96 | . | 2 | 21 | 1 | 66 | . | . | 21 | 8 | . | 222 |
| | | | MALE | 270 | 125 | 15.24 | 8 | . | 50 | 1 | 61 | . | . | 3 | 2 | . | 145 |
| | 2007/09 | 168.13 | FEMALE | 269 | 100 | 15.90 | . | 3 | 16 | . | 65 | . | . | 12 | 3 | 1 | 169 |
| | | | MALE | 35 | 18 | 27.56 | 11 | . | 1 | . | 6 | . | . | . | . | . | 17 |
| RON JACKSON SJCC UT2 | 2004/09 | 115.67 | FEMALE | 187 | 154 | 46.82 | 2 | 1 | 8 | . | 98 | . | . | 39 | 6 | . | 33 |
| | 2004/10 | 118.13 | FEMALE | 218 | 169 | 18.64 | 4 | 1 | 6 | . | 94 | . | . | 57 | 7 | . | 49 |
| | 2004/11 | 113.20 | FEMALE | 212 | 155 | 27.56 | . | 1 | 16 | . | 90 | . | . | 39 | 9 | . | 57 |
| | 2004/12 | 112.77 | FEMALE | 219 | 164 | 36.20 | . | 2 | 14 | . | 84 | . | . | 56 | 8 | . | 55 |
| | 2005/01 | 113.68 | FEMALE | 233 | 178 | 22.95 | 3 | 1 | 20 | . | 93 | . | . | 50 | 11 | . | 55 |
| | 2005/02 | 108.21 | FEMALE | 271 | 203 | 19.57 | 1 | 3 | 16 | . | 118 | . | . | 52 | 13 | . | 68 |
| | 2005/03 | 109.00 | FEMALE | 443 | 325 | 15.14 | 1 | 1 | 33 | 1 | 207 | . | . | 74 | 8 | . | 118 |
| | 2005/04 | 112.80 | FEMALE | 395 | 275 | 14.43 | 1 | 2 | 22 | . | 178 | . | . | 64 | 8 | . | 120 |
| | 2005/05 | 113.52 | FEMALE | 332 | 223 | 17.31 | 2 | 1 | 25 | . | 138 | . | . | 52 | 5 | . | 109 |
| | 2005/06 | 120.63 | FEMALE | 421 | 297 | 17.33 | 2 | . | 29 | . | 169 | . | . | 78 | 19 | . | 124 |
| | 2005/07 | 117.90 | FEMALE | 230 | 156 | 45.89 | 1 | 1 | 20 | . | 97 | . | . | 32 | 5 | . | 74 |
| | 2005/08 | 116.19 | FEMALE | 275 | 209 | 14.54 | . | . | 20 | 1 | 134 | . | . | 43 | 11 | . | 66 |
| | 2005/09 | 115.23 | FEMALE | 227 | 160 | 13.07 | . | . | 11 | . | 121 | . | . | 23 | 5 | . | 67 |
| | 2005/10 | 111.81 | FEMALE | 242 | 180 | 42.88 | 4 | 2 | 29 | 1 | 102 | . | . | 37 | 5 | . | 62 |
| | 2005/11 | 110.07 | FEMALE | 168 | 139 | 64.86 | 1 | 1 | 18 | . | 86 | . | . | 32 | 1 | . | 29 |
| | 2005/12 | 110.65 | FEMALE | 202 | 165 | 47.95 | 2 | 2 | 22 | . | 95 | . | . | 43 | 1 | . | 37 |
| | 2006/01 | 111.77 | FEMALE | 234 | 180 | 34.41 | 2 | 1 | 29 | . | 113 | . | . | 33 | 2 | . | 54 |
| | 2006/02 | 115.61 | FEMALE | 178 | 140 | 24.06 | . | 1 | 18 | . | 93 | . | . | 25 | 3 | . | 38 |
| | 2006/03 | 116.23 | FEMALE | 190 | 149 | 18.91 | 2 | . | 15 | . | 102 | . | . | 21 | 9 | . | 41 |
| | 2006/04 | 121.70 | FEMALE | 191 | 143 | 32.78 | . | 2 | 11 | . | 106 | . | . | 16 | 7 | 1 | 48 |
| | 2006/05 | 124.23 | FEMALE | 202 | 159 | 16.76 | 2 | . | 26 | . | 100 | . | . | 25 | 6 | . | 43 |
| | 2006/06 | 125.87 | FEMALE | 186 | 142 | 27.39 | 1 | 2 | 27 | . | 85 | . | . | 27 | . | . | 44 |
| | 2006/07 | 120.48 | FEMALE | 126 | 108 | 21.09 | . | . | 17 | . | 80 | . | . | 9 | 2 | . | 18 |
| | 2006/08 | 119.29 | FEMALE | 157 | 119 | 17.47 | . | . | 8 | . | 82 | . | . | 27 | 2 | . | 38 |
| | 2006/09 | 115.47 | FEMALE | 139 | 105 | 40.11 | . | 1 | 8 | . | 77 | . | . | 16 | 3 | . | 34 |
| | 2006/10 | 120.87 | FEMALE | 147 | 103 | 32.18 | 1 | 2 | 9 | . | 69 | . | . | 21 | 1 | . | 44 |
| | 2006/11 | 121.50 | FEMALE | 166 | 127 | 24.82 | . | . | 23 | . | 84 | . | . | 20 | . | . | 39 |
| | 2006/12 | 118.42 | FEMALE | 130 | 97 | 20.35 | 1 | 1 | 10 | . | 68 | . | . | 16 | . | 1 | 33 |
| | 2007/01 | 108.23 | FEMALE | 211 | 155 | 26.45 | . | . | 25 | 1 | 111 | . | . | 17 | 1 | . | 56 |
| | 2007/02 | 109.00 | FEMALE | 175 | 123 | 40.56 | 1 | 2 | 16 | . | 87 | . | . | 13 | 4 | . | 52 |
| | 2007/03 | 115.97 | FEMALE | 218 | 152 | 22.87 | 1 | 1 | 33 | . | 88 | . | . | 27 | 2 | . | 66 |
| | 2007/04 | 106.03 | FEMALE | 186 | 132 | 13.83 | . | . | 23 | . | 86 | . | . | 19 | 3 | 1 | 54 |
| | 2007/05 | 101.32 | FEMALE | 206 | 144 | 20.59 | 3 | . | 15 | . | 95 | . | . | 27 | 2 | 2 | 62 |
| | 2007/06 | 82.70 | FEMALE | 121 | 79 | 59.19 | . | 2 | 16 | . | 51 | . | . | 5 | 5 | . | 42 |
| | 2007/07 | 75.97 | FEMALE | 158 | 100 | 21.68 | . | . | 15 | . | 64 | . | . | 15 | 6 | . | 58 |
| | 2007/08 | 82.23 | FEMALE | 223 | 153 | 16.74 | 2 | . | 24 | . | 95 | 2 | . | 29 | 1 | . | 70 |
| | 2007/09 | 76.03 | FEMALE | 180 | 108 | 24.54 | . | 1 | 16 | . | 77 | . | . | 13 | 1 | . | 72 |

***ADMISSION CODES: DS=Disruption of Program, DO=Danger or Injury to Others, AH=Awaiting Hearing/ Transportation, BM=BMP, DP=Destruction of Property, FO=Arrest for Felony Offense, VS=Violating Security Program/Rules, SR=Self ReferralEA=Escape or Attempt, FT=Failure to Report, AR=Arrest for Other than Felony Offense, AD=Abscond, IS=Danger or Injury to Self/ Suicide Alert. ZZ=No Admission/Reason (referral only). Codes from CCS225 Incident form.***

***RUN 12OCT2007***